Karl G. Anuta, WSBA No. 21346
Law Office of Karl G. Anuta, PC
735 S.W. First Ave., Second Floor
Portland, Oregon 97204
Phone (503) 827-0320
Fax (503) 228-6551
kga@integra.net

Thane Tienson, WSBA No. 13310
Landye Bennett, Blumstein
1300 SW 5th Avenue, Suite 3500
Portland, Oregon 97201
Phone (503) 224-4100
Fax (503) 224-4133
ttienson@lbblawyers.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THE COALITION TO PROTECT PUGET SOUND HABITAT, a non-profit Corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>U.S. ARMY CORPS OF ENGINEERS, an agency of the United States of America, LIEUTENANT GENERAL TODD T. SEMONITE in his Official Capacity as Chief of Engineers of the U.S. Army Corps of Engineers; BRIGADIER GENERAL SCOTT A. SPELLMON, in his Official Capacity as COMMANDER of the Northwestern Division of the U.S. Army Corps of Engineers; and COLONEL JOHN G. BUCK, in his Official Capacity as Commander of the Seattle District of the U.S. Army Corps of Engineers,<br><br>                    Defendants. | Case No.<br><br>COMPLAINT<br>(Environmental and Administrative Procedure Act Claims) |

Page 1 - COMPLAINT

**SUMMARY**

1.

This action is an as-applied challenge to decisions of the United States Army Corps of Engineers (hereafter "the Corps") authorizing commercial aquaculture operations on the shores of the Puget Sound under Nationwide Permit 48 (hereafter "NWP 48").  The challenges are based on the defendants' actions and failures to comply with the National Environmental Policy Act ("NEPA"), and/or the Clean Water Act ("CWA"), and/or the Administrative Procedure Act (APA), in making those decisions.

2.

Defendants violated NEPA because they: (i) improperly determined that activities authorized under 2012 NWP 48 would not significantly adversely affect the environment; (ii) conducted permitting actions in a manner other than specified in their environmental documents; and (iii) failed to prepare supplemental environmental documents despite the occurrence of significant new circumstances relevant to environmental effects of the authorized activities.  Defendants violated the CWA in the issuance and administration of 2012 NWP 48, by authorizing activities that result in more than minimal adverse environmental effects and contribute to significant degradation of waters of the United States.  Defendants violated the APA by making arbitrary and capricious decisions not in accordance with law, and by unreasonably withholding or delaying action on a pending Petition filed by Plaintiff with Defendants, seeking suspension or revocation of 2012 NWP 48 in Puget Sound.

3.

By initiating this action, Plaintiff seeks to:

(a)     Obtain a declaration that the Corps violated NEPA and its implementing regulations when it improperly found that activities in Puget Sound authorized under NWP 48 would not significantly adversely affect the environment, and decided not to prepare an EIS;

(b)     Obtain a declaration that the Corps violated NEPA and its implementing regulations, when it failed to prepare a supplemental environmental document following the dramatic increase in the number of activities in Puget Sound authorized (or seeking authorization) under NWP 48;

(c)     Obtain a declaration the Corps violated the Clean Water Act and its implementing regulations, when it issued NWP 48;

(d)     Obtain a declaration that the Corps violated the Clean Water Act and its implementing regulations, when it failed to take required actions to ensure that activities authorized under NWP 48 would have minimal adverse effects on the environment and not significantly degrade waters of the United States;

(e)     Obtain a declaration that the Corps violated the Clean Water Act and its implementing regulations, when it verified that certain activities in Puget Sound are authorized under NWP 48;

(f)     Obtain an order vacating, setting aside, and/or remanding the Corps' most recent authorizations that certain activities are authorized under NWP 48;

(g)     Obtain an order directing the Corps to advise prospective permittees under NWP 48 in Puget Sound to seek authorization through an individual permit, instead of under NWP 48;

(h)     Obtain an order directing the Corps to act upon Plaintiff's Petition to revoke or suspend NWP 48 in Puget Sound; and

(i)     Obtain an order enjoining the Corps from issuing any further authorizations under NWP 48 in Puget Sound, until the Corps complies with NEPA by producing a new supplemental environmental document, and/or complies with the CWA by completing adequate effects analyses, to ensure that authorized activities will have minimal effects on the environment and comply with 33 U.S.C. § 1344(b)(1) and the regulations adopted pursuant to that law.

## JURISDICTION

4.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against agent of the United States); 28 U.S.C. § 1361 (action to compel officer of United States to perform his or her duty); 28 U.S.C. § 2201 (declaratory relief); and 28 U.S.C. § 2202, (injunctive relief).  This cause of action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.* An actual, justiciable controversy exists between Plaintiff and Defendants.  The requested relief is proper under 28 U.S.C. §§ 2201, 2202, and 2412, and 5 U.S.C. §§

705 and 706.

## VENUE

5.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).  A substantial part of the events or omissions giving rise to the claims occurred within this District. The U.S. Army Corps' office that is responsible for substantial portions of the actions or omissions giving rise to this case is also located in this judicial District, in Seattle, King County, Washington.  In addition, Plaintiff's office is located in and a number of Plaintiff's members reside in, this judicial District.

## PARTIES

6.

Plaintiff THE COALITION TO PROTECT PUGET SOUND HABITAT ("Coalition") is a non-profit organization incorporated under the laws of the state of Washington and recognized by the Internal Revenue Service as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code. The Coalition is an alliance of interested citizens, environmentalists, scientists, and recreational users who reside on or near Puget Sound, and study, work to protect and recreate in the waters of Puget Sound.  Plaintiff and its members are concerned about the expanding aquaculture in both the nearshore environment and public waters of Puget Sound, and its impact on plants, animals and ecological function.  Plaintiff and its members are also concerned about the impact of currently approved and expanding aquaculture on their recreational activities and aesthetic enjoyment both near their homes and throughout the areas of the Sound that they visit.  Plaintiff and/or its member has repeatedly commented to the

Corps, both before the issuance of the 2012 NWP 48 and before the issuance of the individual authorization at issue in this case, raising these types of concerns.

7.

The Coalition seeks to give a voice to citizens' concerns about aquaculture and its impact on the health and quality of the shoreline and waters of Puget Sound, as well as the flora and fauna that depend upon these irreplaceable resources. Members of the Coalition live in and/or use Puget Sound and are and will be directly and adversely affected by the rapid and massive expansion of the aquaculture industry of the type at issue under NWP 48. This type of expansion can potentially undermine the protection and enhancement of the quality of the waters of Puget Sound, as well as the many plant and marine species that depend upon those waters for food and habitat. As such, the industrialization of aquaculture that is being allowed by the Seattle District of the Corps interferes with the ability of the plaintiff's members to enjoy and recreate in the waters of the Sound.

8.

Plaintiff has representational standing to bring this action. The Defendants' violations of the CWA, APA and NEPA have had an adverse impact on Plaintiff's members' ability to use and enjoy the waters of Puget Sound, and the Defendants' actions have injured the health, recreational, environmental, aesthetic, commercial and/or other interests of Plaintiff's members. These injuries are fairly traceable to the Defendants' violations, and are capable of redress by this Court.

9.

Plaintiff also has organizational standing to bring this action. Plaintiff has long

been engaged in a variety of educational and advocacy efforts to call attention to and challenge the dramatic expansion of the commercial shellfish industry in Puget Sound, so as to try to improve water quality and ecological function in its waters. This has included filing of a Petition with the Corps in May 2015 to suspend or revoke NWP 48. The Defendants' failures to comply with the requirements of the law have or will adversely affect Plaintiff's abilities to fulfill its mission and purpose, and these injuries are fairly traceable to Defendants' violations. These injuries are also capable of redress by this Court.

10.

Defendant UNITED STATES ARMY CORPS OF ENGINEERS ("Corps") is an agency of the U.S. Department of Defense. The Corps has a District Office in Seattle, Washington. The Corps and its officers are responsible for the lawful execution of the CWA, NEPA, and the APA, in so far as those laws pertain to issuing permits for dredging and filling-in public waters.

11.

Defendant LIEUTENANT GENERAL TODD T. SEMONITE is the Commanding General and Chief of Engineers of the Corps. The Commanding General and Chief of Engineers is charged with the supervision and management of all Corps decisions and actions, including the evaluation of Corps decisions and actions under NEPA and § 404 of the CWA, which are the subject of this lawsuit. The Chief of Engineers is authorized to issue a NWP. The Chief of Engineers is charged with reviewing NWPs and proposing modifications, revocations, and reissuance, as well as preparing NEPA documents and Section 404(b)(1) Guidelines compliance analyses for proposed

NWPs. Both Lieutenant General Thomas P. Bostick and before him Major General Merdith W.B. Temple were Chief of Engineers during a substantial portion of the actions or omissions at issue in this lawsuit. Lieutenant General Semonite replaced Lieutenant General Bostick prior to the filing of this lawsuit.

12.

Defendant BRIGADIER GENERAL SCOTT A. SPELLMON is the Commander and Division Engineer of the Northwestern Division of the Corps. Division Engineers are authorized to modify, suspend, or revoke NWP authorizations within their divisions and are responsible for preparing supplemental documentation for modifications or revocations made as a result of their authority.  According to the Corps, regional conditions are imposed by Division Engineers at their discretion and Corps Headquarters cannot mandate the adoption of regional conditions.  The Northwestern Division is responsible for a substantial portion of the actions or omissions at issue in this lawsuit, including the regional effects analysis and determination that NWP 48, as well as the terms and conditions, all regional conditions, and limitations, and the finding that NWP 48 allegedly would have only minimal and not significant effects on the aquatic environment here. The Northwestern Division includes the Seattle District. Brigadier Generals John S. Kem and John R. McMahon were Commanders and Division Engineers of the Northwestern Division during a substantial portion of the actions or omissions at issue in this lawsuit. Brigadier General Spellman replaced Brigadier General Kem prior to the filing of this lawsuit.

13.

Defendant COLONEL JOHN G. BUCK is the Commander and District Engineer

of the Seattle, Washington District of the Corps. Under Corps regulations, a District

Commander is responsible for compliance with NEPA for actions within district

boundaries.  The Seattle District of the Corps administers Section 404 permitting in

Puget Sound. The Seattle District is responsible for a substantial portion of the actions

or omissions at issue in this lawsuit, including, but not limited to, the issuance of

regional conditions for NWP 48, findings in support of those conditions, responding to

requests for authorization and pre-construction notifications for NWP 48, in Puget

Sound and issuance or denials of authorizations that activities proposed for Puget

Sound are (or are not) authorized under NWP 48.  The Seattle District Engineer is

authorized to add, modify, suspend, or revoke a case specific activity's authorization

under an NWP.  Colonel Bruce A. Estok was actually Seattle District Engineer during a

substantial portion of the actions or omissions at issue in this lawsuit. Colonel Buck

replaced Colonel Estok prior to the filing of this lawsuit.

## LEGAL BACKGROUND

### A.      The Administrative Procedure Act

14.

The APA, 5 U.S.C. §§ 701–706, confers a right of judicial review on any person

adversely affected by agency action.  The APA provides a cause of action to challenge

any final agency action taken pursuant to any statute where the action is made

reviewable by that statute, or where there is no other adequate remedy in a court.  The

APA also authorizes a reviewing court to compel agency action that is unlawfully

withheld or unreasonably delayed.  Pursuant to APA § 706(2)(A) and (D), a court must

set aside and hold unlawful agency action found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

15.

Neither NEPA, nor the CWA, contain a specific private right of action applicable to Plaintiff's claims.  As a result, those claims are reviewable under the APA.

**B.    The Clean Water Act**

16.

The objective of CWA 33 U.S.C. §§ 1251–1387 is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.  As part of implementing that objective, the CWA prohibits the unauthorized discharge of a pollutant to navigable waters from a point source.  A person discharging dredged or fill material into a wetland or water of the U.S. must first obtain a Section 404 permit from the Corps.  Section 404 of the CWA, 33 U.S.C. § 1344, authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into water of the United States when certain conditions are met.  Attached as Exhibit A, and incorporated into this complaint by reference, is an excerpt of a presentation that the Seattle District of the Corps made in April 2016 wherein the District confirmed on page 12 of that presentation (page 2 of Ex. A) its understanding of the Regulatory Authority of the District under Section 404.

17.

Under 33 U.S.C. § 1344(e)(1), the Corps can issue a single permit for a class of polluters, if actions "in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal

cumulative adverse effects on the environment."  These permits can be issued to a class of discharges on the state, regional, or nationwide basis.  Permits issued for a nationwide class of dischargers are referred to as Nationwide Permits ("NWP").  If they are qualified, an applicant may request authorization under an existing NWP, rather than applying for an individual 404 permit.

18.

Pursuant to 40 C.F.R. § 230.12(a)(3), the Corps is prohibited from issuing a permit or an NWP authorization if:

(a)     There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or

(b)     The proposed discharge will result in significant degradation of the aquatic ecosystem; or

(c)     The proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem; or

(d)     There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the Guidelines.

19.

When issuing an NWP, the Corps must conduct an analysis of compliance with the 404(b)(1) Guidelines and prepare a statement of findings.  The Corps must deny a permit that does not comply with those Guidelines.  Pursuant to the 404(b)(1)

Guidelines, the Corps is prohibited from issuing a Section 404 permit or an NWP

authorization under an NWP if the discharge will cause or contribute to significant

degradation of the waters of the United States.  "Significant degradation" includes

significantly adverse effects on fish, shellfish, wildlife, and special aquatic sites.

"Significant degradation" also includes significantly adverse effects on life stages of

aquatic life, as well as on aquatic ecosystem diversity, productivity, and stability.  The

Guidelines require the Corps to predict cumulative effects by evaluating the number of

individual discharges of dredged or fill material into waters of the United States that

already exist and that are expected to be authorized by a NWP until it expires.

20.

In addition, the Corps' "public interest review" rules, found at 33 C.F.R. § 320.4,

prohibit the issuance of a Section 404 permit or an NWP authorization if the

authorization would be contrary to the public interest.  In evaluating this issue, the

Corps must weigh the benefits of a proposed project against its reasonably foreseeable

detriments, considering all relevant factors **and** their cumulative impacts.  Included

among the factors that are considered are conservation, general environmental

concerns, fish and wildlife values, water quality, and the general needs and welfare of

the people.

21.

Under Corps regulations, a Division Engineer may modify, suspend, or revoke a

NWP authorization by geographic area, class of activity, or class of waters within their

division to address effects of authorized activities under the 404(b)(1) Guidelines or

any factor of the public interest or that otherwise may be more than minimal.  Some

NWP's, including NWP 48, require Pre-Construction Notification (PCN) or application to the District Engineer prior to undertaking covered activities.

22.

Upon receipt of a PCN or application, the District Engineer must determine whether the activity will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest. A District Engineer must perform a case-by-case review of each PCN or application submitted under an NWP to determine whether the proposed activity will result in more than minimal individual or cumulative adverse effects or be contrary to the public interest. In doing so, the District Engineer must consider the environmental setting, the resources affected, the functions of affected resources, the degree to which resources perform those functions, the extent of loss of aquatic resource functions, the duration of adverse effects, the importance of aquatic resource functions lost, and required mitigation.

23.

When determining appropriate mitigation, a District Engineer must consider its adequacy to ensure that adverse environmental effects are minimized. If a District Engineer reviewing a PCN or application finds that a proposed activity would have more than minimal individual or cumulative adverse effects or is otherwise contrary to the public interest, the District Engineer must either modify the NWP authorization to reduce or eliminate such effects, or instruct the permittee to apply for a regional general permit (if one exists) or an individual permit

///

Page 13 - COMPLAINT

C.     **The National Environmental Policy Act**

24.

Pursuant to 40 C.F.R. § 1500.1, NEPA is our basic national charter for

protection of the environment.  Regulations promulgated by the Council on

Environmental Quality ("CEQ") establish that NEPA's twin aims are to (1) ensure fully

informed decision-making, and (2) to provide for public participation in environmental

analysis and decision-making.

25.

As provided for by 40 C.F.R. § 1507.3(a), the Corps has adopted regulations to

implement NEPA.  The Corps' NEPA regulations supplement—and do not

supersede—the CEQ's regulations.

26.

According to CEQ regulations, NEPA requires that high quality environmental

information be available to public officials and citizens before decisions are made and

before actions are taken.  Accurate scientific analysis, expert agency comments, and

public scrutiny are essential to implementing NEPA.

27.

NEPA imposes procedural requirements on federal agencies to make sure that

they take a 'hard look' at the environmental effects of their actions.  Pursuant to 42

U.S.C. § 4332(c), NEPA requires federal agencies to prepare an Environmental Impact

Statement ("EIS") for "major Federal actions significantly affecting the quality of the

human environment."  For all actions not subject to a Categorical Exclusion, an agency

must either prepare and EIS or prepare an Environmental Assessment ("EA"), a public

document that provides sufficient evidence and analysis to determine whether to prepare an EIS.

28.

A federal agency may prepare an EA to determine whether an action requires an EIS.  If the agency concludes in an EA that an action will not significantly affect the environment, it may issue a Finding of No Significant Impact ("FONSI") in lieu of preparing an EIS.  A FONSI is a document in which the agency briefly explains the reasons why an action will not have a significant effect on the environment and the reasons an EIS will not be prepared.  A FONSI must include the EA or a summary of it and note all related environmental documents.

29.

Pursuant to CEQ guidelines found in 40 C.F.R. § 1508.18, "[m]ajor Federal action includes new and continuing actions with effects that may be major and which are potentially subject to Federal control and responsibility."  Actions include projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by a federal agency, as well as new or revised agency rules, regulations, plans, policies, or procedures.

30.

"Significantly" refers to the context and intensity of a project.  An agency should consider 10 factors outlined in the CEQ regulations when assessing significance and deciding whether to prepare an EIS.  According to 40 C.F.R § 1508.27(b), the factors include: (i) unique characteristics of the geographic area such as proximity to wetlands and ecologically critical areas; (ii) the degree to which effects on the equality of the

human environment are likely to be highly controversial, are highly uncertain, or involve

unique or unknown risks; (iii) the extent to which the action sets a precedent for future

decisions, (iv) cumulative effects; (v) the degree to which the action may adversely

affect endangered or threatened species or critical habitat; and (vi) conformity with

other law or requirements.  The effects of an action are controversial if there is a

substantial dispute about the nature or effects of the action that casts doubt on the

reasonableness of the agency's conclusions.

31.

NEPA requires disclosure of all environmental effects, and specifically requires

federal agencies to discuss the direct, indirect, and cumulative impacts of a proposed

action.  A "cumulative impact" results from the incremental impact of the action when

added to other (i) past, (ii) present, and (iii) reasonably foreseeable future actions,

regardless of who undertakes the action.  Cumulative impacts can result from

individually minor but collectively significant actions taking place over a period of time.

An agency must consider reasonably foreseeable direct, indirect, and cumulative

effects, including growth-inducing effects and other effects related to induced changes

in the pattern of land use, population density or growth rate, and related effects on air

and water and other natural ecosystems.

32.

An effect may not be determined to be insignificant merely because it is

temporary or a small component part. Under CEQ Guidance, a FONSI that relies on

project terms or mitigation to determine that the effects are not significant should apply

adaptive management provisions to account for instances where mitigation fails to

achieve projected environmental outcomes.

33.

Under the Corps' NEPA regulations, an EIS is normally required when a proposed change substantially increases the size of a project.   In deciding not to prepare an EIS, an agency must thoroughly analyze the environmental effects of the action before concluding that no significant environmental impacts will result.  To this end, an EA must consider the environmental impacts of the action and provide "sufficient evidence and analysis" to support the agency's decision.  It must discuss the need for the proposed action, alternatives, and the environmental impacts of the proposed action and the alternatives.

34.

CEQ regulations provide that the agency must rigorously explore and objectively evaluate all reasonable alternatives, and for all alternatives that were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.  The agency must also consider a No Action alternative, as a means to measure the environmental impacts of action alternatives. According to the CEQ regulations, the alternatives section is the "heart" of NEPA.

35.

An EA must also fully consider the cumulative impacts of the action.  To do so, it must provide sufficiently detailed information about past, present, and future projects and adequately analyze their environmental effects.  An agency may not rely on mitigation measures to offset project impacts in an effort to avoid preparation of an EIS where there are insufficient legal authorities or where it is not reasonable to foresee the

availability of sufficient resources.  Furthermore, the agency must disclose and

evaluate the environmental consequences of mitigation failure.  CEQ regulations

provide that where an applicant prepares information for an EA, the Corps shall make

its own evaluation of the environmental issues and take responsibility for the scope and

content of the EA.

36.

Once an original EIS has been completed, NEPA requires that a federal agency,

such as the Corps, must prepare a Supplemental EA or EIS whenever the agency

makes substantial changes in the proposed action that are relevant to environmental

concerns or "there are significant new circumstances or information relevant to

environmental concerns, and bearing on proposed action or its impacts."  If the action

has unanticipated effects, or happens with unanticipated intensity, then a supplemental

environmental review document is required.  The threshold for supplementation is low:

there need only be a substantial question about whether an action will have significant

effects.

**D.    The Endangered Species Act**

37.

According to 16 U.S.C. § 1531(b), Congress enacted the Endangered Species

Act ("ESA") for the express purpose of providing "a means whereby the ecosystems

upon which endangered species and threatened species depend may be conserved,

[and] to provide a program for the conservation of such endangered species and

threatened species . . . ."  The statute defines "conservation" as "the use of all methods

and procedures which are necessary to bring any endangered species or threatened

species to the point at which the measures provided to this Act are no longer necessary."  Pursuant to 50 C.F.R. § 402.02, the term conservation is synonymous with "recovery" of listed species because the ESA defines "recovery" to mean "improvement in the status of a listed species to the point at which listing is no longer appropriate under the criteria set out in Section 4(a)(1) of the Act."

38.

Section 7 of the ESA, 16 U.S.C. § 1536(a)(1), requires that all federal agencies work toward recovery of listed species.  Specifically, the statute states that federal agencies "shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species . . ." Compliance with this mandate plays a crucial role in determining whether or not many listed species have a chance of ever recovering.  In Exhibit A to this Complaint, specifically on page 15 of the presentation (page 3 of Ex. A) the Seattle District of the Corps acknowledges this obligation under the ESA, and its application to NWP 48 authorizations.

39.

16 U.S.C. § 1536(a)(2), also requires federal agencies to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species, or result in the adverse modification of critical habitat for such species.  Pursuant to 50 C.F.R. § 402.02, "jeopardize the continued existence" means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction,

numbers, or distribution of that species.

40.

The ESA prohibits all persons, including federal agencies, from "taking"

endangered species; this ban also applies by regulation to most threatened species.

The ESA and its implementing regulations specifically, 16 U.S.C. § 1532(18) and

50 C.F.R. § 17.3, define "take to include habitat degradation that results in the actual

death or injury of protected species.

41.

Pursuant to 16 U.S.C. § 1536(a)(2), in order to effectuate the ESA's duty to

avoid jeopardy and adverse modification, where anadromous or marine creatures are

involved the ESA directs an agency proposing an action to consult with the National

Marine Fisheries Service ("NMFS") aka NOAA Fisheries (the expert agency),

depending on the species at issue, to evaluate the consequences of a proposed action

on a listed species.  If the action agency determines that a proposed action "may

affect" a threatened or endangered species, then pursuant to 16 U.S.C. § 1536(a)-(c)

and 50 C.F.R § 402.14, that agency must consult with the appropriate expert agency,

after which the latter must provide the action agency with a "Biological Opinion" (or

"BiOp") explaining how the proposed action will affect the species or its habitat.

42.

Under 16 U.S.C. § 1536(b)(3)(A), if the expert agency concludes that the

proposed action "will jeopardize the continued existence" of a listed species, the BiOp

must outline "reasonable and prudent alternatives," that would allow an action agency

to carry out the purpose of its proposed activity without jeopardizing the existence of

listed species.  If the BiOp concludes that the action will not result in jeopardy but may incidentally cause the death or injury of members of a protected species, the expert agency has authority to provide the action agency with an "incidental take statement." Pursuant to 16 U.S.C. § 15356(b)(4), this statement must specify the impact of such incidental taking on the species, set forth "reasonable and prudent measures" that the expert agency considers necessary to minimize such impact, and include the "terms and conditions" that the action agency must comply with to implement those measures.

43.

If the action agency adopts such measures and implements their terms and conditions, the resulting "take" of listed species is not a violation of the ESA Section 9 prohibition on take of listed species or their habitat.  If the action agency fails to adopt and implement the reasonable and prudent alternatives and measures, or the action agency issues permits that it knows or should know will result in more "take" than the incidental take statement authorized, then the action agency is acting contrary to the mandate of the ESA.

44.

Regulations implementing Section 7 of the ESA, specifically 50 C.F.R. § 402.02, define "jeopardize the continued existence of" as "an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."   The Section 7 Handbook (Handbook), a document released jointly by the US Fish and Wild Life Services and the NMFS to further clarify the agencies' interpretation of federal responsibilities under Section 7,

defines the term "survival" in part to be "the condition in which a species continues to exist into the future while retaining the potential for recovery."

45.

In fulfilling the requirements of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), each agency must use the best scientific and commercial data available.  A finding of compliance with the ESA is not the same as a finding of compliance with NEPA or with the CWA, as the statutes have different statutory standards and goals.

**FACTUAL BACKGROUND**

46.

On February 21, 2012, the Corps reissued a number of NWPs authorizing certain activities that require Corps permits under Section 404 and/or Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.  These NWPs included NWP 48 – Commercial Shellfish Aquaculture Activities.  In reissuing the NWP, the Corps imposed an accompanying suite of General Conditions on authorized activities.  For example, General Condition 2 prohibits activities authorized under a NWP from disruption of necessary life cycle movements of indigenous aquatic species; General Condition 3 requires activities authorized under a NWP to avoid spawning areas; and General Condition 6 prohibits activities under NWP from utilizing unsuitable materials.

47.

General Condition 18 excludes from authorization under an NWP any activity that may jeopardize an ESA-listed or candidate species or adversely modify critical habitat of a listed species, and requires non-federal applicants to submit a PCN or application for activities that may affect species listed under the ESA. General

Condition 27 requires conformance with regional and case-by-case conditions. And General Condition 31 governs contents, submission, and review of a PCN or application for NWP 48 coverage.

48.

As applied under NWP 48, General Condition 31 requires a PCN or application to include information about the permittee; a description of the proposed project, its purpose, its adverse environmental effects, and any associated permits; sketches; a wetland delineation; names of endangered species that might be affected or use critical habitat that might be affected; a map showing the boundary area; the names of cultivated species; and whether canopy predator nets are being used.  Projects resulting in losses of more than 0.1 acre of wetlands must describe compensatory mitigation.

49.

In reissuing 2012 NWP 48, the Corps modified the permit such that it authorized new and expanded aquaculture operations.  The 2007 version of NWP 48 authorized existing activities only. The Corps recognized this change as one of the three greatest substantive changes to NWPs made in the 2012 reissue. The Corps expressly recognized that this 2012 change to NWP 48 would result in a greater number of commercial shellfish aquaculture activities authorized by NWP.

50.

In support of its 2012 reissue of the NWP, the Corps produced a Decision Document, which purports to document the public interest review required by 33 CFR § 320.4(a)(1) and (2); the environmental analysis required by NEPA; and the impact

analysis required by Subparts C through F of the 404(b)(1) Guidelines (40 CFR Part 230).  The Decision Document addresses effects of authorization on a national and programmatic basis and contains a cursory cumulative impacts discussion with little or no application to local conditions.  The Decision Document is an EA for the purposes of NEPA. It asserts that the reissue of NWP 48 will have no significant effect on the quality of the human environment and that preparation of an EIS is not required.

51.

The Nationwide Decision Document acknowledges potential adverse impacts may result from authorized or previously authorized activities but largely fails to describe what those impacts are or how they arise from the authorized activities.  The Decision Document asserts that impacts will be rendered minor and insignificant by: (I) permit terms, (ii) General Conditions, (iii) Division and District authority to impose regional conditions; and (iv) case-by-case review of PCN's to ensure that adverse effects are minimal.

52.

To support the conclusion in the decision document the Corps relied heavily on subsequent exercises of discretionary authority by Division and District Engineers to regionally revoke, modify, or suspend the NWP or to make case by case determinations regarding individual activities. In doing so, the Corps unreasonably relied on *regional* or *case-by-case* review to assess the cumulative effects of a *nationwide* authorization. The Corps conducted little or no substantive analysis of potential effects of authorized activities and provided little or no meaningful guidance or criteria for the exercise of discretionary authority by division and district engineers.

53.

The Corps also failed to provide adequate documentary support or substantive evidence for its conclusions that permit terms and conditions would be sufficient to ensure that environmental effects would be minimal and not significant. Nor did the Corps impose monitoring requirements that would ensure that NWP terms and conditions, including those resulting from subsequent exercises of discretionary authority would be adequately policed. The Corps failed to consider at all whether Division and District Engineers are obliged to or capable of faithfully exercising discretionary authority in response to the myriad potentially significant adverse effects of the issue of NWP 48 that the Corps deferred consideration of when it issued the NWP.

54.

On March 19, 2012, the Seattle District announced regional conditions applicable activities in Washington State authorized under NWP 48.  In doing so, the District clarified that under the provisions of General Condition 18, all authorizations under NWP 48 in Washington State require submittal of a PCN or application.  These regional general conditions also require that a PCN or application include information about essential fish habitat that may be affected by a proposed authorized activity.

55.

Also on March 19, 2012, the Seattle District produced a Supplemental Decision Document for NWP 48.  The Supplemental Decision Document estimated that there were only "101 commercial shell fish growing areas in Washington State" and that NWP 48 would be used "approximately 50 times" each year during the life of the

permit.  The Supplemental Decision Document concluded that NWP terms and conditions, including provisions for post-issuance PCN review, would supposedly ensure that NWP 48 authorizes only activities with minimal effects on the environment.

56.

The Seattle District also developed special conditions for commercial shellfish aquaculture activities. As suggested by the blank reference number in its heading ("Corps Reference Number: NWS-XXXX-XXXXX"), that document is merely a template of conditions, and has no effect except as such conditions are applied to an individual activity on case-by-case review.

57.

At the time it reissued the 2012 NWP,  the Corps had initiated but had not yet completed an ESA Section 7 consultation with NMFS for the national NWP program. On Nov. 24, 2014, after the conclusion of consultation, NMFS issued a Biological Opinion ("2014 BiOp").  On the grounds that the NWP program would address any incidental take in subsequent consultations, the 2014 BiOp did not provide an incidental take statement ("ITS") for the NWP program, and does not exempt any incidental take from the prohibitions in ESA Section 9.

58.

The 2014 BiOp concluded that shellfish farming was not likely to adversely affect critical habitat for salmon.  However, the NMFS analysis and conclusions were premised on the Corps estimate that 2012 NWP 48 permit would only be used roughly 50 times a year, for the life of the permit.

59.

The reality has turned out to be something **starkly** different.  Once the 2012 NWP 48 was available for use, the Seattle District granted approximately **800** or more authorizations in Puget Sound under NWP 48 in just first few years alone.  Since then the Seattle District of the Corps has granted roughly 120 additional authorizations under 2012 NWP 48.  In addition, the Seattle District of the Corps has granted a so far unknown number of individual aquaculture permits, for the same or similar activities' in Puget Sound.

60.

In its March 2012 NEPA analysis the Seattle District anticipated that NWP 48 would be used approximately 250 times, over the **entire** five-year permit period, and the one year extension of the permit authorizations available under 33 C.F.R. 33.6(b). The District concluded, **based on that estimation**, that the cumulative impacts of the NWP 48 authorizations were most likely minimal or "*de minimis.*"

61.

However, NWP 48 has actually been used by the Seattle District **already** more than 920 times.  Attached as Exhibit A, and incorporated into this complaint by reference, is an excerpt of a presentation that the Seattle District made to the industry and the public in April 2016.  On page 20 of that presentation (page 4 of Ex. A) the District acknowledged using NWP 48 approximately 920 times so far.  The Seattle District also recognizes that it is the largest or primary user of the 2012 NWP 48 in the entire nation.  The Seattle District acknowledges issuing 92% of all the NWP 48 authorizations issued in the nation.  The Seattle District's 920 authorizations under the

2012 NWP 48 cover approximately 37,000 acres of Washington shoreline.

62.

There are also many more applications for authorization under the 2012 NWP 48 currently pending before the Seattle District.  Attached as Exhibit B, and incorporated into this complaint by reference, is a print out of a spreadsheet created by the Seattle District which lists the pending applications for authorizations under 2012 NWP 48, as of April 28, 2016. There are over 80 active applications currently on file with the Seattle District, and another 23 that may well come back into active status once more work up is completed.

63.

Even if no further aquaculture development were to be authorized under 2012 NWP 48, the unanticipated intensity with which 2012 NWP 48 was used during its first few years constituted significant new information.  However, the Seattle District has yet to do any supplemental NEPA or CWA analysis that takes this significant new information into account.

64.

Despite being aware of the dramatic increase in the number of authorized activities, the Seattle District of the Corps has continued to repeatedly issue authorizations under 2012 NWP 48 in Puget Sound.  For example, on November 17, 2014, the Corps issued 2012 NWP 48 coverage to a permittee with authorization NWS-2014-65 for yet another operation of a near shore aquaculture facility on Case Inlet on Harstine Island, Mason County, Washington.  On March 10, 2015, the Corps issued 2012 NWP 48 coverage to a permittee with authorization NWS-2013-759 for another

Page - 28 - COMPLAINT

operation of a separate near shore aquaculture facility on Case Inlet near Vaughn, in Pierce County, Washington. On October 21, 2015, the Corps issued 2012 NWP 48 coverage to a permittee under authorization NWS-2015-121 for another operation of a separate near shore aquaculture facility in Totten Inlet, Puget Sound near Shelton, Mason County, Washington.  On October 21, 2015, the Corps also issued 2012 NWP 48 coverage to authorization NWS-2015-147 for operation of a separate near shore aquaculture facility near Totten Inlet, Puget Sound near Shelton, Mason County, Washington.  On February 1, 2016 the Corps also issued 2012 NWP 48 coverage to authorization NWS-2013-1288 for operation of a separate near shore aquaculture facility on Hood Canal in Puget Sound, near Lilliwaup, Mason County, Washington.

65.

Each of these operations is located in the District.  Each authorizes another permittee to place PVC tubes in the near shore habitat.  Into each tube the permittee will place a geoduck clam, which will be harvested after several years.  Depending on the operation, netting will be put over the entire plot of polyvinyl chloride (PVC) tubes, or will be place over each one individually.  Those PVC tubes and/or netting that have not already been washed away by storms or torn up by aquatic animals or tangled in boats, may sometimes be removed after roughly two years.  When the geoducks are ready for harvest, the permittee will use a high volume low-pressure hose to "liquefy" the nearshore beach to retrieve the clams.

66.

Plaintiff (and other citizens) repeatedly submitted comments to the Corps. Plaintiff (and others) repeatedly pointed out the problems with inadequate analysis of

cumulative impacts.  Those comments were submitted prior to issuance of both the

2012 NWP 48 issuance and prior to the authorizations listed in paragraph 64.  Plaintiffs

also repeatedly pointed out the need for a Supplemental NEPA analysis, as well as

raising concerns about other CWA and ESA issues.  Plaintiff did not receive copies of

the specific authorizations, and their related Corps Decision Memo's, that are identified

in paragraph 64 until late 2015 or early 2016. Plaintiff filed this complaint less than one

year after obtaining copies of the decisions listed in paragraph 64.

67.

Plaintiff also filed a Petition with the Corps, in May 2015, requesting suspension

of the use of 2012 NWP 48 in Puget Sound in light of the extensive and unanalyzed

use of 2012 NWP 48 in the area by the Seattle District.  A true copy of the plaintiff's

Petition is attached hereto and incorporated by reference as Exhibit C.  Although over

a year has past, the Corps has yet to Act on that Petition.

68.

The Corps' minimal effects and no significant impacts determinations for issuing

2012 NWP 48 should have been based on the number and extent of the requested

authorized activities that occurred under the prior 2007 NWP 48, which was

substantial.  It is Plaintiff's understanding and belief that the Corps had over 800

authorizations ready to be issued, under the 2007 NWP 48, but that due to a concerns

about ESA coverage the Corps did not issue those authorizations until after 2012 NWP

48 was adopted.  However, the 2012 NWP 48 NEPA and CWA analysis did not

account for the dramatic increase in the number of authorized activities that the Corps

knew or should have known would result from issuance of the 2012 NWP 48,

particularly in light of the number of pending applications or authorizations that the Corps knew had been received and/or considered under the 2007 NWP 48.

69.

Also, in issuing 2012 NWP 48, the Corps expressly relied on the subsequent exercise of discretionary authority by the Division Engineer to reach a finding that the impacts of authorized activities are minimal, consistent with the public interest, and not significant.  The Northwestern Division Engineer's principal exercise of discretionary authority to date has been the imposition of regional conditions in 2012.  The Northwestern Division Engineer analyzed the effects 2012 NWP 48 with regional conditions in the Supplemental Decision Document, which expressly states that the cumulative impacts of the 2012 NWP 48 on the aquatic environment are "dependent on the number times the NWP is used."  Even though the Corps knew it had many many hundreds of authorizations and/or applications or PCN's pending from the 2007 NWP 48, both the Supplemental Regional and the National Decision Documents projected the number of authorized activities based on an unreasonably low and inaccurate assessment of the amount of usage.

70.

Authorized activities are resulting in more than minimal and significant adverse environmental effects and contributing to significant degradation of waters of the United States by effects on water quality, effects arising from the introduction of plastics, and effects on eelgrass, salmon, birds, herring, and flat fish. The cumulative magnitude of these effects is increased by the greatly increased number of authorized activities.

/ / / /

71.

Shellfish aquaculture may result in adverse water quality impacts and geochemical changes in the intertidal environment. The Corps was advised of this in public comments regarding the adverse impacts of geoduck cultivation.

72.

Environmental impacts may arise from unstable plastic material, including PVC. PVC can leach dangerous chemicals into the environment that affect the reproduction, development, and genetics of a variety of organisms.  2012 NWP 48 authorizes the installation of plastic tubes and other structures into waters of the US. Reliance on General Condition 6 and case-by-case exercise of discretionary authority by District Engineers was and is unreasonable, because it is vague and because a District Engineer would not necessarily have an opportunity to exercise case-by-case review for all activities where PVC might be introduced into waters of the U.S.

73.

Eelgrass is an important habitat component in Puget Sound. Eelgrass beds are sensitive to human caused disturbances, including increased sedimentation from aquacultural harvesting activities. Since the 2012 NWP 48 issuance, additional information has become available regarding effects on eelgrass arising from geoduck harvesting. This new information regarding the effects on eelgrass, coupled with the increased number of activities authorized under 2012 NWP 48 over those projected in the Corps' environmental analyses, raises substantial questions regarding the potential for significant adverse effects on eelgrass arising from activities authorized under 2012 NWP 48 in Puget Sound.

74.

ESA-listed Puget Sound Chinook salmon and Hood Canal Summer Run chum
salmon occupy Puget Sound. Activities authorized under 2012 NWP 48 will likely
adversely affect these salmon and their critical habitat.  Greatly expanding the
geographical scope and intensity of aquaculture, by authorizing almost or perhaps
even more than 1,000 projects, significantly increases these effects.

75.

Industrial-scale aquaculture also causes a variety of negative impacts to marine
birds.  The Corps received public comments regarding effects of harassment and
destruction of marine birds. The Corps has at times asserted that impacts to breeding
areas for such birds are addressed by General Condition 4.  However, General
Condition 4 only applies to activities in migratory bird breeding areas.  The Condition
will have no effect on non-migratory birds, or on activities outside of migratory bird
breeding areas, such as key **foraging** areas.

76.

Authorized activities may adversely affect Southern Resident Killer Whales. The
Corps acknowledged public comments on interference with whale recovery and, relying
on the NMFS 2009 BiOp, concluded that such effects will be minimized through
Section 7 consultation and PCN or application review. The Corps provided no other
substantive assessment of the effects of activities authorized under 2012 NWP 48 on
killer whales.  The inclusion of new activities and the dramatic expansion in the number
of authorized activities renders reliance on the 2009 BiOp findings (regarding adverse
effects of authorized activities on killer whales and Puget Sound Chinook salmon and

Hood Canal summer-run chum salmon) unreasonable.

77.

Shellfish aquaculture has displaced beds of sand dollars in the past, and will likely do so in the future. The Corps asserted that provisions relating to submerged aquatic vegetation, General Condition 18 (endangered species), General Condition 14 (proper maintenance), PCN or application review, and prospective Regional Conditions will ensure minimal effects to sand dollars.  However, no Regional or Seattle District Special Conditions are directed at sand dollars.  The unanticipated number of activities authorized under 2012 NWP 48 and the failure of the Corps to impose special conditions directed at minimizing harm to sand dollars, invalidates the premise the Corps relied on to determine in its adoption of 2012 NWP 48 that effects on sand dollars are minimal and not significant.

78.

Shellfish aquaculture can have major negative effects on fish such as herring, which can get caught in netting. The Corps acknowledged this but claimed that Section 7 consultation, PCN or application review, and special Regional Conditions will be enough to  ensure that effects are minimal.  However, the unanticipated number of activities authorized under 2012 NWP 48 and the failure of the Seattle District of the Corps to impose Special Conditions directed at minimizing harm to herring invalidates the premise the Corps relied on n the adoption of 2012 NWP 48 to determine that effects on herring are minimal and not significant.

79.

The presence of aquacultural nets and tubes may also result in loss of habitat

for flat fish. These effects increase with the dramatic increase of authorized

aquacultural activities. The Corps acknowledged public comment regarding effects on

flat fish. The unanticipated number of activities authorized under 2012 NWP 48 and the

failure of the Seattle District of the Corps to impose Special Conditions directed at

minimizing harm to flat fish invalidates the premise the Corps relied on in its adoption of

2012 NWP 48 to determine that effects on flat fish are minimal and not significant.

## FIRST CLAIM FOR RELIEF

### (Violation of CWA in Implementation of 2012 NWP 48)

80.

Plaintiff realleges paragraphs 1 through 79, and further alleges:

81.

The Corps' has violated the CWA and its implementing regulations by continuing

to authorize commercial aquaculture activities in Puget Sound under 2012 NWP 48

which have greater than minimal impacts or cause significant degradation of the

aquatic ecosystem due to the great number and extent of those activities in Puget

Sound.

82.

The CWA's provisions authorizing the Corps to issue general, regional, and

nationwide permits provide meaningful standards to limit Corps discretion: the Corps

may not authorize under general permits activities which have more than minimal

adverse environmental effects or fail to conform with the 404(b)(1) Guidelines.

83.

The Corps continued authorization of commercial shellfish aquaculture activities

under 2012 NWP 48 in Puget Sound is reviewable under 5 U.S.C. § 706(2) as part of

its action to authorize commercial shellfish aquaculture activities under 2012 NWP 48

and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance

with law because the activities authorized in Puget Sound have greater than minimal

impacts, otherwise fail to conform with the CWA and its implementing regulations, and

fail to conform with the Corps decision in issuing 2012 NWP 48.

84.

The Corps' failure to revoke, suspend, or modify 2012 NWP 48 to ensure that

activities in Puget Sound authorized under 2012 NWP 48 will not result in greater than

minimal adverse environmental effects or otherwise fail to conform with the 404(b)(1)

Guidelines in response to the great number and extent of those activities in Puget

Sound constitutes the unlawful withholding and unreasonable delay of an agency

action reviewable under 5 U.S.C. § 706(1). The Corps' scheme to implement 2012

NWP renders the exercise of its authority to revoke, suspend, or modify 2012 NWP 48

a discrete action that is legally required as an essential part of the Corps' compliance

with the CWA.

85.

The Corps determined that the project was in the public interest.  However, that

determination was based on an estimated volume of permit use that has already been

exceeded many times over.  Thus, the Corps based its CWA public interest review on

grossly inaccurate information.  The Corps' determination that the authorization(s)

under 2012 NWP 48 are in the public interest was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.  Accordingly, the Corps'

determination to issue this and any future 2012 NWP 48 authorization must be set aside.

86.

The Corps has failed to adequately analyze the effect that the aquaculture industry, (operating at ten times the level that the Corps' expected) would have on fish, shellfish, wildlife and other special aquatic sites, such as eel grass beds.  Aquaculture operations operating at the current level are causing or contributing to more than minimal adverse environmental effects and "significant degradation" of waters of the U.S. in violation of the CWA.  Issuance of one or more additional 2012 NWP 48 authorizations in such circumstances is unlawful.

87.

Pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, Plaintiff should be awarded its costs, expenses, expert witness fees, and reasonable attorney fees associated with this litigation.

**SECOND CLAIM FOR RELIEF**

**(Violation of NEPA and APA in Implementation of 2012 NWP 48)**

88.

Plaintiff realleges paragraphs 1 through 79, as well as 87, and further alleges:

89.

The Corps' continued authorization of commercial aquaculture activities in Puget Sound is arbitrary, capricious, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A), NEPA, and implementing regulations because it has failed to implement 2012 NWP 48 in the manner committed to by the Corps in the environmental

documents supporting its decision to issue this NWP.  In the decision to issue 2012 NWP 48, the Corps committed that the Division Engineers and District Engineers would revoke, suspend, or modify 2012 NWP 48 as necessary to ensure that authorized activities will not significantly affect the environment.  Although authorized activities are significantly affecting the environment in Puget Sound, neither the Northwestern Division Engineer, nor the Seattle District Engineer have revoked, suspended, or modified 2012 NWP 48 as necessary to ensure that authorized activities will not significantly affect the environment.  The Seattle District instead continues to issue authorization for activities or projects under 2012 NWP 48.

90.

The Corps failed to include accurate information in its 2012 NWP 48 cumulative impacts analysis.  The issuance of further authorizations under 2012 NWP 48, without proper NEPA analysis, is a violation of NEPA and its implementing regulations.

**THIRD CLAIM FOR RELIEF**

**(Violation of CWA and APA in Issuing 2012 NWP 48)**

91.

Plaintiff realleges paragraphs 1 through 79, and 87, and further alleges:

92.

Defendants' 2012 reissue of NWP 48 is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), the CWA, 33 U.S.C. § 1344(e), and implementing regulations of the CWA for the following reasons:

(a)     The Corps' determination that 2012 NWP 48 will have only minimal

adverse environmental individual and cumulative effects relied on projections of the number and extent of authorized activities that were unreasonable at the time that they were made. The Corps' projections were unreasonable because they failed to account for the foreseeable increase in authorized activities attributable to the 2012 modification of NWP 48 providing for authorization of new and expanded operations. The Corps reliance on unreasonable projections undermines its minimal effects, 404(b)(1) Guidelines, and public interest findings regarding many, if not all, of the potential adverse effects arising from authorized activities—including effects on eelgrass, ESA-listed salmon, marine birds, southern resident killer whales, sand dollars, herring, and flat fish—and meaningful consideration of such effects in determining that issuing 2012 NWP 48 was in the public interest;

(b)     The Corps failed to provide a reasoned explanation, scientific basis, or substantial evidence to support its determination that appropriate steps have been taken to minimize the adverse water quality effects of shellfish aquaculture authorized under 2012 NWP 48 and to meaningfully consider such effects in determining that issuing 2012 NWP 48 was in the public interest;

(c)     Disregarding the impact of the enormous expansion of commercial shellfish aquaculture outside of its historical area and the culturing of species, including exotic species not native to Puget Sound that were never part of the historic commercial shellfish industry and never included

the use of plastic oyster bags, plastic nets, PVC tubes, plastic netting, rubber bands and plastic zip ties, anchors and discs;

(d)    The Corps also failed to substantively or meaningfully address to public comments regarding (i) the lack of independent peer reviewed science in conjunction with the proposed issuance of 2012 NWP 48, (ii) the presence and potential spread of parasites and disease as a result of the intensive industrial scale cultivation of shellfish in Puget Sound, (iii) the adverse impacts to eelgrass, (iv) the potential adverse impact on the available food supply for other aquatic species, including eggs and larvae ingested by large numbers of farmed bivalves, (v) adverse impacts on the sand lance and forage fish habitat due to expanded cultivation and harvest activities, (vi) the disruption of macro algae and sand dollar beds and other Essential Fish Habitat, (vii) adverse impacts to food, shelter and habitat for both ESA listed and non-listed species, and (viii) the adverse impacts on forage and refuge for both migratory and other marine bird species;

(e)    The Corps failed to provide a reasoned explanation, scientific basis, or substantial evidence to support its determinations that adverse effects of authorized activities on ESA-listed salmon will be minimal, that the aquatic environment would not be significantly degraded through significant adverse effects on ESA-listed salmon species, and that 2012 NWP 48 incorporated all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem and failed to weigh the

benefits of issuing 2012 NWP 48 against the potential adverse effects to ESA-listed salmon species;

(f)     The Corps failed to provide a reasoned explanation, scientific basis, or substantial evidence to support its determination that appropriate steps have been taken to minimize the adverse effects of netting and displacement of food sources on birds arising from activities authorized under 2012 NWP 48 and to meaningfully consider such effects in determining that issuing 2012 NWP 48 was in the public interest;

(g)     The Corps failed to provide a reasoned explanation, scientific basis, or substantial evidence to support its determinations that adverse effects of authorized activities on ESA-listed southern resident killer whales will be minimal, that the aquatic environment would not be significantly degraded through significant adverse effects on southern resident killer whales, and that 2012 NWP 48 incorporated all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem and failed to weigh the benefits of issuing 2012 NWP 48 against the potential adverse effects to ESA-listed salmon species in determining that issuing 2012 NWP 48 was in the public interest;

(h)     The Corps failed to provide a reasoned explanation, scientific basis, or substantial evidence to support its determinations that adverse effects on herring arising from anti-predator nets will be minimal, that the aquatic environment would not be significantly degraded through significant adverse effects on herring, and that 2012 NWP 48 incorporated all

appropriate and practicable measures to minimize potential harm to

herring and failed to weigh the benefits of issuing 2012 NWP 48 against

the potential adverse effects to herring;

(i)     The Corps failed to provide a reasoned explanation, scientific basis, or

substantial evidence to support its determinations that adverse effects of

habitat exclusion on flat fish arising from aquacultural tubes and nets will

be minimal, that the aquatic environment would not be significantly

degraded through significant adverse effects on flat fish, and that 2012

NWP 48 incorporated all appropriate and practicable measures to

minimize potential harm to flat fish;

(j)     The Corps failed to properly weigh the benefits of issuing 2012 NWP 48

against the potential adverse effects to flat fish in determining that issuing

2012 NWP 48 was in the public interest; and

(k)     The Corps otherwise failed to support its decision to reissue 2012 NWP

48 with substantial evidence or reasoned decision-making and failed to

respond meaningfully to public comments.

### FOURTH CLAIM FOR RELIEF

### (Violation of NEPA and APA in Issuing 2012 NWP 48)

93.

Plaintiff realleges paragraphs 1 through 79, and 87, and further alleges:

94.

The 2012 reissue of NWP 48 was a major federal action for the purposes of

NEPA.

95.

Defendants' issuance of the 2012 NWP 48 under a FONSI was arbitrary, capricious, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A), NEPA, and implementing regulations because:

(a)     The Corps failed to sufficiently analyze the direct and indirect environmental effects of the activities authorized under 2012 NWP 48 when it determined that no significant environmental impacts would result;

(b)     The Corps failed to provide a substantive analysis of the potential adverse effects of authorized activities;

(c)     The Corps unreasonably relied on subsequent regional and case-by-case determinations to assess cumulative impacts of a national action;

(d)     The Corps failed to provide documentary support or substantive evidence for its determinations that permit terms and conditions, including those arising from subsequent exercise of discretionary authority by division and district engineers, would be sufficient to ensure that environmental effects would be minimal and not significant;

(e)     The Corps failed to disclose or consider the environmental consequences of the failure of permit terms and conditions, including those arising from subsequent exercise of discretionary authority by division and district engineers, to effectively address adverse environmental effects;

(f)     The Corps failed to prepare an EIS; and

(g)     The Corps determined that the potential adverse effects of issuing 2012

NWP 48 were not significant was improper because; (i) there was controversy regarding the effects of authorized activities; (ii) the effects of authorized activities were highly uncertain; (iii) the issuance of 2012 NWP 48 was precedential for and represented a decision in principle for subsequent case by case authorizations to a great extent; (iv) the authorized activities were likely to adversely affect endangered species and their critical habitat; and (v) because the Corps issuance of 2012 NWP 48 threatened violation of the CWA and its implementing regulations because it authorizes activities with greater than minimal effects.

### FIFTH CLAIM FOR RELIEF

### (Violation of CWA and APA in Issuing Specific Authorizations)

96.

Plaintiff realleges paragraphs 1 through 79, and 87, and further alleges:

97.

Defendants' conclusions that NWS-2013-759, NWS-2014-65, NWS-2015-121, NWS-2015-147, and NWS-2013-1288  were authorized under 2012 NWP 48 were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), the CWA, 33 U.S.C. § 1344(e), and implementing regulations of the CWA, for one or more the following reasons:

     (a)     The Corps failed to properly assess the individual and/or cumulative adverse effects that would result from one or more of these activities;

     (b)     The Corps authorized under 2012 NWP 48 one or more activities that, by

virtue of their individual or cumulative effect(s), will have more than

negligible impacts; and

(c)     The Corps issued authorizations for one or more activities that were not

in conformance with the terms & conditions of 2012 NWP 48.

**SIXTH CLAIM FOR RELIEF**

**(Violation of NEPA and APA by Failing to Prepare a**

**Supplemental NEPA Analysis)**

98.

Plaintiff realleges paragraphs 1 through 79, and 87, and further alleges:

99.

Pursuant to 40 C.F.R. § 1502.9(c)(1)(ii), the Corps must prepare a

Supplemental NEPA analysis when there are significant new circumstances or

information relevant to environmental concerns and bearing on proposed action or its

impacts.  Failure to complete a Supplemental EA or SEIS before issuance of more

NWP 48 authorizations is a violation of NEPA and its implementing regulations.

100.

The dramatic difference between the number of authorized activities anticipated

in the National and Supplemental Decision Documents and the number of activities

authorized since issuing those documents, raised or should have raised a substantial

question of significant impacts arising from significant new circumstances.  That

constituted new information bearing on authorized activities and their impacts. These

changed circumstances would most likely have changed the Corps' analysis of

environmental effects, because of the nature of the cumulative impacts resulting from

the unanticipated number of times that 2012 NWP 48 has been used by the Corps,

primarily by the Seattle District.

101.

Under the permitting scheme established by 2012 NWP 48, regional conditions,

and Corps regulations, the authorization of an activity under 2012 NWP 48 in the

Seattle district is a discrete action that the Corps is required to undertake.  After the

anticipated 250 authorizations were issued, while knowing the number of additional

authorizations or applications for authorizations that were pending, each additional

authorization or groups of authorizations that the Corps issued either individually or

collectively constituted a major federal action related to authorization of activities under

2012 NWP 48.

102.

Despite only estimating that 2012 NWP 48 usage in the Seattle District would be

roughly 250 authorizations over the five year life of the permit; despite knowing that it

had already vastly exceeded that estimated level of usage of 2012 NWP 48; despite

being repeated warned about the unevaluated cumulative impacts of its excessive use

of 2012 NWP 48; and despite being Petitioned to cease issuance of further

authorizations until a cumulative impacts analysis was complete; the Corps has to date

refused or failed to issue or complete any supplemental NEPA document that includes

analysis of the cumulative impacts of the authorizations issued under 2012 NWP 48.

103.

The Corps violated NEPA by failing to prepare a supplemental environmental

analysis in response to its authorization of a dramatically greater number of activities in

the Seattle District under 2012 NWP 48 than the Corps contemplated or evaluated,

when it issued 2012 NWP 48 and/or the Seattle District Regional Conditions for 2012

NWP 48.

104.

To the extent the Corps' has rejected Plaintiff's requests to prepare a

supplemental environmental document, the Corps' failure to prepare a supplemental

environmental document either for the issue of 2012 NWP 48 or for the issue of

regional conditions on activities authorized under 2012 NWP 48 in the Seattle District,

or for the issuance of additional authorizations under 2012 NWP 48, was and is

arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law,

in violation of the APA, 5 U.S.C. § 706(2).  To the extent that the Corps has conciously

refused to prepare, or evaluate and determine whether to prepare, such a

supplemental environmental document, the Corps' conduct constitutes the unlawful

withholding and unreasonable delay of an agency action in violation of 5 U.S.C. §

706(1).

**SEVENTH CLAIM FOR RELIEF**

**(Violation of the APA – Agency Action**

**Unlawfully Withheld and/or Unreasonably Delayed**)

105.

Plaintiff realleges paragraphs 1 through 79, and 87, and further alleges:

106.

5 U.S.C. § 706(1) provides in pertinent part that the courts shall compel agency

action that is unlawfully withheld or unreasonably delayed.

107.

On or about May 5, 2015, Plaintiff filed a legal Petition with the Corps,

addressed to the predecessor of Defendants Semonite and Spellmon and to Defendant

Buck, asking that the Seattle District of the Corps suspend use of 2012 NWP 48, to

authorize commercial shellfish aquaculture activities in Puget Sound "until such time as

the Corps has initiated and completed a new review of the environmental effects of

authorized activities and imposed conditions on 2012 NWP 48 as appropriate to ensure

that the effects of authorized activities are minimal, consistent with the public interest,

and not significant."   In the Petition, Plaintiff cited and submitted over 50 studies,

documents, and/or publications, highlighting the potential harm from industrial scale

aquaculture.  This included, but was not limited to, the dramatic increase in plastic

pollution in Puget Sound waters as a consequence of the deployment of hundreds of

thousands of plastic PVC tubes, high density polyethylene (HDPE) netting, plastic

bands, and HDPE oyster bags and mussel disks by commercial aquaculture operators.

Plaintiff also noted in its Petition that when 2012 NWP 48 was issued, the

accompanying analysis by the Corps presumed that the authority that 2012 NWP 48

conferred would be used only about 50 times a year over a five-year period and the

Defendants conducted their evaluations of the projected environmental impacts of 2012

NWP 48 predicated on the assumption that there would be at most approximately 250

authorizations of shellfish aquaculture operations over the permits' expected five-year

duration.  However, in the first few years of the existence of 2012 NWP 48, the Seattle

District of the Corps issued almost a thousand authorizations -- almost a 400%

increase over the Defendant's evaluated level of permit usage.

108.

Despite these dramatically changed circumstances signaling the need for immediate suspension and re-evaluation, and the passage of a full year, the Defendants have to date taken no action with respect to Plaintiff's Petition. Both the Clean Water Act itself and Corps' own regulations expressly provide for modification, suspension or revocation of NWP authorizations for any specific geographic area, class of activities or class of waters within a specific Division, such as Seattle District of the Northwestern Division. The District Engineer, Defendant Buck, also has authority under 33 U.S.C. § 1344(d; 33 U.S.C. § 1344(e)(2); 33 C.F.R. § 330.1(d); 33 C.F.R. § 330.2(g); 33 C.F.R. § 330.4(e); 33 C.F.R. § 330.5(c)(1); 33 C.F.R. § 330.5(d)(2)(ii); 33 C.F.R. § 330.5(d)(2)(iii); 33 C.F.R. § 330.5(d)(3); and/or 40 C.F.R. § 330.7(b)(2), to suspend any already issued specific authorizations under an NWP, as long as the engineer notifies the Permittee in writing and takes certain steps specified by the law.

109.

In issuing 2012 NWP 48 and making a finding that 2012 NWP 48 was in the public interest, the Corps expressly invoked and relied upon its authority to suspend, revoke and modify the NWP at a later date in its National Decision document. The Corps also expressly relied upon its ability to revoke 2012 NWP 48 on a geographic basis to ensure that the individual and cumulative impacts would be minimal and not significant in the same document.

110.

The Seattle District of the Corps made the same determination in its own Supplemental Decision documents regarding 2012 NWP 48. Indeed, the NMFS

repeatedly referenced and relied upon the Corps' ability to revoke, suspend or modify 2012 NWP 48 in the NMFS 2014 BiOp.  That BiOp not only relies upon that presumption, it requires re-initiation of consultation "if the Corps fails to modify, suspend or revoke nationwide permits" to address any concerns mutually identified by the Corps and NMFS.

111.

The number of authorizations already issued under the 2012 NWP 48 (to say nothing of the number of NWP 48 applications also still pending and the unknown number of individual permits for the same type of operations in the same areas) dramatically exceeds the number anticipated when the Corps' made its minimal effects, public interest and no-significant impact findings allowing issuance of 2012 NWP 48. There is also significant new information regarding the potential effects of authorized activities on the environment that has been repeatedly provided to the Corps.  As a result there is no longer a reasonable basis to conclude that the 2012 NWP 48 is consistent with the requirements of 33 U.S.C. § 1344(3) for the issuance of general permits.  Furthermore, the changes have raised substantial questions as to the adequacy of the Corps' prior environmental analysis and should have triggered the requirement for suspension or revocation of the permit.

112.

The Corps should be required to act upon the plaintiff's Petition, as the Corps has now unreasonably or unlawfully withheld action regarding that Petition for over a year.  Plaintiff submits that its Petition should have been granted and that the Corps should accordingly have already suspended further authorizations under 2012 NWP 48

in Puget Sound, so that future commercial shellfish operations under CWA § 404

and/or § 10 of the Rivers Harbors Act are authorized by individual permit only.  That

suspension of 2012 NWP 48 should have remained in effect until the Seattle District of

the Corps has completed a supplemental NEPA and CWA review of the effects of the

already authorized activities under 2012 NWP 48 and the potential effects of any

further 2012 (or future) NWP 48 authorizations.  The Corps should be required to

supplement its existing analysis with detailed information and analysis regarding the

cumulative impacts of the existing and future projected levels of aquaculture in Puget

Sound.  The Corps should be required to hold one or more public hearings to take

testimony on and collect evidence regarding the existing and likely cumulative impacts

of the 2012 NWP 48.  The Corps should be required to reassess whether authorization

of activities under 2012 NWP 48 will result in "take" of ESA-listed species, including

Puget Sound Chinook Salmon, jeopardize their continued existence or adversely

modify their habitat.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)    Declare that the Corps violated NEPA and its implementing regulations

when it improperly found that activities in Puget Sound authorized under 2012 NWP 48

would not significantly adversely affect the environment and decided not to prepare an

EIS;

(b)    Declare that the Corps violated NEPA and its implementing regulations

when it failed to prepare a supplemental environmental document following the

dramatic increase in the number of activities in Puget Sound authorized and seeking authorization under 2012 NWP 48;

(c)     Declare that the Corps violated the Clean Water Act and its implementing regulations when it issued 2012 NWP 48;

(d)     Declare that the Corps violated the Clean Water Act and its implementing regulations when it failed to take required actions to ensure that activities authorized under 2012 NWP 48 have minimal adverse effects on the environment and not significantly degrade waters of the United States;

(e)     Declare that the Corps violated the Clean Water Act and its implementing regulations when it authorized that the specific projects listed in the Complaint are allowed under 2012 NWP 48;

(f)     Vacate, set aside, and/or remand the Corps' authorizations of those same projects under 2012 NWP 48;

(g)     Order the Corps to direct the prospective and/or current permittees of those activities to seek authorization through an individual permit;

(h)     Order the Defendants to act on Plaintiff's Petition to suspend or revoke 2012 NWP 48 in Puget Sound, and/or enjoin Defendants from issuing any further authorizations under 2012 NWP 48 in Puget Sound until Defendants comply with NEPA by producing a new supplemental environmental document and/or comply with the CWA by completing adequate effects analyses to ensure that authorized activities will have minimal effects on the environment and conform with the 33 U.S.C. § 1344(b)(1) and the regulations adopted pursuant to that statute;

(i)     Award to Plaintiff its costs, expenses, expert witness fees, and

reasonable attorney fees associated with this litigation; and

(j)     Grant Plaintiff such further equitable relief as the court may believe just

and proper.


Dated this 22nd day of June, 2016


By:   /s/ *Karl G. Anuta*
       Karl G. Anuta, WSBA No. 21346
       kga@integra.net
       Thane Tienson, WSBA No. 13310
       ttienson@lbblawyers.com
       Attorneys for Plaintiff

# EXHIBIT A

# Shellfish Aquaculture Permitting Program Update

**Seattle District**

**U.S. Army Corps of Engineers**

**April 2016**





US Army Corps of Engineers
**BUILDING STRONG**®



COMPLAINT EXHIBIT A – Page 1 of 4

# Regulatory Authority

## Section 404 of the Clean Water Act

- To restore and maintain the chemical, physical and biological integrity of the waters of the U.S.

- Requires a permit for the discharge of dredged or fill material in any water of the U.S.







12

**BUILDING STRONG**®

COMPLAINT EXHIBIT A - Page 2 of 4

# Historical Programmatic ESA/MSA Coverage

► Expired programmatic ESA/MSA consultation tied to one permit: 2007 Nationwide Permit (NWP) 48

► Limited to <u>existing</u> commercial shellfish activities

► Majority of NWP 48 verifications for existing activities do not currently have ESA/MSA coverage for their work: consultation expired

► Permits for <u>new</u> activities completed individual ESA/MSA consultation





15

**BUILDING STRONG**®

COMPLAINT EXHIBIT A - Page 3 of 4

# Usage Across the Country

► Seattle District primary user of NWP 48
  - Seattle District issued about 920 NWP 48 verifications covering approx. 37,000 acres
  - 92% of all NWP 48 verifications in nation
  - 58% of all aquaculture type permits

► Other Districts use Regional General Permits/State Programmatic General Permits
  - New England District - RGPs (316)
  - New York District - NWP 48 (51)





**BUILDING STRONG**®

COMPLAINT EXHIBIT A - Page 4 of 4

EXHIBIT B

Pending NWP 48 projects and acreages 28 April 2016

| | DA Number | Name | County | Waterbody | Latitude | Longitude | Area Cultivated & Fallow (acres) | Area Never in Aquaculture (acres) | Total Area (acres) | Pending - Existing | Pending - New |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | NWS-2007-01129 | Penn Cove Shellfish, LLC--Island | Island | | 48.21844 | -122.10784 | 55 | 0 | 55 | x | |
| 2 | NWS-2007-01137 | Blau Oyster Co, Inc. | Skagit | | 48.58536 | -122.46959 | 130 | 56.95 | 186.95 | x | |
| 3 | NWS-2007-01138 | Heckes Clam Co. Inc.--Skagit | Skagit | | 48.58806 | -122.45698 | 4.25 | 20.75 | 25 | x | |
| 4 | NWS-2007-01158 | Coast Seafoods Co.--Jefferson | Jefferson | | 47.80314 | -122.86462 | 25 | 0 | 25 | x | |
| 5 | NWS-2007-01165 | Puget Beach Shellfish LLC | Thurston | | 47.12923 | -122.78492 | 2 | 0 | 2 | x | |
| 6 | NWS-2007-01171 | Best Fish LLC dba Crab Fresh | Mason | | 47.21477 | -123.0681 | 22.7 | 27.3 | 50 | x | |
| 7 | NWS-2007-01173 | Acme Seafood, Inc. | Skagit | | 48.57271 | -122.4886 | 100 | 40 | 140 | x | |
| 8 | NWS-2007-01186 | Deer Harbor Clam Farm | Mason | | 47.15615 | -123.02318 | 1 | 0 | 1 | x | |
| 9 | NWS-2007-01201 | Taylor Shellfish (Samish Bay) | Skagit | | 48.61148 | -122.44993 | 2250 | 50 | 2300 | x | |
| 10 | NWS-2007-01203 | Samish Bay Oyster Co. | Skagit | | 48.58201 | -122.47641 | 19.5 | 1 | 20.5 | x | |
| 11 | NWS-2007-01212 | Case Cove | Pierce | | 47.37256 | -122.62598 | 4.57 | 2.06 | 6.63 | x | |
| 12 | NWS-2007-1221 | Seattle Shellfish | Mason | | 47.25361 | -123.01983 | | | | | |
| 13 | NWS-2007-01222 | Seattle Shellfish LLC | Mason | | 47.27157 | -122.86762 | 5.265 | 16.735 | 22 | x | |
| 14 | NWS-2007-01243 | Taylor Shellfish (Allyn) | Mason | | 47.38825 | -122.824 | 70 | 0 | 70 | x | |
| 15 | NWS-2007-01244 | Taylor Shellfish--Mason 2 | Mason | | 47.32373 | -122.83737 | 2 | 0 | 2 | x | |
| 16 | NWS-2007-01255 | Taylor Shellfish--Mason 12 | Mason | | 47.2056 | -123.0397 | 1 | 0 | 1 | x | |
| 17 | NWS-2007-01373 | Northwest Shellfish Company Inc.--Thurston 5 | Thurston | | 47.15098 | -122.88132 | 0 | 0 | 0 | | |
| 18 | NWS-2007-01407 | Taylor Shellfish | Thurston | | 47.11219 | -122.93828 | 2 | 0 | 2 | x | |
| 19 | NWS-2007-01412 | Penn Cove Shellfish, LLC--Jefferson | Jefferson | | 47.79098 | -122.85165 | 21.57 | 0 | 21.57 | x | |
| 20 | NWS-2007-01460 | Heckes Clam Co. Inc.--Pacific 8 | Pacific | | 46.55345 | -123.70956 | | | 0 | | |
| 21 | NWS-2007-01484 | Willapa Bay Shellfish Inc.--Pacific 2 | Pacific | | 46.42779 | -124.01831 | 15 | 0 | 15 | x | |
| 22 | NWS-2008-00247 | J&G Gunstone, Inc. | Jefferson | | 48.03709 | -122.69741 | 0.5 | 0 | 0.5 | x | |
| 23 | NWS-2008-502 | Hood Canal Mariculture | Jefferson | Hood Canal | 47.88373 | -122.613858 | 5.74 | | 5.74 | X | |
| 24 | NWS-2008-00514 | Taylor Shellfish - Mason 32 | Mason | | 47.34579 | -123.12228 | 220 | 0 | 220 | x | |
| 25 | NWS-2008-00537 | Olympia Oyster Company | Thurston | Eld Inlet | 47.071025 | -123.00958 | ? | ? | 30 | ? | ? |
| 26 | NWS-2008-00564 | J&G Gunstone Clams, Inc. | Jefferson | | 47.99585 | -122.85116 | 8 | 0 | 8 | x | |
| 27 | NWS-2008-00567 | J&G Gunstone Clams, Inc. - Jefferson 9 | Jefferson | | 48.07327 | -122.9253 | 10 | 0 | 10 | x | |
| 28 | NWS-2009-00826 | Goodro Shellfish | Mason | | 47.38834 | -122.92539 | 25 | 0 | 25 | x | |
| 29 | NWS-2009-01082 | Case Cove | Pierce | | 47.2547 | -122.825 | 3.5 | 0 | 3.5 | x | |
| 30 | NWS-2009-01116 | Taylor Shellfish | Mason | | 47.36846 | -122.8261 | 6 | 0 | 6 | x | |
| 31 | NWS-2009-01148 | Taylor Shellfish (Stanley Rudd Tidelands) | Skagit | | 48.5734 | -122.4819 | 42.5 | 0 | 42.5 | x | |
| 32 | NWS-2009-01157 | Steve Zimmerman Shellfish | Thurston | | 47.12273 | -122.9635 | 0.3 | 0.2 | 0.5 | x | |
| 33 | NWS-2009-01268 | Willapa Bay Seafoods | Pacific | | 46.61379 | -124.02564 | 77 | 0 | 77 | x | |
| 34 | NWS-2009-01327 | Taylor Shellfish | Mason | | 47.15085 | -123.02252 | 20 | 0 | 20 | x | |
| 35 | NWS-2009-01381 | Olympia Oyster Company | Mason | | 47.11796 | -123.04734 | 420 | 0 | 420 | x | |
| 36 | NWS-2009-01481 | J & G Gunstone Clams Inc. | Jefferson | | 48.03913 | -122.69844 | 0.5 | 0 | 0.5 | x | |
| 37 | NWS-2009-01555 | Heckes | Skagit | | 48.599 | -122.455 | 1 | 24 | 25 | x | |
| 38 | NWS-2009-01572 | Seattle Shellfish | Thurston | | 47.13315 | -122.78705 | 1.3 | 0.1 | 1.4 | x | |
| 39 | NWS-2010-486 | Seattle Shellfish | Mason | | 47.273 | -122.86986 | 2.5 | | 2.5 | X | |

COMPLAINT EXHIBIT B - Page 1 of 3

| # | Permit | Name | County | Water Body | Lat | Long | A | B | C | D | E |
|---|--------|------|--------|-----------|-----|------|---|---|---|---|---|
| 40 | NWS-2010-00499 | Seattle Shellfish LLC | Mason | | 47.27881 | -122.8704 | 14.9 | 12.9 | 27.8 | x | |
| 41 | NWS-2010-00502 | Seattle Shellfish LLC | Mason | | 47.27402 | -122.87127 | 0.7 | 6 | 6.7 | x | |
| 42 | NWS-2010-00503 | Seattle Shellfish LLC | Mason | | 47.27476 | -122.87135 | 1.9 | 5.2 | 7.1 | x | |
| 43 | NWS-2010-00504 | Seattle Shellfish LLC | Mason | | 47.27534 | -122.87145 | 0.7 | 2.1 | 2.8 | x | |
| 44 | NWS-2011-01281 | Taylor Shellfish | Mason | | 47.3149 | -122.8298 | 1 | 0 | 1 | x | |
| 45 | NWS-2011-1100 | Taylor Shellfish | Thurston | | 47.1135 | -122.9382 | 0.5 | 0 | 0.5 | x | |
| 46 | NWS-2012-00074 | Taylor Shellfish - Nationwide Permit 48(Aquaculture) | Thurston | | 47.11384 | -122.93846 | 0.2 | 0 | 0.2 | x | |
| 47 | NWS-2012-00164 | Holbrook, Rich and Amy | Thurston | | 47.12306 | -122.96351 | 0.21 | 0.29 | 0.5 | x | |
| 48 | NWS-2012-00362 | Marrowstone Island Shellfish LLC - Hoffstater Lease | Jefferson | | 48.03161 | -122.69074 | 1.11 | 0.28 | 1.39 | x | |
| 49 | NWS-2012-00373 | Marrowstone Island Shellfish LLC - Erving Lease | Jefferson | | 48.0547 | -122.69123 | 0.71 | 0.18 | 0.89 | x | |
| 50 | NWS-2012-00379 | Marrowstone Island Shellfish LLC - Buckland Lease | Jefferson | | 48.05768 | -122.69324 | 0.45 | 0.11 | 0.56 | x | |
| 51 | NWS-2012-00380 | Marrowstone Island Shellfish LLC - Johnson N. Lease | Jefferson | | 48.05898 | -122.69729 | 0.6 | 0.15 | 0.75 | x | |
| 52 | NWS-2012-00381 | Marrowstone Island Shellfish LLC - Rempel Lease | Jefferson | | 48.05368 | -122.70137 | 0.37 | 0.09 | 0.46 | x | |
| 53 | NWS-2012-00391 | Seattle Shellfish (Toten Inlet-Rodeheaver Trust) | Thurston | | 47.17781 | -122.94113 | 0.08 | 0.8 | 0.88 | x | |
| 54 | NWS-2012-00421 | Marrowstone Island Shellfish LLC - Lunde Lease | Jefferson | | 48.041 | -122.69992 | 0.39 | 0.1 | 0.49 | x | |
| 55 | NWS-2012-00928 | Judd Shellfish | Thurston | | 47.12068 | -122.962993 | 0.34 | 0 | 0.34 | | x |
| 56 | NWS-2012-01136 | Seattle Shellfish, LLC | Mason | | 47.27144 | -122.86531 | 1 | 0 | 1 | x | |
| 57 | NWS-2012-01152 | Taylor Shellfish (aquaculture) | Mason | | 47.2432 | -122.8665 | 3 | 0 | 3 | x | |
| 58 | NWS-2012-1210 | BDN LLC (WA Shellfish) | Jefferson | | 47.867972 | -122.673777 | | | 5.3 | | |
| 59 | NWS-2012-01229 | Capital Duck Farms, LLC | - | | - | | 0.5 | 0 | 0.5 | x | |
| 60 | NWS-2012-1231 | Goodro Shellfish | | | | | | | | | |
| 61 | NWS-2012-01253 | Intertidal Farms (Tan Lease) | Mason | | 47.1684 | -122.99033 | 0.1 | 0.23 | 0.33 | x | |
| 62 | NWS-2012-01346 | Clam Fresh, LLC | - | | - | | 6.2 | 7 | 13.2 | x | |
| 63 | NWS-2013-00120 | Sisters Point Shellfish (aquaculture) | Mason | | 47.45316 | -123.07006 | 0.4 | 0.9 | 1.3 | x | |
| 64 | NWS-2013-00313 | Sisters Point Shellfish (aquaculture - 322263400040) | Mason | | 47.36035 | -123.02769 | 0.07 | 0.11 | 0.18 | | x |
| 65 | NWS-2013-00331 | R and B Oyster, Inc (aquaculture) | Pacific | | 46.64726 | -123.95966 | 12.84 | 0 | 12.84 | x | |
| 66 | NWS-2013-00391 | Bailey, Barbara P (aquaculture) | Pacific | | 46.53094 | -124.02412 | 1.99 | 0 | 1.99 | x | |
| 67 | NWS-2013-00512 | Sea Fresh Farms, Inc (aquaculture) Withdrawn | Mason | Totten Inlet | 47.18978 | -122.94829 | 1.75 | 2.05 | 3.8 | x | |
| 68 | NWS-2013-01147 | BDN (Brad Nelson)(Tjemsland Lease) Withdrawn | Jefferson | Squamish Harbor | 47.867 | -122.67505 | | 0.73 | 0.73 | x | |
| 69 | NWS-2013-01175 | Washington Shellfish | Pierce | Henderson Bay | | | 8.4 | | 8.4 | | X |
| 70 | NWS-2013-01201 | Washington Shellfish | Pierce | Dutchers Cove | | | 8.46 | | 8.46 | | X |
| 71 | NWS-2013-01222 | BDN (Brad Nelson) Withdrawn | Jefferson | Squamish Harbor | 47.867 | -122.675 | | 0.92 | 0.92 | X | |
| 72 | NWS-2013-01223 | BDN (Brad Nelson)(Garten Lease) Withdrawn | Jefferson | Squamish Harbor | 47.867 | -122.675 | | 2.02 | 2.02 | X | |
| 73 | NWS-2013-01235 | Transocean Seafoods | Snohomish | Skagit Bay | 48.2728 | -122.4208 | 508.51 | 0 | 508.51 | x | |
| 74 | NWS-2013-01268 | BDN (Smersh Lease) Withdrawn | Jefferson | Squamish Harbor | 47.865422 | -122.661214 | | 10.62 | 10.62 | X | |
| 75 | NWS-2014-00171 | Penn Cove | Jefferson | Quilcene Bay | | | | 3.1 | 3.1 | | X |
| 76 | NWS-2014-00282 | Minterbrook Oyster, Chin, Yoshimura | Pierce | Rocky Bay | | | | | | | |
| 77 | NWS-2014-00589 | Minterbrook Oyster Farm (Minter Bay) | Pierce | Minter Bay | | | | | | | |
| 78 | NWS-2014-00590 | Minterbrook Oyster Farm (Rocky Bay) | Pierce | Rocky Bay | | | | | | | |
| 79 | NWS-2014-00783 | Henderson Shellfish (Connollys Geoduck) (Cancelled) | Thurston | Eld Inlet | 47.164261 | -122.920403 | | | | | X |
| 80 | NWS-2014-00784 | Henderson Shellfish (Hanhs Geoduck) (Cancelled) | Thurston | Eld Inlet | 47.164173 | -122.920403 | | 0.35 | 0.35 | | X |
| 81 | NWS-2014-00809 | Taylor Shellfish Farms (Green Geoduck Farm) (Cancelled) | Thurston | Dana Passage (Fishtrap Loop) | 47.1656 | -122.846 | | 0.7 | 0.7 | | |
| 82 | NWS-2014-00808 | Taylor Shellfish Farms (Arnold Geoduck Farm) (Cancelled) | Thurston | Dana Passage (Fishtrap Loop) | 47.1656 | -122.846 | | 0.8 | 0.8 | | |

| 83 | NWS-2014-00807 | Taylor Shellfish Farms (Brannon Geoduck Farm) (Cancelled) | Thurston | Dana Passage (Fishtrap Loop) | 47.1656 | -122.846 | | | 0.8 | 0.8 | | |
| 84 | NWS-2014-01063 | Taylor Shellfish Farms (Bergh Geoduck Farm) (Cancelled) | Thurston | Dana Passage (Fishtrap Loop) | 47.1656 | -122.846 | | | 0.6 | 0.6 | | |
| 85 | NWS-2015-00148 | Suquamish Seafood (Cancelled) | Kitsap | Dyes Inlet | 47.6064 | -122.70213 | | | 85 | | | |
| 86 | NWS-2015-00264 | Geoducks Unlimited (Dibble) Withdrawn | Thurston | Totten Inlet | 47.1802 | -122.9405 | | | | | | |
| 87 | NWS-2015-00266 | Geoducks Unlimited (Coley) Withdrawn | Thurston | Totten Inlet | 47.17979 | -122.94054 | | | | | | |
| 88 | NWS-2015-00373 | Port Gamble S'Klallam Tribe (FLUPSY Nursery)(LOP) | Kitsap | Port Gamble Bay | 47.84545 | -122.57384 | | | 5.75 | 5.75 | | X |
| 89 | NWS-2015-874 | Sea Fresh Farms, Inc (aquaculture) | Thurston | Eld Inlet | 47.10382 | -122.963928 | | | | | | |
| 90 | NWS-2015-879 | Nelson, Thomas | Thurston | Eld Inlet | 47.104995 | -122.959299 | | | | | | |
| 91 | NWS-2015-878 | Wilson, Bernice M Trust | Thurston | Eld Inlet | 47.10468 | -122.96022 | | | | | | |
| 92 | NWS-2015-888 | Skokomish Tribe | Mason | Hood Canal | 47.344028 | -123.134861 | | | 30 | 30 | | X |
| 93 | NWS-2015-902 | JM Resources LLC (FLUPSY) | Mason | Oakland Bay | 47.21954 | -123.0786 | | | 0.4 | 0.4 | | X |
| 94 | NWS-2016-21 | Dabob Bay Oyster Company | Jefferson | Hood Canal | 47.615667 | -122.974537 | | | 11.28 | 11.28 | | X |
| 95 | NWS-2016-22 | Rites of Passage Shellfish Co | Mason | Pickering Passage | | | | | 2 | 2 | | X |
| 96 | NWS-2016-204 | Coast Seafoods (Tokeland Marina FLUPSY) | Pacific | | 46.7072 | -123.9682 | | | | | | |
| 97 | NWS-2016-229 | Seattle Shellfish (NWS-2007-1334) * will probably be added to previous number | | | 47.22234 | -122.80809 | | | | | | |
| 98 | NWS-2007-1213 | Jamestown Tribe | Clallam | Dungeness Bay | | | | | | | | |

Projects in red
withdrawn

cancelled pending
revised JARPA

# EXHIBIT C

**COALITION**
To Protect Puget Sound Habitat

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

May 1, 2015

**Via Certified Mail Return Receipt Requested**

Lieutenant General Thomas P. Bostick
Commanding General and Chief of Engineers
U.S. Army Corps Of Engineers
441 G Street NW
Washington, DC 20314-1000

Brigadier General John S. Kem
Commander Northwestern Division
P.O. Box 2870
Portland, OR 97208-2870

Colonel John G. Buck
Commander, Seattle District
U.S. Army Corps of Engineers
P.O. Box 3755
Seattle, WA 98124-3755

> **Re:    Petition For Suspension Of Authorizations
> Of Commercial Shellfish Aquaculture Activities
> Under Nation Wide Permit 48 In Puget Sound.**

Dear Generals Bostick & Kem and Colonel Buck:

The Coalition To Project Puget Sound Habitat ("CPPSH"), hereby requests - pursuant to  33 C.F.R. § 330.5(b) and other applicable authorities - that the Seattle District of the U.S. Army Corps of Engineers ("Corps") suspend authorization of commercial shellfish aquaculture in Puget Sound under Nation Wide Permit (NWP) 48, until such time as the Corps has initiated and completed a new review of the environmental effects of authorized activities and imposed conditions on NWP 48 as appropriate to ensure that the effects of authorized activities are minimal, consistent with the public interest, and not significant.

CPPSH is an alliance of concerned citizens, environmentalists, scientists, and recreational users who are concerned about the potential adverse effects of current and expanding aquaculture plants, animals, and ecological function in the nearshore environment and public waters.  CPPSH submits this Petition to again notify and remind the Corps of the dramatic difference between the **anticipated** number of activities authorized under NWP 48 in Puget Sound, and the **actual** number of pre-construction

1

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

notifications received and authorizations issued so far, **as well as** new information regarding the potential effects of the authorized activities on the environment in Puget Sound —including ESA-listed species.

CPPSH requests that Corps suspend authorization of commercial shellfish aquaculture in Puget Sound under NWP 48 until the Corps has initiated and completed a new review of the environmental effects of authorized activities. In addition, the use of NWP 48 in Puget Sound should be suspended until the Corps has imposed conditions to ensure that the effects of authorized activities are minimal, consistent with the public interest, and not significant.

Suspending authorization of additional commercial shellfish aquaculture in Puget Sound under NWP 48 would be in the public interest. It would avoid the authorization of activities under this NWP 48 which may have more than minimal and significant effects on the environment. It would allow the Corps to continue to authorize commercial shellfish aquaculture activities under individual permits, for which it conducts individualized environmental affects analyses. It would also the Corps comply with it's obligations under the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA) and the Clean Water Act (CWA).

This Petition is being submitted in both electronic and paper form. The paper letter is accompanied by a CD that includes extensive supporting materials including photographs, references, and considerable relevant literature. These materials document some (though not all) of the extensive, unaccounted for, and newly discovered impacts resulting from industrial-scale aquaculture activities in Puget Sound that are taking place under the auspices of NWP 48 authorizations.

**Background**

In early 2012, the Corps reissued a suite of NWPs to authorize certain activities that require permits under Section 404 of the CWA and/or Section 10 of the Rivers and Harbors Act.[1] These NWPs included NWP 48 – Commercial Shellfish Aquaculture Activities. *Id.* at p.10,280.

As part of that re-issuance the Corps produced a Decision Document, which purports to satisfy the Corps's obligations to analyze the effects of activities authorized under NWP 48 on the environment and the public interest. Those obligations are imposed by the NEPA, and by the Corps own regulations.[2] The National Decision Document addresses effects of authorization on a national and programmatic basis, and it contains only a cursory cumulative impacts discussion with little or no application to

---

[1]   *See,* Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184 (Feb. 21, 2012).

[2]   *See,* Decision Document, Nationwide Permit 48 1 (Feb. 13, 2012) ("*National Decision Document*").

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

local conditions anywhere. *Id.* at pp.25–30.

Shortly thereafter, the Seattle District announced regional conditions applicable to NWP 48.[3]  Concurrently, the Seattle District produced a Supplemental Decision Document for NWP 48.[4]  The Supplemental Decision Document is Seattle District Engineer's analysis of the cumulative adverse effects of NWP 48, as modified by regional conditions, which the District deemed necessary to address effects on the aquatic environment.  The District relied on these two documents to conclude that such effects would be minimal and not significant. *Id.* Supp. Dec. Doc. at p.1. In the Supplement, the Seattle District estimated that there were only "101 commercial shellfish growing areas in Washington State" **and** that NWP 48 would be used "approximately 50 times" each year during the life of the permit. *Id.* at p.31.

As indicated in the Supplemental Decision Document, the Seattle District has developed special conditions for commercial shellfish aquaculture activities.[5]  As suggested by a blank reference number in its heading ("Corps Reference Number: NWS-XXXX-XXXXX"), this document appears to be a template of conditions that has no effect until applied to an individual verification.

At the time, Corps had initiated but had not yet completed an "ESA Section 7 consultation with National Marine Fisheries Service ("NMFS") for the national NWP program.  On Nov. 24, 2014, after the conclusion of consultation, NMFS issued a Biological Opinion (hereafter "BiOp").[6]  On the grounds that the NWP program would address any "incidental take" of ESA listed species or their habitat in subsequent consultations, the 2014 BiOp did not provide an Incidental Take Statement ("ITS") for the NWP program, and the 2014 BiOP does not exempt from the "take" prohibitions in ESA Section 9 any incidental take that occurs as a result of NWP 48. *Id.* at p.355.

Previously, in 2009, NMFS issued a BiOp for activities in Washington State authorized under the 2007 version of NWP 48.[7] The 2009 BiOp clearly stated that it

---

[3]  *See*, Special Public Notice (Mar. 19, 2012), *available at*: http://www.nws.Corps.army.mil/Portals/27/docs/regulatory/Special%20Public%20Notices/2012_Final_NWP_48_SPN.pdf  ("*Special Public Notice*") (explaining requirements of 2012 NWP 48 as applicable in Washington State).

[4]  *See,* Supplement to the National Decision Document for 2012 Nationwide Permit 48 and Regional General Conditions 1 (Mar. 19, 2012) ("*Supplemental Decision Document*") *available at*:http://www.nws.usace.army.mil/Portals/27/docs/regulatory/NWPs/2012%20NWP%201%20to%2010%20Supp%20Decdoc%20_3-19-12_.pdf.

[5]  *See, Special Conditions for Commercial Shellfish Aquaculture Activities,* Permit Guidebook, http://www.nws.Corps.army.mil/Portals/27/docs/regulatory/NWPs/Existing%20Aquaculture%20Activities%20-%20Special%20Conditions.pdf ("Special Conditions Template").

[6]  *See,* NMFS, BiOp for Authorization of discharges of dredged and fill material or other structures into the waters of the United States under the Corps' Nationwide Permit Program 1 (2014) ("2014 BiOp").

[7]  *See,* NMFS, Conference Programmatic on Nationwide Permit 48 – Shellfish Aquaculture Activities, NWR-2008-4151 (Apr. 28, 2009) ("2009 BiOp").

3

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

**also** did not exempt any incidental take of listed species arising from activities authorized under NWP 48 in Puget Sound. *Id.* at p.65. Although the 2009 BiOp found that the activities under NWP 48 were likely to adversely affect critical habitat designated for Puget Sound Chinook salmon and Hood Canal summer-run chum salmon (*id.* at p.25) the 2009 BiOp ITS did "not quantify incidental take nor exempt any incidental take from the prohibition against take." *Id.* at p.65.

Current conditions are dramatically different from those contemplated by the 2012 Supplemental Decision Document or the 2009 BiOp. Rather than authorizing 50 activities per year, in the first eight months after the 2012 NWP 48 issued, the Seattle District issued authorizations or verifications for approximately 800 activities under NWP 48.[8]  And, in 2013, the Seattle District issued verifications for more than 100 *additional* activities. *Id.* There are also **many** more requests for verification under NWP 48 currently pending. *Id.*

**CWA**

A person discharging dredge and full into a wetland or water of the U.S. must first obtain a section 404 permit from Corps, pursuant to 33 U.S.C. § 1344 (2012). The Corps may issue a NWP to authorize a certain category of activities that involves discharges of dredged or fill material.[9]

Corps may issue a NWP only if it determines that the activities permitted are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effects on the environment.[10] Activities may be permitted under NWP only if no significant adverse effects to fish, shellfish, wildlife or their habitats will occur and appropriate steps have been taken to minimize the adverse effects on the aquatic ecosystem.[11]

When issuing an NWP the Corps must conduct an analysis of compliance with 404(b)(1) Guidelines and prepare a statement of findings.[12]  The Corps must deny a permit that does not comply.[13]

**NEPA**

---

[8]  *See,* Corps Spreadsheet marked Attachment A.

[9]  *See,* 33 U.S.C. § 1344(e); 33 C.F.R. § 325.5(c) (2014); *See also,* Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,184 (Feb. 21, 2012).

[10]  *See,* 33 U.S.C. § 1344(e); 40 C.F.R. § 230.7.

[11]  *See,* 40 C.F.R. §§ 230.7, 230.10.

[12]  *See,* 40 C.F.R. 230.6(d); 33 C.F.R. § 330.5(b)(3).

[13]  *See,* 33 C.F.R. 320.4(a)(1); *Sierra Club v. Army Corps of Engineers*, 464 F. Supp. 2d 1171, 1218 (M.D. Fla. 2006) *affirmed at* 508 F.3d 1332 (11th Cir., 2007).

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

Under NEPA, the Corps must prepare an Environmental Impact Statement ("EIS") when undertaking a major Federal action that significantly affects the quality of the human environment, pursuant to 42 U.S.C. § 4332(C). Corps may initially prepare an environmental assessment ("EA") to determine whether an action requires an EIS.[14] Although less demanding than an EIS, an EA must still consider all reasonably expected environmental impacts of the action.[15]

An EA must include a brief discussion of the environmental effects of the action, including cumulative impacts.[16]  If, through the EA, Corps concludes that an action will have no significant environmental effects, it may forgo preparation of an EIS and undertake the action, but it must produce a Finding Of No Significant Impact ("FONSI").[17]

A federal agency must prepare a Supplemental NEPA analysis when there are substantial changes to the proposed action, significant new circumstances, or significant new information relevant to environmental impacts of the agency action.[18]  The obligation to supplement is triggered when "substantial questions" about "whether a project **may** have a significant effect" arise.[19]  The same standard for supplementation applies to EA's as to EIS's.[20]

## Number And Extent Of Authorized Activities

The number of activities authorized in Puget Sound under NWP 48 is dramatically different from the number contemplated by Corps when it made its minimal impacts and no-significance findings. As outlined, rather than authorizing 50 activities per year (as estimated in the Seattle Dist. Supp. Decision Document) in the first eight months after 2012 NWP 48 issued the Seattle District issued verifications for approximately 800 activities.  In 2013, the Seattle District issued verifications for over 100 additional activities and many more notifications are pending.

---

[14]  *See*, 33 C.F.R. § 230.10; 40 C.F.R. § 1501.4.

[15]  *See*, 33 C.F.R. § 230(10); 40 C.F.R. §1508.9(b); *see Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1246 (9th Cir. 2005).

[16]  *See*, 40 C.F.R. §§ 1508.7–.9.

[17]  *See*, 33 C.F.R. § 230.11; 40 C.F.R. §§ 1501.4(e), 1508.13.

[18]  *See, Alliance for the Wild Rockies v. U.S. Department of Agric.*, 772 F.3d 592, 606 (9th Cir. 2014); 40 C.F.R. § 1502.9(c)(1) (2014).

[19]  *See, Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998)(emphasis added).

[20]  *See, Humane Soc'y of U.S. v. Bryson*, 924 F. Supp. 2d 1228, 1253 n.27 (D. Or. 2013); *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 566 n.2 (9th Cir. 2000); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998).

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

The National Decision Document for this NWP expressly relies on the Corps's subsequent exercise of discretionary authority to modify, suspend, or revoke NWP 48 in order to reach a finding that the impacts of authorized activities are minimal, consistent with the public interest, and not significant.[21]  Corps's principal exercise of regional discretionary authority to ensure minimal effects was the imposition of regional conditions which Corps analyzed in the Supplemental Decision Document.[22]  The Supplemental Decision Document expressly states that the cumulative impacts of NWP 48 on the aquatic environment are "dependent on **the number times** the NWP is used."[23]

When it issued NWP 48 and the Seattle District's regional conditions, the Corps did not account for the potential massive increase in authorized activities attributable to the modification of the 2012 NWP 48 allowing authorization of new and expanded operations. The Corps's projections of the number of authorized activities were based on the reported use of the 2007 version of NWP 48, which did not authorize new and expanded activities. The National Decision Document projects the number of authorized activities based on reported uses of the 2007 permit.[24]  The Supplemental Decision Document likewise estimated the number of times 2012 NWP 48 would be used based on applications received during previous years.[25]

Since the Corps's minimal effects and no significant impacts findings relied heavily (if not exclusively) on projections of the numbers of authorizations under the NWP 48, and because those projections **dramatically underestimated** the number of authorized activities in Puget Sound, the actual number of authorized activities invalidates the essential premises of Corps's prior findings.  The actual number of authorizations raises substantial questions as to whether the authorized activities will actually have significant and/or more than minimal effects.

**Water Quality Effects Of Shellfish Aquaculture**

The Corps' minimal impacts, public interest, and no significant impact findings relied on the premise that aquaculture will improve water quality.[26]  However, research published after the 2012 re-issue of NWP 48 contravenes this premise.  The USGS presentation at the 2014 SeaGrant shellfish symposium documented that "water quality

---

[21]  *See, E.g.*, National Decision Document at pp. 29 & 38.

[22]  *See, Supplemental Decision Document* at p.1.

[23]  *See, Supplemental Decision Document* at p.31 (emphasis added).

[24]  *See, National Decision Document* at p.38.

[25]  *See, Supplemental Decision Document* at p.31.

[26]  *See, National Decision Document* at pp. 5, 12, 13, and 30 ("At moderate population densities, commercially produced shellfish populations may improve general environmental concerns, such as water and habitat quality, within navigable waters by removing suspended materials and plankton from the water column in waters subject to eutrophication and by providing physical structure to the waterbody that can be used as habitat by some aquatic organisms (Dumbauld et al. 2009).")

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

effects of bivalves are not understood in much of Puget Sound." [27] A recent study warns of adverse water quality impacts, including algal blooms, from intensive shellfish production.[28]  Other studies have linked aquaculture to geochemical changes in the intertidal environment.[29] In 2015, a new Bendell study documented changes in ammonium and PH in intertidal sediments.[30]  In addition, there were early on some claims that industry made, about potential benefits that have not turned out to be supportable.[31]

The Seattle District Supplemental Decision Document asserts that water quality impacts arising from shellfish farming will be minimal based on regional special conditions developed in consultation with NMFS.[32]  However, that consultation was conducted for the 2007 permit and expressly excluded new and expanded operations. *Id.* at 19. Thus, the dramatic increase in the number of authorized activities undermines the premises on which the minimal effects finding relies upon.

Furthermore, there is no reasonable basis to assert that this consultation or regional and special conditions will address the effects of shellfish aquaculture under current conditions because those conditions are not described and information supporting their efficacy is not provided.  Sadly, the Corps's minimal effects and no significant impacts findings relied on premises that have been contravened by research. They also relied upon facts that are not applicable to current conditions.  Given that, there are substantial questions as to whether the already authorized activities - not to mention any future authorizations - will have a significant and/or more than minimal effect on water quality.

## PVC, High Density Polyethylene, Polyolefin

Although the National Decision Document acknowledges public comments regarding the "introduction of plastics," it does not address effects of chemical leachate from PVC tubing.[33]  The Supplemental Decision Document also does not discuss plastic

---

[27] *See,* Konrad, Christopher Approaches for Evaluating the Effects of Bivalve Filter Feeding on Nutrient Dynamics in Puget Sound, Dec 8, 2014 Washington SeaGrant Symposium Presentation.

[28] *See,* Bouwman, Lex, et al., *Mariculture: Significant and Expanding Cause of Costal Nutrient Enrichment*, 8 Environ. Res. Lett. 044026, *4 (2013).

[29] *See, e.g.*, Bendell, L.I., et al., *Changes in Geochemical Foreshore Attributes as a Consequence of Intertidal Shellfish Aquaculture: A Case Study*, 404 Marine Ecology Progress Series 91–108 (Apr. 2010).

[30] *See, e.g.,* Bendell, L.I., et al., Changes in Ammonium and PH within Intertidal Sediments in Relation to Temperature and the Occurrence of Non-Indigenous Bivalves, Open Journal of Marine Science, 2014, 4, 151-162.

[31] *See,* Coalition To Protect Puget Sound Habitat, Shellfish Aquaculture, Dispelling the Myths, March 2015.

[32] *See, Supplemental Decision Document* at p.19, & 31–32.

[33] *See, National Decision Document* at p.11.

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

leachate, PVC, or phthalates.  Yet recently published studies describe the dangerous environmental impacts that may arise from PVC.   It is now well known that PVC can leach dangerous chemicals.  PVC is "sensitive to thermal- and photo-degradation and is not useful without the addition of stabilizer additives, such as antioxidants and UV stabilizers."[34]

Also, PVC uses phthalates as plasticizers. Unfortunately, "these chemicals are proven endocrine disruptors." *Id.* at p.29.  "Phthalates may constitute up to 50 percent of the total weight of PVC plastics."[35]  These chemicals can leach into the environment and affect the reproduction, development, and genetics of a variety of organisms. *Id.* Phthalates easily leach into the environment and have been shown to bioaccumulate in fish and alter behavior. *Id.*, at p.2,051.

PVC introduced directly into the marine environment will likely degrade and release phthalates, among other chemicals.[36]  We now know that if salmon spend enough time near the PVC piping, they could absorb ecologically significant amounts of endocrine disrupting phthalates.[37]  In fact, NMFS has already determined that tubes and canopy netting associated with geoduck aquaculture can pose adverse effects on essential fish habitat and substrate.[38]  In general, introductions of plastics to marine environments will contribute to plastic pollution. A recent study estimates a minimum of 5.25 trillion particles weighing 268,940 tons are afloat in the world's oceans,[39] while microplastic debris harm is well documented in deeper waters. [40]

Charles Moore, a well know ocean expert, recently tested the plastic geoduck canopy nets, net caps, mesh tubes, oyster bags and clam canopy netting typically used by industry working under NWP 48 permits.  They are made of High Density Polyethylene, known to be harmful to aquatic life.[41]  Moore also tested Willapa Bay

---

[34] *See e.g.,* Jort Hammer et al., *Plastics in the Marine Environment: The Dark Side of a Modern Gift*, 220 Reviews Of Envtl. Contamination And Toxicology 1 (2012); *see also,* Center for Biological Diversity, Rulemaking Petition to EPA on PVC Use in Oceans (July 24, 2014) *available at* http://www.epa.gov/oppt/chemtest/pubs/PVC_RCRA.pdf.

[35] *See,* Jörg Oehlmann *et al.*, *A Critical Analysis of the Biological Impacts of Plasticizers on Wildlife*, 364 Philosophical Transactions Of The Royal Soc'y B., 2,047, 2,048 (2009).

[36] *See e.g.,* Anthony L. Andrady, *Microplastics in the Marine Environment*, 62 Marine Pollution Bulletin 1596 (2011).

[37] *See e.g.,* Heather J. Hamlin, *Review, Embryos as Targets of Endocrine Disrupting Contaminants in Wildlife*, 93 Birth Defects Research Part C: Embryo Today: Reviews 26 (2011).

[38] *See,* Letter from William W. Stelle, Jr., NMFS, to Michelle Walker, Corps, WCR-2013-29, (Haley permit comment) at pages 4 and 5 (Nov. 15, 2013).

[39] *See, e.g.,* Eriksen, M., *Plastic Pollution in the World's Oceans: More than 5 Trillion Plastic Pieces Weighing over 250,000 Tons Afloat at Sea*, PLoS ONE 9(12): e111913. doi:10.1371/journal.pone.0111913 (2014).

[40] *See,* Woodall, Lucy, et al, 2014. The deep sea is a major sink for microplastic debris. R. Soc. Open sci.1:140317.

[41] *See,* Charles Moore Algalita Power point, March 3, 2015 Haley Hearing.

oysters, and found that the Polyolefin rope was imbedded in some of the oyster shell and oysters.  These produce plastic particles that are harmful to human health.[42] [43] Further evidence of environmental harm from aquaculture plastics and micro-plastics was presented by Mr. Moore in a Tulane Law Review report.[44]  The 5 Gyres Institute, a leading marine plastic pollution organization, has also stated that in terms of the future of aquaculture gear "only 100% environmentally benign materials are acceptable moving forward."[45]

Given the unanticipated number of activities authorized under NWP 48, in conjunction with the newly information available regarding the water quality effects of PVC, High Density Polyethylene and Polyolefin materials, there is a clear need to conduct a supplemental environmental assessment of the potential impacts of use of NWP 48 in Puget Sound.

**Eelgrass**

Eelgrass "creates complex habitat that supports a diverse food web including fish, invertebrates, and waterfowl and reduces oxygen, dampens wave energy, absorbs nutrients and promotes conditions that facilitate organic matter mineralization and sedimentation."[46]  Eelgrass beds are sensitive to human caused disturbances, including increased sedimentation from adjacent geoduck farm harvesting activities.[47]

The NWP National Decision Document and NWP 48 Supplemental Decision Document assert that adverse environmental effects of authorized activities on eelgrass will be addressed through general and regional conditions, ESA Section 7 consultation, and subsequent review of pre-construction notifications.  The Seattle District describes special conditions that all "newly positioned" culturing not be placed within 10 feet of eelgrass and requiring a plan for grounding of vessels within eelgrass beds.[48]

However, since the 2012 reissue, information has become available regarding effects on eelgrass arising from the use of motorized boats and increased sediment

---

[42] *See, e.g.,* Avio, Carlo Giacomo, et al, 2014. Pollutants bioavailability and toxicological risk from microplastics to marine mussels. Environmental pollution 198 (2015) 211-222.

[43] *See, e.g.,*Van Cauwenberghe, Lisbeth, et al. 2014. Microplastics in bivalves cultured for human consumption. Environmental Pollution 193 (2014) 65-70.

[44] *See,* Moore, Charles. 2014. Rapidly increasing Plastic Pollution from Aquaculture Threatens Marine Life, Tulane Environmental Law Journal Volume 27 Issue 2.

[45] *See,* Letter from Marcus Eriksen, PhD, 5 Gyres Institute, to The Coalition to Protect Puget Sound Habitat, February 8, 2015.

[46] *See,* Washington State Dept. of Natural Resources, Puget Sound Submerged Vegetation Monitoring Project, 2009 Report 41 (2011).

[47] *See, Coalition to Protect Puget Sound Habitat v. Pierce County*, SHB Case No. 13-016 *15 (Findings of Fact, Conclusions of Law, and Order, Jan. 22, 2014) (stating that disturbances from geoduck harvest can harm eelgrass).

[48] *See, Special Conditions Template* at p.2.

from geoduck harvesting.[49]  The unanticipated number of activities authorized under NWP 48 in conjunction with the newly information available regarding the effects on eelgrass invalidate the premises Corps relied on to determine that regional and special conditions would ensure that effects on eelgrass are minimal and not significant.

**Salmon and the Nearshore**

ESA-listed Puget Sound Chinook salmon and Hood Canal Summer Run chum salmon occupy Puget Sound.[50]  As NMFS noted in the 2009 BiOp, activities authorized under NWP 48 will likely adversely affect critical habitat for these salmon. *Id.* at p.25. Shellfish aquaculture harms salmon populations though consumption of zooplankton and direct competition for food with juvenile salmon.[51]  Further, the method of growing geoducks that is most frequent harbors fish that prey on salmon.[52]

Greatly expanding the geographical scope of aquaculture could lead to lower salmon runs as their population comes into direct competition with commercial shellfish farms. PVC and related pollutants will also potentially harm salmon in Puget Sound. As noted already, salmon may absorb ecologically significant amounts of phthalates.[53] Further, expanding geoduck harvesting could  lead to a further decline in eelgrass beds in Puget Sound, which would reduce salmon habitat.[54]  Finally, harvesting geoduck greatly increases sediment in the water around the harvest site, which will potentially negatively affect both juvenile and adult salmon in the vicinity.

James Brennan, a well respected nearshore marine ecologist (with over 24 years experience in Puget Sound), has outlined the adverse effects from aquaculture in a detailed power point.[55]  Noted in Brennan's presentation is the Chinook and Bull Trout South Sound Recovery plan, which shows aquaculture as a stressor to salmon populations.[56]  A similar power point presented by Jim Johannessen, a noted Puget

---

[49]  *See e.g.*, Nat'l Parks Service, FEIS Drakes Bay Oyster Company Special Use Permit, 333 (2012) (noting that motor boats scar eelgrass meadows); and *Coalition to Protect Puget Sound Habitat v. Pierce County*, at p.*15.

[50]  *See,* 2014 BiOp at pp. 182 and 192.

[51]  *See e.g.,* Canadian Science Advisory Secretariat, *Effects of Shellfish Aquaculture on Fish Habitat*, 25-26 (2006), *available at* http://www.dfo-mpo.gc.ca/Library/323203.pdf.

[52]  *See*, G.R. VanBlaricom, et al., *Ecological Consequences of Geoduck Clam Aquaculture for Benthic Communities of Intertidal San Flats in Southern Puget Sound*, *available at* http://www.caseinlet.org/uploads/Benthic_Communities_of_Intertidal-Van_Blaricom.pdf.

[53]  *See*, Hamlin, *Review, Embryos as Targets of Endocrine Disrupting Contaminants in Wildlife*, *supra* at p.26.

[54]  *See*, Washington State Dept. of Natural Resources, Puget Sound Submerged Vegetation Monitoring Project, 2009 Report 3 (2011).

[55]  *See,* James Brennan Power point, March 2015, Assessment of Known, Apparent, and Likely Impacts Associated With Geoduck Aquaculture with Emphasis on the Proposed Haley Shellfish Farm.

[56]  *See,* Chinook and Bull Trout Recovery Plan, South Puget Sound, Submitted to NOAA

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

Sound geomorphologist and restoration expert (with over 30 years of experience in Puget Sound) also discusses the adverse impacts of geoduck aquaculture.[57]

Both Mr. Brennan and Mr. Johannessen included Bendell studies that document adverse impacts to native species, changes in community composition and increasing nearshore impacts and plastic pollution.[58] [59] [60]  A Washington Department of Fish and Wildlife biologist, Chris Waldbillig, similarly noted in an email to Pierce County in 2012 that "I would look at typical juvenile salmonids windows, **generally aquaculture and juvenile salmon habitat do not go hand in hand** and try to get them to avoid clam predator netting." (emphasis added).[61]

Mr. Brennan has also cautioned that the SeaGrant geoduck research that is often cited by industry as demonstrating little or no impact from aquaculture, was actually **very** limited in its scope and contains significant scientific caveats.[62]   A power point by Dr. Gary Ritchie similarly outlines the lack of statistical rigor in the SeaGrant geoduck impact studies.[63]

The National Decision Document responds to comments regarding the effects on critical habitat for ESA-listed species, asserting that such effects would be addressed through General Condition 18, pre-construction notification review, and Section 7 consultation.[64]  The Supplemental Decision Document also responded to comments on critical habitat and reached similar conclusions.[65]

However, prior ESA consultations expressly excluded new and expanded operations. *Id.* at 19. The dramatic increase in the number of authorized activities invalidates the premises on which the decision documents rely.

---

Fisheries and adopted in 2005, Ch.4).

[57] *See,* Jim Johannessen Power point, March 2015, Coastal Geomorphology and Coastal Geology Analysis of Proposed Haley (Taylor Shellfish, Seattle Shellfish) Geoduck Farm, Pierce County, Wa.

[58] *See,* Bendell, L.I. 2014. Evidence for Declines in the Native Leukoma staminea as a Result of the Intentional Introduction of the Non-native Venerupis philippinarum in Coastal British Columbia, Canada. Estuaries and Coasts (2014)37:369-380.

[59] *See,* Bendell, L.I.2014. Community composition of the intertidal in relation to the shellfish aquaculture industry in coastal British Columbia, Canada. Aquaculture 433 (2014) 384-394.

[60] *See,* Bendell, L.I. 2015. Favored use of anti-predator netting (APN) applied for the farming of clam beds leads to little benefits to industry while increasing nearshore impacts and plastics pollution. Marine Pollution Bulletin (In Press) (2015).

[61] *See,* emails from Chris Waldbillig, WDFW, to Scott Sissons at Pierce County, March 28, 2012.

[62] Brennan Power point, March 2015, Assessment of Known, Apparent, and Likely Impacts Associated With Geoduck Aquaculture with Emphasis on the Proposed Haley Shellfish Farm.

[63] *See,* Dr. Gary Ritchie, PhD. Power point, Geoduck impact studies lack statistical rigor, March 2-6, 2015.

[64] *See, National Decision Document* at pp.10, 24, 36, & 40–42.

[65] *See, Supplemental Decision Document* at pp.2–4, 7, 18–19, 7 24–25.

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

The 2009 BiOp's finding that the anticipated adverse effects of activities authorized under NWP 48 on critical habitat designated for Puget Sound Chinook salmon and Hood Canal summer-run chum salmon are "too small, too short-lived and diffuse" to cause takings of these species is no long reliable.  The scope of activities authorized under NWP 48 has dramatically expanded.  In addition, there are dramatic increases in the number of activities authorized under the NWP.

The 2009 BiOp was issued for the NWP 48 under the 2007 NWP program.  In 2012, Corps reissued the NWPs with modifications to General Conditions and to NWP 48.  These changes included removing reporting requirements and substantially reducing the number of notification thresholds.[66]  Perhaps most significantly, the 2012 NWP 48 authorizes new commercial shellfish activities, whereas the 2007 version only authorized existing activities.[67]

To make its finding regarding potential for take of ESA-listed species, the 2009 BiOp relied on assessments driven by the amount and extent of covered activities. For example, the BiOp: stated that size of the action area for the consultation was "driven by the spatial extent of aquacultural acreage," *id.* at p.30; considered estimates of the number of farmed parcels and total farmed acreage in each portion of the action area, *id* at pp. 30–33; concluded that benthic disturbances did not effect listed fish based on the current level of disturbance, *id.* at p. 52;  and concluded that the functional depression of eelgrass sites within managed beds had limited effect on listed fish due to the extent of shellfish aquaculture sites, *id.* at p.53.

The number of authorized activities under 2012 NWP 48 dramatically exceeds that contemplated by the 2009 BiOp.  This alone constitutes new information that the effects of the action may affect listed species and critical habitat in a way not considered in the biological opinion.

The 2009 BiOp specified that reinitiation of consultation is required if the amount or extent of taking specified in the ITS is exceeded; if new information reveals effects of the action that may affect listed species or designated critical habitat in a manner or to an extent not previously considered; if the identified action is subsequently modified in a manner that has an effect to the listed species or designated CH that was not considered in the biological opinion; or if a new species is listed or critical habitat is designated that may be affected by the identified action.[68] The dramatic expansion of authorized activities in number and in application to new and expanded activities constitutes unconsidered changes in *extent* of effect and a *modifications* that may have an effect.

---

[66]  *See,* 77 Fed. Reg. 10,184, at pp. 10,228–30.
[67]  *See,* 77 Fed. Reg. 10,184, at pp. 10,232 and 10,280.
[68]  *See,* 2009 BiOp at pp.64–65.

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

Since the 2009 BiOp findings were predicated on the extent of activities authorized under NWP 48, the inclusion of new activities and the dramatic expansion in the number of authorized activities triggers the reinitiation conditions of the 2009 BiOp and renders reliance on its findings regarding adverse effects of authorized activities on Puget Sound Chinook salmon and Hood Canal summer-run chum salmon unreasonable. This invalidates the premises of Corps findings that the effects of authorized activities on these species will be minimal and not significant.

**Birds**

Aquaculture causes a variety of negative impacts to marine birds. The industry treats waterfowl as pests, and purposely harasses them so that they stay away from the planted sites.[69] As numerous incidents affirm, predator exclusion nets can directly harm marine waterfowl by trapping birds.[70] Aquaculture can also harm marine waterfowl by displacing their food supply, as areas historically open for foraging are converted to aquaculture use.[71] Harmful industry practices which include clearing the shorelines of marine life and polluting plastics are depicted in a South Sound and Burley Lagoon power point.[72]

The Nationwide Decision Document acknowledges comments regarding effects of harassment and destruction of migrating birds through harassment.  The Decision Document asserted that minimal impacts to breeding areas for migrating birds were addressed by General Condition 4.[73]   That Decision Document also specifies that NWP 48 requires that PCN include information about the use of anti-predator nets. *Id.* at pp.2 & 4.  The Seattle District Supplemental Decision Document also acknowledges additional public comment regarding effects on birds.  The Seattle District felt that such effects would be minimized through General Condition 4 and special regional conditions.[74]

Unfortunately, General Condition 4 cannot be reasonably relied on because it only excludes, to the maximum extent practicable, activities in migratory bird "breeding"

---

[69]  *See*, DeFrancesco, J. and Katie Murray, *Pest Management Integrated Plan for Bivalves in Oregon and Washington* 52–53 (Diane Clarke, ed. 2010) *available at* http://www.ipmcenters.org/pmsp/pdf/OR-WAbivalvePMSP.pdf.
[70]  *See, e.g.*, Photos, Case Inlet Shoreline Association (CISA), http://www.caseinlet.org/Photos.php (showing image of a bold eagle trapped in aquaculture netting).
[71]  *See*, A. Heffernan, et al., *A Review of the Ecological Implications of Mariculture and Intertidal Harvesting in Ireland* (1999); *see also*, John P. Kelly, et al., *Effects of Aquaculture on Habitat Use by Wintering Shorebirds in Tomales Bay, California* (1996).
[72]  *See,* Coalition To Protect Puget Sound Habitat Picture Power Point, 14 pages.
[73]  *See, Nationwide Decision Document* at pp.11, 32 and 42.
[74]  *See, Supplemental Decision Document* at pp.18, 21–23.

areas.[75] This condition will have no effect on non-migratory birds or on activities outside of migratory bird **breeding areas**. While the District's special conditions require labeling and control of net materials, they do not include any conditions directed at minimizing effects on birds of any kind.  In fact the word "bird" or "birds" do not even appear in the Special Conditions adopted by the District.

The extra pressure that aquaculture places on the birds through netting and displacement of food sources needs to be carefully examined. The Corps current NWP 48 NEPA documents fail to do this, primarily because of the grossly underestimated intensity of the NWP 48 usage. The unanticipated number of activities authorized under NWP 48 and the failure of Corps to impose special conditions directed at minimizing harm to birds invalidate the premises Corps relied on to determine that effects on birds are minimal and not significant.

**Other Species**

The added increase in noise from aquaculture vessels has the potential to harm or harass Southern Resident Killer Whales. Furthermore, declines in Chinook salmon populations would adversely affect prey availability for killer whales.[76] The Nationwide Decision Document does not discuss killer whales at all. Killer whales are commonly seen in South Puget Sound in the project areas. The Supplemental Decision Document acknowledges public comments on interference with whale recovery, but concludes that such effects will be minimized through Section 7 consultation and pre-construction notification review.[77]  The Supplemental Decision Document also points at a regional general conditions addressing bank stabilization. *Id.* at p.40.

Unfortunately, these findings and the 2009 BiOp findings were predicated on the limited presumed extent of activities authorized under NWP 48.  The inclusion of new activities, **and** the dramatic expansion in the number of authorized activities, triggers the reinitiation conditions of the 2009 BiOp.  It also renders reliance on its findings regarding adverse effects of authorized activities on killer whales and Puget Sound Chinook salmon and Hood Canal summer-run chum salmon entirely unreasonable.

Geoduck aquaculture is know to have displaced beds of sand dollars in the past, and will likely do so in the future.[78] Sand dollars are an important feature of the nearshore environment, and wide scale removal will be detrimental to organisms that

---

[75]  *See*, 77 Fed. Reg. 10,184 at p.10,282.

[76]  *See*, NMFS, Recovery Plan for Southern Resident Killer Whale (Orcinus orca) II-75 (2008).

[77]  *See, Supplemental Decision Document* at pp.18–19.

[78]  *See, e.g.*, Photos, CISA, http://www.caseinlet.org/Photos.php (showing image of sand dollars removed from tidelands near Steamboat Island).

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

depend on that environment.[79]

The Nationwide Decision Document asserts that provisions relating to submerged aquatic vegetation, General Condition 18 (endangered species), General Condition 14 (proper maintenance), PCN review, and prospective regional conditions will ensure minimal effects to sand dollars.[80]  The Supplemental Decision Document also acknowledges public comment on sand dollar beds, and reaches a similar conclusion.[81]

However, no regional or special conditions are directed at sand dollars.  The unanticipated number of activities authorized under NWP 48 and the failure of Corps to impose special conditions directed at minimizing harm to sand dollars invalidate the premises Corps relied on to determine that effects on sand dollars are minimal and not significant.

Shellfish aquaculture can also at least potentially have major negative effects on fish such as herring, which can get caught in netting.[82]  The Nationwide Decision Document does not address the trapping of herring in anti-predator nets.  However, it does specify that NWP 48 requires that PCN include information about the use of anti-predator nets.[83]  The Supplemental Decision Document acknowledges public comment regarding introduction of nets to aquatic habitats, and concludes that Section 7 consultation, PCN review, and special regional conditions will ensure that effects are minimal.[84]

However, the regional conditions on NWP 48 do not address herring or nets. The Special Conditions Template only includes a condition requiring spawning surveys and avoidance of certain activities if herring spawn are present.[85]  Unfortunately, because those two actions do not directly address the placement of netting, they cannot be reasonably relied on to minimize the effects of trapping herring spawn in nets. Thus, the unanticipated number of activities authorized under NWP 48 and the failure of Corps to impose special conditions directed at minimizing harm to herring invalidate the premises Corps relied on to determine that effects on herring are minimal and not significant.

Recent Sea Grant diver survey results also indicate potential loss of habitat for

---

[79]  *See*, Megan N. Dethier and Amy Leitman, *Concerns and Questions Relevant to Infaunal and Epibenthic Impacts of Geoduck Aquaculture* 1 (2007).

[80]  *See, Nationwide Decision Document* at p.13.

[81]  *See, Supplemental Decision Document* at pp.18-19.

[82]  *See, e.g.*, Home, CISA, http://www.caseinlet.org/Home_Page.php (showing photos of dead herring trapped by anti-predator netting).

[83]  *See, Nationwide Decision Document* at pp.2 & 4.

[84]  *See, Supplemental Decision Document* at pp.18 & 23.

[85]  *See, Special Conditions Template* at p.1.

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

Flat Fish, when tubes and nets are present. The Nationwide Decision Document acknowledges public comment regarding effects on flat fish.[86]  The Decision Document concludes, based on permit terms, other regulation, and prospective regional and case-specific conditions, that such conditions will be minimal. *Id.*   The Decision Document also specifies that NWP 48 requires that PCN include information about the use of anti-predator nets. *Id.* at pp.2, 4.

The Supplemental Decision Document does not discuss flat fish at all. The regional conditions on NWP 48 also do not address flat fish or nets.  The Special Conditions Template includes no conditions directed at flat fish. Thus, the unanticipated number of activities authorized under NWP 48 and the failure of Corps to impose special conditions directed at minimizing harm to flat fish invalidate the premises Corps relied on to determine that effects on flat fish are minimal and not significant.

**Authority to Suspend**

The Corps may revoke or modify a NWP if the Corps determines that the authorized activities have an adverse environmental impact or are more appropriately authorized by individual permits.[87] The Corps has delegated to District and Division engineers the discretionary authority to suspend, revoke, or modify authorizations under an NWP.[88]

Corps regulations expressly provide that a Division engineer may modify, suspend, or revoke NWP authorizations for any specific geographic area, class of activities, or class of waters within their division.[89]  In fact, the District engineer also has authority, following informal consultation with a permittee, to suspend any already issued specific authorization under an NWP, as long as the engineer notifies the permittee in writing.[90]

In issuing NWP 48, and making a finding that issuing NWP 48 was in the public interest, the Corps expressly invoked and relied upon its authority to suspend, revoke, or modify the NWP at a later date.[91]  The Corps also expressly relied on its authority to

---

[86]  *See, Nationwide Decision Document* at p.11.

[87]  *See,* 33 U.S.C. §1344(e)(2) (2012); *See also id.* at § 1344(d) (2012). The 404(b)(1) Guidelines, 40 CFR Part 230 (2014), also specify that activities which are more appropriately regulated by individual permit, due to their location in specific geographic areas, must be excluded from a NWP. *See,* 40 CFR § 230.7(b)(2).

[88]  *See,* 33 C.F.R. § 330.1(d), 33 C.F.R. § 330.4(e); *See also id.* at § 330.2(g).

[89]  *See,* 33 CFR § 330.5(c)(1).

[90]  *See,* 33 CFR § 330.5(d)(2)(ii).  If, following suspension, the district engineer finds that environmental concerns or the public interest so requires they can issue a final written decision to the permittee completely revoking the NWP authorization.  *See,* 33 CFR  § 330.5(d)(2)(iii).  No public notice or hearing is required for such a case-specific revocation. *Id.* at § 330.5(d)(3).

[91]  See, *National Decision Document*, NWP 48, p.36 (Feb. 13, 2012)(Describing a district engineer's authority to revoke, suspend, or modify any NWP authorization).

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

revoke NWP 48 on a geographic basis, to ensure that individual and cumulative impacts would be minimal and not significant.[92]

The Seattle District made the same determination in its own Supplement Decision Documents on NWP 48.[93]  In addition, NMFS repeatedly referenced and relied upon the Corps's authority to revoke, suspend, or modify the NWP in its 2014 BiOp.[94] In fact, the 2014 BiOp not only relies on that presumption, it **requires** reinitiation of consultation "If the Corps **fails to** modify, **suspend or revoke** Nationwide Permits to address any" concerns mutually identified by the Corps and NMFS.[95]

**Conclusion**

The number of activities authorized and seeking authorization under 2012 NWP 48 dramatically exceeds the number of activities anticipated when Corps made its minimal effects, public interest, and no-significant impact findings for 2012 NWP 48. There is also new information regarding the potential effects of authorized activities on the environment.  Given both (or either) of those, there is no longer a reasonable basis to conclude that 2012 NWP 48 is consistent with the requirements of 33 U.S.C. §1344(e) for the issuance of general permits.

Further, these changes raise substantial questions as to the adequacy of Corps's

---

[92]  *Id.* at p.4 (Citing 33 C.F.R. §§ 330.4(e) and 330.5 and asserting that The Corps's abilities take action to suspend or revoke an NWP or NWP authorization for activities within a region or state provide "additional safeguards."), at p.16 ("Specific NWPs can also be revoked on a geographic or watershed basis where the individual and cumulative adverse effects resulting from the use of those NWPs are more than minimal." and "Division engineers can also revoke an NWP if use of that NWP results in more than minimal individual and cumulative adverse effects on the aquatic environment, especially in high value or unique wetlands and other waters."), and at p.29 ("In a specific watershed, division or district engineers may determine that the cumulative adverse effects of activities authorized by this NWP are more than minimal. Division and district engineers will conduct more detailed assessments for geographic areas that are determined to be potentially subject to more than minimal cumulative adverse effects. Division and district engineers have the authority to require individual permits in watersheds or other geographic areas where the cumulative adverse effects are determined to be more than minimal, or add conditions to the NWP either on a case-by-case or regional basis to require mitigation measures to ensure that the cumulative adverse effects are minimal. When a division or district engineer determines, using local or regional information, that a watershed or other geographic area is subject to more than minimal cumulative adverse effects due to the use of this NWP, he or she will use the revocation and modification procedure at 33 CFR 330.5. In reaching the final decision, the division or district engineer will compile information on the cumulative adverse effects and supplement this document."); *See also,* Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, p.10,186 (2012).

[93]  *See,* Supp. Dec. Doc and Reg. Gen. Conditions pp.40 & 47 (Mar. 19, 2012).

[94]  *See generally,* NMFS 2014 BiOp, finding that as a result of consultation the Corps agreed to exercise its authority to revoke, suspend, or modify NWP as needed to respond to information that raises concerns regarding environmental effects. *Id.* at pp.78, 325, 338–39, & 344–45. To this end, The Corps agreed to issue guidance and semi-annual reports on its permitting activities. *Id.* at pp.72, 75, 77, & 325.

[95]  2014 BiOp at pp.105 & 112 (NMFS even notes that the New England District has suspended at least one NWP within its jurisdiction.)

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**

prior environmental analysis.  These changes and new information trigger the requirement to supplement the NEPA documents for this permit.

To address these deficiencies, CPPSH requests the following:

• The Corps should suspend authorizations under 2012 NWP 48 in Puget Sound, so that commercial shellfish operations under CWA Section 404 and/or Section 10 of the Rivers and Harbors Act are authorized by individual permit only;

• That suspension of 2012 NWP 48 should remain in effect until the Seattle District Corps has completed a supplemental NEPA and CWA review of the effects of the already authorized activities;

• That suspension of 2012 NWP 48 should remain in effect until the Seattle District Corps has completed a supplemental NEPA and CWA review of the potential effects of the further NWP 48 authorizations;

• The Corps should supplement its existing analysis with detailed information and analysis regarding the cumulative impacts of the existing and future projected levels of aquaculture.  This is needed because the current permit usage and authorization levels are clearly an order of magnitude or more greater than Corps previously anticipated;

• As part of that process, the Corps should hold one or more hearings to take testimony on and collect evidence regarded the existing and likely cumulative impacts; and

• The Corps needs to reassess whether authorization of activities under NWP 48 will result in "take" of ESA-listed species, including Puget Sound Chinook salmon and Hood Canal chum salmon, or jeopardize their continued existence or adversely modify their habitat.

We look forward to hearing from you on these issues.  Since at the moment, NWP 48 remains in operation in Puget Sound, and the number of applications and potential authorizations under NWP 48 continues to mount, we ask that you act, or publicly refuse to act, on this Petition within 30 days.  If you have not done so, in order to protect Puget Sound from further cumulative and individual negative impacts, CPPSH will have little choice but to take any legal action available.

Sincerely,

COALITION
To Protect Puget Sound Habitat

P.O. Box 1374
Gig Harbor, WA 98335
**coalitiontoprotectpugetsoundhabitat.com**


Laura Hendricks


cc:
Karl G. Anuta, Esq. Atty for CPPSH
Thane Tienson, Esq. Atty for CPPSH

**Mr. William Stelle** , Regional Administrator
National Marine Fisheries Service
7600 Sand Point Way Northeast
Seattle, WA 98115

**Mr. Dennis McLerran**, Regional Administrator
U.S. EPA Region 10
1200 6th Avenue, Suite 900
Seattle, WA 98101

**Ms. Maia Bellon**, Director
Washington Department of Ecology
P.O. Box 47600
Olympia, WA 98504-7600

**Ms. Megan Duffy**
Deputy Supervisor
Washington Department of Natural Resources
P.O. Box 47000
1111 Washington Street SE
Olympia, Wa 98504-7000

**Mr. Jim Unsworth**
Director
Washington Department of Fish and Wildlife
600 Capitol Way N.
Olympia, Wa   98501