The Honorable Robert S. Lasnik

Karl G. Anuta (WSB No. 21346)
Law Office of Karl G. Anuta, P.C.
735 S.W. 1st Ave., 2nd Floor
Portland, Oregon 97204
T: (503 827-0320 / F: (503) 288-6551
kga@integra.net

Thane Tienson (WSB No. 13310)
Landye Bennett, Blumstein
1300 S.W. 5th Ave., Suite 3500
Portland, Oregon 97201
T: (503) 224-4100 / F: (503) 224-4133
ttienson@lbblawyers.com

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| THE COALITION TO PROTECT PUGET SOUND HABITAT,<br><br>Plaintiff,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, *ET AL.*,<br><br>Defendants,<br>and<br><br>TAYLOR SHELLFISH COMPANY, INC.,<br><br>Defendant-Intervenor. | No.: 2:16-CV-00950-RSL<br><br>PLAINTIFF COALTION TO PROTECT PUGET SOUND HABITAT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF MOTION<br><br>NOTE ON MOTION CALENDAR:<br>  [COURT TO SCHEDULE ONCE<br>    BRIEFS FILED]<br><br>ORAL ARGUMENT REQUESTED |

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - Page i
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

1
2
3
4
5
6
7
8
9
10
11      CENTER FOR FOOD SAFETY,

12              Plaintiff,                          No.: 2:17-CV-01209-RSL

13              v.

14      U.S. ARMY CORPS OF ENGINEERS, *ET AL.*,

15              Defendants,

16              and

17      PACIFIC COAST SHELLFISH GROWERS
        ASSOCIATION.,
18
19              Defendant-Intervenor.

20
21                              **TABLE OF CONTENTS**

22      **TABLE OF CONTENTS** ............................................................................................................ **ii**

23      **TABLE OF AUTHORITIES** ........................................................................................................ **iv**

24      **MOTION** .......................................................................................................................................... **1**

25      **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** ................. **1**

26      **INTRODUCTION** ........................................................................................................................... **1**

27      **STATEMENT OF JURISDICTION** .......................................................................................... **3**

28      PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - Page ii
        CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

                                        LAW OFFICE OF KARL G. ANUTA, P.C.
                                                TRIAL ATTORNEY
                                              735 S.W. First Avenue
                                               Portland, OR 97204
                                        Phone: 503.827.0320 – Fax 503.228.6551

STANDARD OF REVIEW ................................................................................. 3

LEGAL BACKGROUND ................................................................................... 4

    I.   National Environmental Policy Act............................................................4

    II.   Clean Water Act........................................................................................5

SUMMARY OF FACTUAL BACKGROUND .................................................. 6

    I.   2012 NWP 48.............................................................................................7

    II.   2017 NWP 48...........................................................................................10

    III.   Public and Agency Involvement...............................................................11

ARGUMENT ...................................................................................................... 13

    I.   The Coalition has Standing......................................................................13

    II.   The 2017 NWP 48 analysis is fatally flawed...........................................15

        A.   Both the CWA and NEPA require a properly supported cumulative
impacts analysis, in order to try to prevent piecemeal destruction of aquatic
ecosystems.......................................................................................................... 15

        B.   Continued reliance on the defective 2012 cumulative impacts analysis was
arbitrary and capricious and not in accordance with the requirements of the CWA
and NEPA.......... 17

            1.   The 2017 cumulative impact analysis violates NEPA and the APA by
failing to adequately explain why it is not undermined by the Corps' gross
underestimates.................................................................................................... 18

            2.   The failure to provide an adequate explanation also violates the CWA
and the APA....................................................................................................... 20

        C.   Even ignoring the gross underestimates of use and acreage in 2012,
reliance on general and conclusory statements is arbitrary and capricious. ............... 21

            1.   The Corps failed to consider the collective effect of NWP 48 verifications
when added to past, present, and reasonably foreseeable future actions under
NEPA..................................................................................................................21

            2.   Stating that effects will be minimal when verifications are "properly
sited and operated" is a conclusion, not an analysis of cumulative impacts under
CWA...................................................................................................................24

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

3.    Refusal to consider key impacts directly connected to shellfish aquaculture was contrary to the broad scope of NEPA cumulative impacts analysis…......................................................................................... 27

4.    The Corps' refusal to consider cumulative impacts render its Finding Of No Significant Impact arbitrary and capricious. ....................................... 28

5.    The 100-year "look back" has significant potential cumulative impacts, that have not been addressed by the Corps.. ............................................... 30

CONCLUSION ...................................................................................................... 33

## TABLE OF AUTHORITIES

### Cases

*Baltimore Gas & Elec. Co. v. Nat. Res. Defense Council*, 462 U.S. 87 (1983)............................. 4

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ................... 18

*Califano v. Sanders*, 430 U.S. 99 (1977) ..................................................................... 3

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)........................................ 3

*City of Oxford v. FAA*, 428 F.3d 1346 (11th Cir. 2005) ................................................ 5

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031 (9th Cir. 2015) ......... 13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167  (2000)......................... 14

*Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008)........................... 20

*Fritofson v. Alexander*, 772 F.2d 1225 (5th Cir. 1985) .................................................. 28

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 *amended on other grounds*, 387 F.3d 968 (9th Cir. 2004)............................................................. 23

*Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006) ................................... 19

*Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) ........................................................... 15

*Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062 (9th Cir. 2002)............................ 15

*Klamath-Siskiyou Wildlands v. Bureau of Land Management*, 387 F.3d 989 (9th Cir. 2004) 16, 18

*Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402 (6th Cir. 2013)......................................... 3, 29

*Mtr. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .............. 3, 19, 31

*Nat. Res. Def. Council v. EPA*, 542 F.3d 1235 (9th Cir. 2008) ....................................... 14

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

*Nat'l Wildlife Fed. v. U.S. Army Corps*, 384 F.3d 1163 (9th Cir. 2004) ........................... 3

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998) ............. 23, 28

*NLRB v. Int'l Bhd. of Elec. Workers, Local 48*, 345 F.3d 1049 (9th Cir. 2003)...................... 4, 25

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468 (9th Cir. 1994) ................................ 3

*O'Reilly v. U.S. Army Corps of Engr's*, 477 F.3d 225 (5th Cir. 2007)........................................ 5

*Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884 (9th Cir. 2007)...................................... 3

*Preserve Our Island v. U.S. Army Corps of Eng'rs,* 2009 U.S. Dist. LEXIS 71198 (W.D. Wash 2009)………......................................................................................................7,19,22,32

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)........................................... 4

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988)................................................... 18

*Sierra Club v. U.S. EPA*, 762 F.3d 971 (9th Cir. 2014)........................................................ 13, 14

*Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973) ............................................................................ 5

*Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155 (9th Cir. 2012).. 4

*Stewart v. Potts*, 996 F. Supp. 668 (S.D. Tex. 1998)................................................................ 27

*Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974) .................................................. 5, 27

### Statutes

33 U.S.C. § 1251(a) ................................................................................................................... 5

33 U.S.C. § 1344 ....................................................................................................................... 5

33 U.S.C. § 1344(b) ................................................................................................................... 5

33 U.S.C. § 1344(e)(1)......................................................................................................... 16, 25

33 U.S.C. § 1344(e)(1)............................................................................................................... 26

33 U.S.C. §§ 1251 *et seq.*........................................................................................................... 3

42 U.S.C. §§ 4321 *et seq.*........................................................................................................... 3

5 U.S.C. § 706(2)(A)................................................................................................................... 3

5 U.S.C. § 706(2)(D)................................................................................................................... 3

5 U.S.C. §§ 701 *et seq.*............................................................................................................... 3

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

**Rules**

FRCP 56 ................................................................................................................ 1, 3

**Regulations**

33 C.F.R. § 320.4(a)(2)(ii) ...................................................................................... 6

33 U.S.C. § 1344(b)(1) ........................................................................................... 16

40 C.F.R. § 1508 ...................................................................................................... 5

40 C.F.R. § 1508.25(a)(2) ...................................................................................... 15

40 C.F.R. § 1508.7 ........................................................................................... passim

40 C.F.R. § 1508.8 .................................................................................................. 15

40 C.F.R. § 1508.9 .................................................................................................. 15

40 C.F.R. § 230.11 .................................................................................................. 16

40 C.F.R. § 230.11(g)(1) ........................................................................................ 16

40 C.F.R. § 230.11(g)(2) ........................................................................................ 16

40 C.F.R. § 230.12(a)(3)(i-iv) .................................................................................. 6

40 C.F.R. § 230.2 ............................................................................................... 5, 16

40 C.F.R. § 230.7(a)(3) ..................................................................................... 16, 25

40 C.F.R. § 230.7(b)(1) ..................................................................................... 16, 29

40 C.F.R. § 230.7(b)(3) ..................................................................................... 19, 25

40 C.F.R. §1502.2(g) ......................................................................................... 22, 28

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

**MOTION**

Pursuant to FRCP 56, Plaintiff, Coalition to Protect Puget Sound Habitat ("CPPSH"), moves for an Order entering Summary Judgment in its favor, finding that the U.S. Army Corps of Engineers ("Corps") conduct with regard to NWP 48 in Puget Sound violates the Clean Water Act ("CWA"), the National Environmental Policy Act ("NEPA"), and/or the Administrative Procedures Act ("APA"), and issuing appropriate Declaratory and Injunctive relief as a result.

**MEMORANDUM IN SUPPORT OF PLAINTIFF CPPSH'S
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Over the past six years, the Corps has authorized a dramatic and unprecedented increase in the number of commercial shellfish aquaculture operations in the waters of Puget Sound. The Corps allows these operations to occur through the issuance of "verifications" under Nationwide Permit 48 ("NWP 48"). These highly visible commercial farms dramatically intrude into the Sound's intertidal waters. The following are representative depictions of such operations:



COE 067417

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551



COE 067585



COE 067587

In the implementation of the 2012 NWP 48, it became quickly evident that the Corps' initial determinations that NWP 48 would have only "minimal" environmental impacts were based on **gross** underestimates of both the number of commercial shellfish operations seeking verification in Puget Sound, and the associated amount of intertidal acreage that would be affected by those expanded operations. In the 2017 NWP 48, the Corps not only failed to address those clear deficiencies of the 2012 NWP 48, but has now authorized an enormous **further expansion** of the amount of shoreline acreage subject to industrial scale commercial aquaculture. Moreover, the 2017 NWP 48 relies upon much of the same defective environmental analysis as did the 2012 NWP 48. The 2017 NWP 48 decision also fails to address at all the pre-existing

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 2
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

1    gross underestimates of the projected adverse impacts resulting from the widespread and steadily

2    increasing use of NWP 48 in Puget Sound.

3                            **STATEMENT OF JURISDICTION**

4        This court has jurisdiction over this case as a review of a final agency action under the

5    Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

6                                **STANDARD OF REVIEW**

7        In the Ninth Circuit, FRCP 56 Summary Judgment Motions are appropriate for resolving

8    APA claims. *See, e.g.*, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th

9    Cir. 1994). Thus, this Motion is appropriate, as this case arises under the APA for violations of

10   the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Clean

11   Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq. Or. Nat. Res. Council Fund v. Goodman*, 505

12   F.3d 884, 889 (9th Cir. 2007) (NEPA); *Nat'l Wildlife Fed. v. U.S. Army Corps*, 384 F.3d 1163,

13   1170 (9th Cir. 2004) (CWA).

14       The issuance of a Nationwide Permit is a final agency action reviewable under the APA.

15   *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013). Under the APA, a court

16   must "hold unlawful and set aside agency action, findings, and conclusions" which are

17   "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," or

18   "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),(D). To have agency

19   action upheld, the agency must "articulate a satisfactory explanation for its action including a

20   rational connection between the facts found and the choice made." *Mtr. Vehicle Mfrs. Ass'n v.*

21   *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted).

22       Agency action is arbitrary and capricious if the agency: (1) relied on factors Congress did

23   not intend for it to consider; (2) offered an explanation that runs "counter to the evidence before

24   the agency"; or (3) came to conclusions so implausible that they could not be ascribed to a

25   difference in view or the product of agency expertise. *Id.* While the standard is deferential, courts

26   must still subject agency decisions to a "thorough, probing, in depth review." *Citizens to*

27   *Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds Califano*

28   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 3
     CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

1 | *v. Sanders*, 430 U.S. 99, 107 (1977).

2 |       Agency factual findings are reviewed under the substantial evidence standard, which

3 | requires enough evidence as "a reasonable mind might accept as adequate to support a

4 | conclusion." *NLRB v. Int'l Bhd. of Elec. Workers, Local 48*, 345 F.3d 1049, 1054 (9th Cir. 2003).

5 | "[T]he agency must articulate a rational connection between the facts found and the conclusions

6 | made." *Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1163 (9th

7 | Cir. 2012) (quoting *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th

8 | Cir. 2004)). When reviewing decisions based on these conclusions, "[t]he reviewing court **may**

9 | **not supply a reasoned basis for the agency's action that the agency itself has not given**."

10 | *Snoqualmie Valley*, 683 F.3d at 1163 (quoting *State Farm*, 463 U.S. at 43)(emphasis added).

### LEGAL BACKGROUND[1]

#### I.  National Environmental Policy Act

      Congress passed NEPA in 1969 to ensure that federal agencies consider the environmental effects of proposed actions before approving them. NEPA's primary purpose is to make certain "that the agency, in reaching its decision, will have available, and will **carefully consider, detailed** information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (emphasis added).

      Additionally, NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Id.* This audience includes the public, as the NEPA documentation gives the public the assurance that the agency has actually considered environmental concerns in its decision making process and serves as a springboard for meaningful public participation in the commenting phase of decision making. *Baltimore Gas & Elec. Co. v. Nat. Res. Defense Council*, 462 U.S. 87, 97 (1983); *Robertson*, *supra*.

---

[1] The Supplemental Complaint in this case contains a detailed outline of the legal background.  Since this background is largely admitted in the Answer, in the interest of brevity plaintiffs have only briefly summarized that background here.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 4
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

To effect its purpose, "NEPA imposes procedural requirements on federal agencies to analyze the environmental impact of their proposals and actions." *O'Reilly v. U.S. Army Corps of Engr's*, 477 F.3d 225, 228 (5th Cir. 2007). A proper NEPA analysis must provide a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974), *superseded by regulation*, 40 C.F.R. § 1508, *as recognized in City of Oxford v. FAA*, 428 F.3d 1346, 1355 n.22 (11th Cir. 2005) (discussing whether certain actions would be considered cumulative impacts).

Of key importance is NEPA's requirement that the agency's analysis "go beyond mere assertions and indicate its basis for them" when discussing expected consequences. *Silva v. Lynn*, 482 F.2d 1282, 1287 (1st Cir. 1973). An agency must "explicate fully its course of inquiry, its analysis and its reasoning," and the agency cannot be "to vague, too general and too conclusory" because a "conclusory statement unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind not only fails to crystallize issues, but affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives." *Id.* at 1284-85 (citations and quotation marks omitted).

## II.   Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). Section 404 of the CWA prohibits the filling or dredging of wetlands without first obtaining a permit from the Corps. 33 U.S.C. § 1344. The Environmental Protection Agency ("EPA") and the Corps have developed joint regulations to implement the CWA. The Corps must follow these regulations when deciding whether to issue a Section 404 permit. *See* 33 U.S.C. § 1344(b); 40 C.F.R. § 230.2.

The regulations mandate that a permit shall **not** be issued if "(i) there is a practicable alternative which would have less adverse impact and does not have other significant adverse environmental consequences, (ii) the discharge will result in significant degradation, (iii) the discharge does not include all appropriate and practicable measures to minimize potential harm, or (iv) there does not exist sufficient information to make a reasonable judgment as to whether

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 5
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

1  the proposed discharge will comply with the [Corps'] Guidelines for permit issuance." 40 C.F.R.

2  § 230.12(a)(3)(i-iv); *See also* 33 C.F.R. § 320.4(a)(2)(ii) (additional Corps regulations

3  implementing "public interest" review to consider the "practicability of using reasonable

4  alternative locations and methods to accomplish the objective of the proposed structure or

5  work.").

6  ### SUMMARY OF FACTUAL BACKGROUND[2]

7        Puget Sound is a unique place vital to the region for its environmental, aesthetic, and

8  economic values. NWP 003069-071(Corps 2017 Decision Document Nationwide Permit 48;

9  hereafter: "2017 Decision Doc").[3]  Puget Sound is home to at least 13 endangered or threatened

10  species, not to mention countless other species essential to the continued vibrancy of the region.

11  COE 071493-495 (National Oceanic and Atmospheric Administration Endangered Species Act

12  §7 Consultation re-initiation letter (2014), noting 13 threatened or endangered species and 51

13  fish species with designated EFH in the NWP 48 action area), *See also:* NWP 003071 (2017

14  Decision Doc).

15        Industrial scale commercial shellfish aquaculture activities disrupt the nearshore habitat

16  on which they take place. NWP 043719 (CPPSH Comment citing peer-reviewed study). Near

17  shore habitat is critical to the biological and economic health of Puget Sound. *Id.* Nevertheless,

18  the Corps has issued nearly ten times the number of permits estimated in its 2012 Decision

19  Document, and in so doing the Corps has allowed impacts to at least three times as much acreage

20  as was estimated. Despite multiple requests, the Corps has not provided any Supplemental NEPA

21  analysis of the impacts (including cumulative impacts) of this massive number of permits.

22  The Corps has instead tried to deflect responsibility for NWP 48 to Corps Regional offices or to

23  the District Engineers. COE 076126-127 (2012 Decision Doc.). The Corps was repeatedly made

---

24

25  [2] To avoid duplication, plaintiffs have merely summarized some of the general background facts here. Additional key facts that are in the Record are cited *infra* as relevant.

26  [3] Defendants chose to use Bates numbering with the prefix "COE" for documents on Discs 1-4, and 6 of the

27  Administrative Record ("AR"), and the prefix "NWP" for documents on Disc 5 of the AR. Consequently, there are both NWP and COE cited documents in this Memo.

28  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 6
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

aware of the actual adverse impacts to environmental, economic, and aesthetic values of Puget Sound that were resulting from the massive expansion of commercial aquaculture.[4] Yet so far the Corps has refused to analyze those impacts in the context of their regulatory authority and obligations.[5]

Understandably, the rapid and dramatic changes to Puget Sound's physical environment resulting from the Corps' NWP 48 actions have alarmed many citizens, including the Board and other members of Plaintiff CPPSH many of whom enjoy boating, fishing, walking, and swimming in Puget Sound. *See e.g.,* Hendricks Decl ¶4; Ruddy Decl ¶4; Gale Decl ¶¶4, 8-9; Macomson Decl ¶¶5-6. Members of CPPSH also enjoy the aesthetic values provided by the previously relatively pristine shoreline and nearshore areas in Puget Sound. *See e.g.,* Ruddy Decl ¶¶6-8. Members of CPPSH appreciate the value of this habitat and understand its value in the greater ecosystem. *See e.g.,* Ruddy Decl ¶¶5, 13. Members of CPPSH and the organization itself have been harmed by the inadequate analysis of the impacts of aquaculture on Puget Sound. *See e.g.,* Ruddy Decl ¶¶12-14; Hendricks Decl ¶¶7, 9-13; Gale Decl ¶¶10, 12-17; Macomson Decl ¶¶6-12.

## I.  2012 NWP 48

On February 21, 2012, the Corps reissued a number of NWPs, including NWP 48 – Commercial Shellfish Aquaculture Activities. COE 076090-137 (2012 Decision Doc.). 2012 NWP 48 modified the previous 2007 NWP by authorizing new and expanded aquaculture operations (COE 076095-102). The 2007 version had authorized **only** existing activities. NWP 003044 (2017 Decision Doc, quoting 2007 NWP 48 language restricting permit issuance to "existing operation[s]").

---

[4] *See e.g.* public comments at COE 071287-292, NWP 043593-739, COE 089440-452, COE 060883-886, and Plaintiff's Petition for Revocation or Suspension of NWP 48 usage in Puget Sound at COE 135243-263.

[5] The impacts the Corps has failed to consider include the cumulative impacts on resident Orca Whales, a topic that the Corps **should have been** intimately **and painfully** aware of, having lost a CWA/NEPA case on that very issue based on the very same failure or refusal to look at cumulative impacts. *See, Preserve Our Island v. U.S. Army Corps of Eng'rs,* 2009 LEXIS 71198 (W.D. Wash 2009).

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 7
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

A host of General Conditions accompanied the 2012 reissuance of NWP 48 from the national office. COE 072234-242. The Decision Document that outlined these conditions as applied to NWP 48 served as the Environmental Assessment ("EA") and a Finding Of No Significant Impact ("FONSI") for purposes of NEPA. COE 076133.

The 2012 Nationwide Decision Document acknowledged that some potential adverse impacts might result from authorized or previously authorized activities, but the Decision largely fails to describe what those impacts are, or how they arise from the activities authorized by NWP 48. Instead, the Corps asserts in the 2012 Decision that impacts will allegedly be rendered minor and insignificant by either permit terms, General Conditions, Regional Conditions imposed by individual Districts or Divisions, or by case-by-case review of Pre-Construction Notices ("PCNs") by District Engineers. COE 076126-127.

The 2012 Decision Document failed to take into account anywhere near the actual number of authorizations or acreage that were issued under the 2012 NWP 48. The Decision stated that 2012 NWP 48 would impact about 3,320 acres over a 5-year period, and its analysis of impacts and conclusions about the allegedly "minimal" nature of those impacts relied on what later proved to be a gross underestimate. COE 076127. The Corps also estimated use of 2012 NWP 48 "approximately 50 times per year," nationwide and based its EA conclusions regarding allegedly "minimal" impacts on that figure. COE 073091 (Corps Seattle Dist. Supplement to 2012 National Decision Document and Regional General Conditions ) ("2012 Supp. Decision Doc.").

In reality, the Corps knew at the time it issued 2012 NWP 48 that it had well over a thousand applications for verification under that permit already pending (and possibly well over 6,000 applications). *See, e.g.,* Verification Spreadsheet Part 1 (provided on AR Disc #1), which shows 748 issued authorizations with file numbers assigned between 2007-2011, and Verification Spreadsheet Part 2 (provided on AR Disc #4), which shows another 400 issued authorizations with file numbers before 2012.[6] After the 2012 NWP 48 came into effect, in the

---

[6]  There were actually more than 1,148 applications pending, as a good number of the 2012 applications were before

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

first 8 months alone the Seattle District issued verifications for approximately 800 activities. *See e.g.,* Verification Spreadsheet Part 1, which contains links to files #1 through #803, all of which have issuance letters dated between March – December of 2012.  This was done despite the Corps estimate in March 2012 that it would allow use of NWP 48 "approximately 50 times per year" on a nationwide basis COE 073091 (2012 Supp. Decision Doc.).

Notwithstanding that massive increase over the estimated number and acreage of usage, neither the Seattle District nor the National office of the Corps issued any kind of Supplemental NEPA analysis to address the impacts of so many increased NWP 48 authorizations and how those impacts could allegedly still be "minimal", nor was the Corps able to justify or explain the gross miscalculation or misrepresentation of the amount of expected use in the 2012 Decision Documents.

In fact, the Seattle District alone ultimately issued 926 authorizations covering approximately 49,575 acres under the 2012 NWP 48. COE 127591-592 (2017 Supp. Decision Doc. Table 4 – listing estimate of expected 2017 usage at over 72,000, as compared to actual usage under 2012 of "about 49,575."); *See also,* CPPSH Cpl Ex.A, p.4 (Corps Seattle Dist Powerpoint listing permits issued and stating that Seattle District alone had accounted for "92% of all NWP 48 verifications.").  A visual representation of the known existing and proposed NWP 48 shellfish farms, **as of 2014** looks like this:



COE 155243

_____
March, when NWP 2012 was issued.  The Seattle District of the Corps had a similar Spreadsheet of all the pending applications, in hand, when the decision to issue 2012 NWP 48 was made. *See e.g.,* Verification Spreadsheets provided on AR Discs #1 & #4, and Exhibit B to CPPSH Complaint (Docket #1), a Spreadsheet run by the Seattle District as of 4-28-16.

## II.   2017 NWP 48

On January 6, 2017, the Corps again reissued NWP 48, to be effective March 19, 2017. NWP 003034-116 (2017 Decision Doc.). Despite that massive increase in usage of NWP 48 beyond what was estimated, the Corps did essentially **nothing** to remedy the ongoing and reasonably foreseeable impacts to Puget Sound of so many NWP 48 permits. Worse, by the Corps' headquarters estimation, the 2017 NWP 48 would impact approximately 56,250 acres. NWP 003054. *But see,* COE 127592 (2017 Supp. Dec. Doc, Tbl 4, listing total estimated 2017 usage as "72,300" acres). The Corps allegedly based the 56,250 estimate on the reported use of NWP 48 between March 19, 2012 and March 12, 2015. NWP 003098. In other words, even if the Seattle District's estimate of over 72,000 acres is ignored, the Corps' own headquarters records showed that the Corps used 2012 NWP 48 to authorize **an average of 326 uses per year.** COE 118085. This was despite the representation in the 2012 Supplemental Decision Documents that usage would be only "50" times per year.

The Seattle District Supplement to the 2017 NWP 48 Decision Document acknowledges that over 1,000 operations were authorized under 2012 NWP 48. COE 127591-592 (2017 Supp. Decision Doc.). Yet the Corps never addressed the vast chasm between its prior deficient analysis and actual usage; nor did it analyze meaningfully the proposed new impacts from nearly doubling the acreage available to shellfish cultivation (which it did in 2017 by changing the definition of "new operation" to exclude any place where **any** commercial cultivation of **any** shellfish had taken place at **any** time in the prior 100 years) *Id.*; *See also,* NWP 003034.

There is also a significant chasm between the facts presented by the Corps in an unpublished draft cumulative impact analysis (COE 125583-700), and what was ultimately presented to the public in the 2017 National and Supplemental Decision Documents. In the unpublished cumulative impact analysis, the Seattle District of the Corps describes in detail eelgrass' "key role in the aquatic ecosystem." COE 125680. The District goes on to conclude that "[g]iven the magnitude of the impacts in acreage, the importance of eelgrass to the marine ecosystem, and the scale of the aquaculture impacts relative to other stressors, **the impacts are**

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 10
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

considered significant." COE 125685 (emphasis added).

This 112-page cumulative impact analysis marks a significant departure from the "copy-paste" analysis done for the rest of the 2012 and 2017 issuances of NWP 48. *See,* COE 125585-700.  But somehow both the National and Supplemental Decision Documents entirely failed to integrate the finding of this draft cumulative impact analysis into the Decisions that were ultimately issued by the Corps.

The Corps also acknowledged in its final 2017 Decision Documents that there would be impacts from aquaculture operations' use of pesticides, the use of plastics (including the PVC tubes, and plastic nets and lines), the discharge of non-fill trash, and the risk of parasitism, but there is no analysis of the extent of those impacts in the Decision Documents. NWP 003042 (2017 Decision Doc., estimating impacts to "approximately 56,250 acres of water of the United States, including jurisdictional wetlands). The Seattle District acknowledged "a serious impact on the marine environment" from the use of PVC tubes, but also did not analyze further, citing a lack of alternative materials. COE 127553 (2017 Supp. Decision Doc.). Additionally, the Corps admitted that shellfish cultivation leads to essentially permanent displacement of valuable eelgrass while cultivation operations are ongoing, yet despite having a cumulative impact analysis in its files that showed "significant" impacts on eelgrass the 2017 NWP 48 actual Decision Documents provided no analysis about the impacts of the permanent displacement of eelgrass even though they acknowledge the expected continued growth of aquaculture activities in Puget Sound. COE 127588-589 (2017 Supp. Decision Doc.). The Corps instead deferred to District Engineers, or worse, deferred altogether, stating some of the conduct was not regulated by the Corps at all. NWP 003052-053 (2017 Decision Doc).

### III.  Public and Agency Involvement

The CPPSH has been involved in the public process surrounding NWP 48 issuance and use since at least 2009, with formal comments filed in 2011. COE 071287.  CPPSH advised the Corps at virtually every available opportunity about the deficiencies in the NEPA analysis and the potential or actual violations of the CWA. *See .e.g.,* COE 071287, NWP 43595, NWP 46862

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 11
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

1   (CPPSH comments on 2012 & 2017 National and District Decisions and Supplements). CPPSH

2   even met with the Seattle District to discuss NWP 48 concerns. COE 135278. CPPSH also

3   commented on at least 80 individual PCN/applications.[7] And CPPSH Petitioned the Corps to

4   suspend authorizations under NWP 48 in Puget Sound. COE 135243-263.

5        The Coalition was not alone in its effort to inform the Corps of its deficient analysis. A

6   multitude of public interest groups and concerned citizens have submitted comments, together

7   with interested federal and state agencies. For example, on April 1, 2011, Washington

8   Department of Natural Resources (WA DNR) submitted comments regarding Seattle District's

9   intended use of 2012 NWP 48. COE 71210-225, 71226-245. WA DNR stated that "it is not clear

10  how the NW 48 issued in 2007 has actually provided any protection to natural resources." COE

11  71238. WA DNR specifically expressed concern for juvenile salmonids, which are particularly

12  dependent on nearshore areas and which are less able to avoid disturbance, calling the

13  importance of this habitat "well documented," and citing several studies. *Id.*

14       On April 8, 2011, the National Marine Fisheries Service (NMFS) filed comments

15  regarding Regional Conditions for the 2012 NWP 48. COE 71356-362. NMFS specifically

16  mentioned the important role served by intertidal and nearshore areas in Puget Sound for juvenile

17  salmonids, and advised the Corps to consider "the cumulative impacts of small-scale activities

18  over large scales of space and time," and NMFS further recommended that the Corps issue

19  "Regional Conditions that restrict or prohibit the use of NWP's in Puget Sound." COE 71357.

20  Similarly, in November 2011, the U.S. Fish and Wildlife Service ("USFWS") informed the

21  Corps of its concerns over the 2012 NWP 48, stating its belief that the program "may result in

22  more than minimal individual and cumulative adverse environmental effects on the aquatic

23  environment," pointing to a 2009 Biological Opinion ("BiOp") on the 2007 program. COE

24  89977.

25

_____

26  [7] A list of the permits on which the Coalition commented, as of March 6, 2016, appears at COE 112628. However, only the permit files for permits that were ultimately authorized are included in the AR, so some of the comments in that list are not before this court.

27

28  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 12
    CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

On January 6, 2017, The Environmental Protection Agency ("EPA") expressed concern and disappointment in the Corps' proposed 2017 NWP 48, and requested "additional protective language to avoid and minimize impacts" to sensitive resources. COE 125542-544. The Northwest Indian Fisheries Commission provided unequivocal criticism at multiple points in the process, including an August 19, 2016 letter calling out the Corps for potentially violating the Chinook Recovery Plan by allowing continued degradation of salmon habitat. COE 128068.[8]

This is hardly an exhaustive list of examples. The Corps has been on continual notice of its inadequate and potentially dangerously insufficient analysis of the direct, indirect, and cumulative impacts from NWP 48 since at least 2009. Yet, the Corps has, for some reason, continued to choose to shirk its statutory duties in favor of expedited permit authorization.[9]  To try to address this problem, CPPSH initially filed suit on June 22, 2016, challenging use of 2012 NWP 48.  Following the issuance of 2017 NWP 48, CPPSH filed a Supplemental Complaint on June 5, 2017, challenging both permits.

## ARGUMENT

### I.  The Coalition has Standing

To establish standing, a party invoking federal jurisdiction must demonstrate the three prongs of Article III standing requirements. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1043 (9th Cir. 2015). Specifically, the party must demonstrate: (1) "the existence of an injury-in-fact that is concrete and particularized, and actual or imminent"; (2) "the injury is fairly traceable to the challenged conduct"; and (3) "the injury is likely to be redressed by a favorable court decision." *Id.*  When an organization sues, it has associational standing when: (1) at least one of its members would have standing to sue in his or her own

---

[8] Concerns regarding nearshore eelgrass habitat and water quality degradation were echoed by Skagit River System Cooperative (COE 128951), Stillaguamish Tribe (COE 128961), Skokomish Tribe (COE 127752), and the Swinomish Tribe (COE 128966) among others. In fact, the Swinomish Tribe just recently filed suit against the Corps raising many of the same legal issues as Plaintiff CPPSH. See, Case No. 2:18-cv-00598-JCC.

[9] Plaintiffs suspect this was due to political pressure, in Washington DC, but the actual reason why the Corps failed to comply with its legal obligations need not be determined by the court.  The only question to be decided is whether the agency did or did not do what the law requires, not why it chose to engage in such conduct.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 13
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6651

right; (2) "the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members." *Sierra Club v. U.S. EPA*, 762 F.3d 971, 976 (9th Cir. 2014).

There should be no question that the CPPSH has standing. The challenged conduct is directly contrary to the goals and mission of the CPPSH.[10]  In addition, members of the CPPSH live and/or recreate in parts of Puget Sound subject to the direct impacts of commercial shellfish aquaculture activities, and those members have been and will be harmed by the conditions created by the Corps over the permitting of such activities. *See, e.g.* the concurrently filed Ruddy Declaration at ¶4 (has used inter- and sub-tidal areas for 30 years); Hendricks Declaration at ¶4 (commonly visits such areas); and Gale Declaration at ¶3-4 (born and raised in Puget Sound, currently lives on Bainbridge Island).

Each of the declarants have described with particularity how the effects of shellfish aquaculture have negatively affected their enjoyment of the areas at issue. This is more than enough to establish injury-in-fact. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 182 (2000) (holding that it is sufficient to present evidence that plaintiff's use and enjoyment has been diminished by environmental degradation or their reasonable concerns about that degradation); *Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, 1245 (9th Cir. 2008) (same). It is also clear from the Declarations that the injuries are fairly traceable to the challenged conduct, and are likely to be redressed by a favorable court decision. Restrictions of the use of NWP 48 in Puget Sound would limit the excessive commercial shellfish aquaculture activities – conduct that cause a cumulatively significant environmental impact – is likely to redress the CPPSH and Declarants' injuries. *Cf. Sierra Club*, 762 F.3d at 978 (holding that requiring EPA to properly apply emissions standards for $NO_2$ and $SO_2$ under the Clean Air Act would redress plaintiffs' concerns for their health). The impacts of industrial scale shellfish aquaculture detailed by Declarants and the CPPSHJ are clearly traceable to NWP 48, as they

---

[10]  *See,* Supp. Cpl ¶¶ 6-7 & 9.

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

1    would not occur but for that permit. *See id.* (concerns about emissions from energy project were

2    fairly traceable to EPA's emission standards).

3        **II.   The 2017 NWP 48 analysis is fatally flawed.**

4        The Corps' promulgation of a defective NWP 48 has caused and will continue to cause

5    piecemeal degradation of Puget Sound.  With the degradation of Puget Sound comes the

6    degradation of the recreational and aesthetic values enjoyed by the Coalition and its members.

7    This is precisely what the CWA and NEPA cumulative impact analysis requirement was meant

8    to prevent.

9        The degradation is happening because in issuing and implementing both 2012 and 2017

10   NWP 48 the Corps relied on a cumulative impacts analysis that was and is based on a gross

11   underestimate of the amount of shellfish aquaculture that would occur under NWP 48.[11] This

12   deficiency is further compounded by the Corps' refusal to consider the incremental impact of

13   present and reasonably foreseeable future actions by third parties.[12]

14       **A.   Both the CWA and NEPA require a properly supported cumulative
            impacts analysis, in order to try to prevent piecemeal destruction of
15          aquatic ecosystems**

16       Before an agency may embark on a major action, NEPA demands a comprehensive

17   analysis of cumulative impacts. NEPA cumulative impact analysis requires consideration of how

18   "past, present, and reasonably foreseeable future actions" impact the environment, "**regardless**

19   **of** what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §

20   1508.7 (emphasis added).[13] These impacts can arise from "individually minor but collectively

21   significant actions taking place over a period of time." *Id.*

_____

[11] The fact that the AR now reveals that the Seattle District actually did perform a cumulative impact analysis on the 2017 NWP 48 (COE 125583-700), and that analysis concluded there **would be significant impacts** - but the Corps nonetheless proceeded with an EA and never shared that analysis and those conclusions with the public before issuing 2017 NWP 48, serves only to highlight the illegality of the damage that the Corps has inflicted on Puget Sound with its excessive use of NWP 48.

[12] As alleged in the First Claim for Relief, ¶¶93-99.

[13] *See also,* 40 C.F.R. §§ 1508.8, 1508.9, 1508.25(a)(2), (c); *Hall v. Norton*, 266 F.3d 969, 978 (9th Cir. 2001).

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 15
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

The Corps' 2012 and 2017 NWP 48 Decision Documents serve as a NEPA EA.[14] They must, therefore, address the cumulative impacts for both the CWA and NEPA. *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062, 1078 (9th Cir. 2002). An EA is deficient if it fails to address cumulative impacts or if it fails to tier to an Environmental Impact Statement ("EIS") that does such an analysis. *Id* at 1076. This is a critical issue here, because NWP 48 authorizes commercial shellfish aquaculture activities that will potentially affect more than 50,000 acres of tidelands in the Puget Sound. *See,* NWP 0003099 (2017 Decision Doc); *see also* COE 127591-92 (2017 Supp. Decision Doc., estimating 49,575 acres impacted under the 2012 NWP 48, with at least 332 new acres and 22,351 other acres potentially subject to authorization under the 2017 NWP 48).

Under the CWA, a Nationwide Permit may only issue if the Corps determines that the authorized activities "will have only **minimal** cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1)(emphasis added); *see also* 40 C.F.R. § 230.7(a)(3) (NWPs must "have only **minimal** cumulative adverse effects on water quality and the aquatic environment")(emphasis added). This determination is governed by EPA and Corps guidelines defining cumulative effects.[15] *See* 33 U.S.C. § 1344(b)(1), (e)(1) (general permits must be based on guidelines jointly promulgated by EPA and the Corps); 40 C.F.R. § 230.2 (applicability). The guidelines define cumulative impacts as "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. § 230.11(g)(1) (guidelines for factual determinations for Section 404(b)(1)).

Cumulative impacts analysis is needed to protect against "piecemeal changes [that] can result in a major impairment of the water resources and interfere with the productivity of water quality of existing aquatic ecosystems." *Id.* This type of analysis is needed to prevent a proverbial "death by a thousand cuts." *See, Klamath-Siskiyou Wildlands*, 387 F.3d 989, 994  (9th

---

[14] *See,* NWP 003059 (2017 Decision Doc., describing the Document as an EA).

[15] The guidelines use "impact" and "effect" interchangeably. *See, e.g.*, 40 C.F.R. § 230.11.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 16
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

Circuit 2004)("the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact"). Before a Nationwide Permit may issue, the Corps must complete its evaluation of the potential cumulative impacts and document information supporting its ultimate determination. *See id.* §§ 230.7(b)(1), 230.11(g)(2) (directing the Corps to conduct a written evaluation of potential cumulative impacts and to include documented information supporting factual determinations from 40 C.F.R. § 230.11).

### B. Continued reliance on the defective 2012 cumulative impacts analysis was arbitrary and capricious and not in accordance with the requirements of the CWA and NEPA.

The glaring defect of the 2012 cumulative impacts analysis is the extent to which the implementation of NWP 48 revealed that the Corps' estimated number of verifications and acreage impacted over the five-year period was **grossly unrepresentative** of the actual number and acreage. The Corps Headquarters had estimated that the 2012 NWP 48 would impact 3,320 acres of waters nationwide, and the Seattle District estimated that it would issue approximately 250 permits for activities within Washington State. COE 076345 (2012 Decision Doc.); COE 073091 (2012 Supp. Decision Doc.).

Yet the actual use of the 2012 NWP 48 was over 1,720 verifications (with at least 1,020 of those being new projects, and the other 700 reverifications of prior projects) and it had impacts to approximately 49,575 acres of waters in Washington State alone. COE 127591-593 (2017 Supp. Decision Doc.). In short, the 2012 analysis was premised on what turned out to be a dramatic underestimation of use and impacts.[16]  This is of serious concern still, because the 2017 NWP 48 impact analysis relied extensively on the flawed 2012 analysis, and because, as the Corps admits, the commercial shellfish aquaculture industry "is growing and expected to continue to grow both in Washington State and nationally," which will result in even more

---

[16]  As alleged in the Sixth Claim for Relief, ¶¶119-125, CPPSH and others repeatedly warned the Corps about the impacts created by the excessive 2012 NPW 48 permitting, but the Corps never substantively acted on those warnings.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 17
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

tidelands and forage fish spawning areas to be annexed by private commercial use. COE 127588 (2017 Supp. Decision Doc.).

      **1.**  **The 2017 cumulative impact analysis violates NEPA and the APA by failing to adequately explain why it is not undermined by the Corps' gross underestimates**

The 2017 NWP 48 National Document relies on what is substantively the same NEPA cumulative impacts analysis as the 2012 NWP 48 Document.[17] With respect to the NEPA requirements, excluding the new sections for endangered and threatened species and climate change, nearly half of the 2017 cumulative impacts analysis is taken directly from the 2012 analysis.[18] *Compare* NWP 003075-086 (2017 Decision Doc. at 41-52), *with* COE 076114-119 (2012 Decision Doc. at 25-30). There is new language that expands upon the variety of past and present impacts that generally affect wetlands, coastal waters, and endangered species ( NWP 003076-078, NWP 003081-086 - 2017 Decision Doc.) but the Corps never addresses how its gross underestimate of the 2012 NWP 48 use and acreage impacts does not affect its previous finding of no significant cumulative impact.

The Seattle District's Supplemental Decision Documents **could have** used the draft cumulative impact analysis done in February 2017 (COE 125583-700) to buttress or expand on the Corps HQ NEPA analysis, but that is not what happened. *See,* COE 127556 (2017 Supp. Decision Doc.- stating, "NEPA cumulative impacts is accomplished at the national level for NWP 48 activities."). This abject failure to disclose the Corps internal findings about cumulative impacts, and to update and address the inadequacy of the 2012 analysis, does not in any way satisfy NEPA requirements.

The decision to prepare an EA (rather than an EIS) requires an agency to take a "hard

_____

[17] As alleged in the Second Claim for Relief, ¶¶ 102-105, that is unlawful.

[18] In approximate numbers, 2,200 of the 5,900 words from the 2017 cumulative impacts analysis are virtually verbatim to the 2012 analysis. The 2012 analysis does not discuss in detail the cumulative impacts to endangered or threatened species, or the cumulative impacts relating to climate change. *See* COE 076114-076119 (2012 Decision Doc.). Those sections amount to approximately 1,300 words of the 2017 analysis. Thus, comparing the parts of the 2017 analysis that reflect what the Corps analyzed in 2012 results in a fraction of 2,200 of 4,600 words, approximately 48%.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 18
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

look" at the environmental effects of its actions on the environment, and to support its

conclusions by a "convincing statement of reasons why the potential effects are insignificant."

*Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988). An agency's conclusions in an

EA must be "fully informed and well-considered." *Blue Mountains Biodiversity Project v.*

*Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998), *cert. denied sub nom. Malheur Lumber v. Blue*

*Mountains Biodiversity*, 527 U.S. 1003 (1999). Courts have repeatedly found that "generalized

conclusory statements" that cumulative effects are "not significant" are legally insufficient. *See,*

*e.g.*, *Klamath-Siskiyou Wildlands, supra.* , 387 F.3d at 996 (insufficient cumulative impact

analysis); and *Preserve Our Island,* 2009 U.S. Dist. LEXIS 71198, at *50-56 (Corps cumulative

impacts analysis was too narrow).

In this case, the Corps' published 2017 NWP 48 substantive analysis of cumulative

impacts is based upon an analysis that estimated an impact on only 3,320 acres (5.19 square

miles) of jurisdictional waters with only 250 verifications in Washington State. *See* COE 076127

(2012 Decision Doc.); COE 073091(2012 Supp. Decision Doc.). After actual use of NWP 48

resulted in impacts to approximately 49,575 acres (77.46 square miles) of waters with over 1,020

additional verifications in Washington alone.  COE 127590 (2017 Supp. Dec. Doc. "Future

Trends").[19]  Yet in the 2017 NWP 48 analysis, the Corps essentially just substituted a few

numbers and repeated the same analysis and findings it made previously.The Corps never even

acknowledges its gross underestimate, much less explains why impacts to an area of water

amounting an order of magnitude greater merit no more than a copy and paste analytical

approach. **This is not the "hard look" that NEPA requires**, particularly not when salmon, orca

whales, and other key species in the Pacific Northwest are at issue.[20]

To be sure, the 2017 analysis includes some new text discussing in slightly more words

---

[19] According to the Spreadsheet provided in the AR on Disc #5, there were at least 69 additional NWP 48 permits
issued in other parts of the nation, under the 2012 NWP 48.

[20] Sadly, even the Seattle District's draft cumulative impact analysis entirely overlooks impacts on Orcas.  There is
no mention in that analysis (COE 125583-700) of the impact on resident whales, of the expected reduction in
Salmon and forage fish **that are** acknowledged.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 19
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

1  relevant past projects, but this does nothing to directly justify the copy and paste approach or the

2  failure to address the result of the prior gross underestimate in usage. *See Great Basin Mine*

3  *Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006) (agency must do "more than just catalogue

4  relevant past projects in the area"). Given the AR, the Corps' finding of no significant

5  cumulative impacts is "so implausible that [it cannot] be ascribed to a difference in view or the

6  product of agency expertise." *See State Farm*, 463 U.S. at 43.

7           **2.  The failure to provide an adequate explanation also violates the CWA
               and the APA.**

8

9           In contrast to the NEPA analysis, the Corps' has made some attempt to bolster its

10  inadequate 2012 cumulative impacts analysis under the CWA. With respect to cumulative

11  impacts under 40 C.F.R. § 230.7(b)(3), the national Document does little more than discuss the

12  number of estimated verifications and acreage of impacts to waters. NWP 003098 (2017

13  Decision Doc.). Included with the discussion of uses and acreage is a statement that "[n]o

14  compensatory mitigation will be required to offset those impacts." *Id.* Following that: four pages

15  describing compensatory mitigation and discussing its benefits. NWP 003099-003102. The

16  Corps concludes the CWA analysis with the bald assertion that "cumulative adverse effects on

17  the aquatic environment resulting from the activities authorized by [NWP 48] will be no more

18  than minimal." NWP 003102.  A statement directly contradicted by the draft analysis done by

19  the Seattle District.  *See*, COE 125685-686 (finding significant impacts to eelgrass) and COE

20  125695 (finding significant impacts to forage fish).

21          Following the lead of headquarters, in its published documents the Seattle District

22  refused to acknowledge the gross underestimate of the 2012 NWP 48 analysis. Without such

23  acknowledgment there can be no meaningfully analysis of the Corps prior conclusion that the

24  impacts would be minimal or would not cause significant degradation to the aquatic ecosystem.

25  It is not clear what information (if any) the Corps collected and considered to address the

26  unexpectedly widespread use and impact of NWP 48. By failing to provide information in the

27  AR to explain how the 2017 NWP 48 addresses the significant oversight of the 2012 NWP 48,

28

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 20
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

the Corps has failed to articulate a crucial rational connection required by the APA for its conclusions.[21] *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1032 (9th Cir. 2008).

### C. Even ignoring the gross underestimates of use and acreage in 2012, reliance on general and conclusory statements is arbitrary and capricious.

The Corps cannot seriously dispute that its estimate of the use and acreage impact of NWP 48 in 2012 was grossly inaccurate. But even in a hypothetical world, wherein the Corps had not dramatically underestimated the use and acreage impact of NWP 48, the 2017 cumulative impacts analysis that the Corps National office did (on which the issuance decision was based) is entirely inadequate to support the conclusion that there would be no significant impact under NEPA, or that there would be no more than minimal cumulative adverse effects or avoid significant degradation of the aquatic ecosystem as mandated by the CWA.

#### 1. The Corps failed to consider the collective effect of NWP 48 verifications when added to past, present, and reasonably foreseeable future actions under NEPA.

The 2017 National Decision Document impacts analysis goes to great lengths to discuss the multitude of other activities that cause environmental impacts on jurisdictional waters. However, the Corps never meets its ultimate obligation to describe the **cumulative** impact of the collective effect of NWP 48 verifications **added to** those **other** past, present, and reasonably foreseeable future actions.[22] Rather, the Corps simply baldly asserts that: (1) "it is not practicable or feasible" to collect the information necessary to assess that impact; (2) "[t]he activities authorized by [NWP 48] will result in a minor incremental contribution to the cumulative effects to wetlands, streams, and other aquatic resources"; and (3) the incremental contribution is minor because NWP 48 activities "are one category of many categories of activities that affect those aquatic resources." NWP 003081 (2017 Decision Doc.).  Of course the draft cumulative impact analysis done by the Seattle District proves those conclusions to be false, at least as to the

---

[21] As alleged in the Third Claim for Relief at ¶¶107-109.

[22] As alleged in the Fourth Claim for Relief, ¶¶112-114.

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

1   eelgrass and forage fish resources addressed in that draft analysis.

2       To try to justify its failure to provide the information necessary to quantifiably support

3   that determination, the Corps states that the necessary data "are not available at the national

4   scale." *Id*.  As the draft Seattle District cumulative impact shows that is not true for the area of

5   the nation where over 90% of the NWP 48 usage was occurring. The Corps' own Spreadsheets

6   and documents show that they were well aware that the vast majority of the usage (over 90%)

7   was in Puget Sound. The Corps could and should have looked at the data from the Seattle

8   District to do a cumulative impact analysis. Instead of evaluating the cumulative impacts at the

9   critical level where they knew those impacts were occurring, the Corps simply refused to address

10  the issue.

11      Worse, the Corps Headquarters' apparently refused to credit the cumulative impact

12  analysis done by the Seattle District, which showed there **were** significant impacts occurring and

13  expected to occur. This shows that the Corps Headquarters had already made its decision, before

14  the NEPA documents on 2017 NWP 48 were completed. Such a predetermined outcome is

15  directly contrary to the NEPA regulations.  *See, .* 40 C.F.R. §1502.2(g)(NEPA documents "shall

16  serve as the means of assessing the environmental impact of proposed agency actions, rather than

17  justifying decisions already made").

18      To add insult to injury, the inadequate Decision in 2017 uses the same language as the

19  defective 2012 analysis and relies heavily on Division and District engineers to allegedly

20  "ensure" that cumulative impacts will not be significant.  *See*, NWP 003044 (2017 Decision

21  Doc). Yet the AR, specifically the Corps own Seattle District draft cumulative impacts analysis,

22  shows that when the District offices do raise concerns, the Headquarters office (or the

23  Division/Regional office) entirely ignores those concerns and instead issues Decisions falsely

24  stating that there are not significant impacts - when the District analysis shows that there are.

25      Failing in 2012, and then refusing again in 2017 to do a full cumulative impacts analysis

26  violates NEPA requirements. First, 40 C.F.R § 1508.7 requires the Corps to consider the

27  incremental impact of NWP 48 when ***added*** to other past, present, and reasonably foreseeable

28  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 22
    CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

future actions. The plain language of the regulation requires the Corps to assess the aggregate effect that NWP 48 as well as other categories of contributors will cumulatively have on Puget Sound and the rest of the nation's waters. *See, e.g.*, *Preserve Our Island, supra.* 2009 U.S. Dist. LEXIS, at \*50-56 (cumulative impact analysis of proposed barge-loading facility in Puget Sound failed because it only focused on a narrow geographical region and did not include surrounding activities).

Yet in the 2017 NWP 48 Decision Documents, the Corps failed to do such an analysis. The focus is not, as the Corps incorrectly states, on "whether [the] **incremental i**mpact is significant." NWP 003080 (2017 Decision Doc.)(emphasis added). The whole reason why NEPA requires a cumulative impacts analysis is because the "incremental" impacts are rarely significant – but the cumulative impact of over a 1,000 incremental impacts **is potentially** significant (in 2012 the Corps underestimated the number of verifications that would occur by a factor of 4 – there were 1,000 instead of 250 – and that resulted in an underestimation of the acreage of impact by a **factor of 14** – 49,575 instead of 3,320).  The Corps' 2017 conclusion that there would be no significant cumulative impact is arbitrary and capricious because it is based on an erroneous interpretation of 40 C.F.R. § 1508.7.

Second, to make a fully informed and well-considered finding of no significant cumulative impact, the Corps must provide quantified or detailed information. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998). Without this information, a reviewing court cannot confirm that the Corps conducted the "hard look" that NEPA requires. *Id.* The 2017 Decision claimed that there was insufficient data at a national level. But the Seattle District *did* analyze potential cumulative effects of 2017 NWP 48 in Puget Sound. In that analysis, the District concluded that as to forage fish spawning habitat "the significance threshold **has already been reached from the cumulative impacts that have occurred to date** meaning that any additional impacts would be considered significant." COE 125695(emphasis added).

For a decision to *not* be arbitrary and capricious, an agency must "state a rational

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

1  connection between the facts found and the decision made." *Gifford Pinchot Task Force v. U.S.*

2  *Fish & Wildlife Serv.,* 378 F.3d 1059, 1065 *amended on other grounds*, 387 F.3d 968 (9th Cir.

3  2004). Here, despite the facts revealed by the Seattle District analysis, the Corps ultimately

4  issued and EA and a FONSI, claiming that 2017 NWP 48 would have no significant cumulative

5  impacts because it will result in "minor incremental contribution". NWP 003080-081 (2017

6  Decision Doc.).  The Corps' decision lacks any "rational connection between the facts found and

7  the decision made," and is therefore arbitrary and capricious. *Gifford Pinchot Task Force*, 378

8  F.3d at 1065.

9           **2.   Stating that effects will be minimal when verifications are "properly**
           **sited and operated" is a conclusion, not an analysis of cumulative**
10          **impacts under CWA.**

11          The Seattle District 2017 Supplemental Decision does finally recognize that there will be

12  impacts from shellfish aquaculture on important resources such as eelgrass and forage fish.

13  However, merely acknowledging that there will be an impact remains inadequate to meet the

14  cumulative impact analysis requirements of NEPA. The Seattle District concluded in its not

15  published cumulative impact analysis that given "the importance of eelgrass to the marine

16  ecosystem, and the scale of the aquaculture impacts relative to other stressors, the impacts are

17  considered significant." COE 125686. And in its Supplemental Decision, the Seattle District

18  admits that the long recovery time of eelgrass as compared to harvesting cycles results in an

19  essentially permanent displacement of eelgrass for the duration of shellfish aquaculture activities.

20  COE 127588 (2017 Supp. Decision Doc.).[23] Nonetheless the Corps then goes on to state a general

21  conclusion that "[w]hen properly sited and operated, impacts to eelgrass are minimal." COE

22  127588. That makes no rational sense, in light of the District's own findings of significant

23  cumulative impact.  Such a conclusion cannot rationally follow from the facts found.

24          For eelgrass, forage fish, and other species, the Corps essentially claims that the

25  cumulative impacts will be minimal because "District engineer[s] **may** exercise [their]

26

27  ───────────
   [23] This is significant because "66% of continuing active aquaculture acreage is potentially co-located with eelgrass," with certain regions of Puget Sound having co-location as high as 84%. COE 12756.

28  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 24
   CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

1   discretionary authority" to ensure that they will be minimal COE 127587-589 (emphasis added).

2   But there is no discussion of whether the Engineer "will" do so, or if they do, how they will

3   apply that discretion and what changes (if any) that would produce in the acknowledged likely

4   impacts.[24] And the actions of the Seattle District between 2012 and 2017 **demonstrate** that the

5   reliance on District Engineers is misplaced. The Seattle District did **not** exercise discretion to

6   limit impacts, instead they issued over 1,700 verifications and caused a 14 fold increase in the

7   number of acres suffering impacts from the use of NWP 48.

8       Before NWP 48 could lawfully issue, the Corps was supposed to determine that industrial

9   shellfish aquaculture authorized by that permit "will have only minimal cumulative adverse

10  effects on the environment." 33 U.S.C. § 1344(e)(1); *see* 40 C.F.R. § 230.7(a)(3). The Corps was

11  required to include an estimate of the expected number of discharge activities, as well as a

12  documented consideration of changes in the aquatic ecosystem attributable to the collective

13  effect of the aquaculture activities. *See* 40 C.F.R. §§ 230.7(b)(3) (requiring estimates of

14  discharge activities), and 230.11(g) (requiring documented consideration of impacts). In reaching

15  its conclusion, the Corps was required to provide more than a mere scintilla of evidence, and it

16  was supposed to articulate a rational connection between the facts and its conclusion that NWP

17  48 will have no more than minimal cumulative impacts on the environment. *See NLRB*, 345 F.3d

18  at 1054; *Friends of Yosemite Valley*, 520 F.3d at 1032.

19      In this case, the national analysis' estimate of use and acreage impact only satisfies the

20  requirement under 40 C.F.R. § 230.7(b)(3). It is silent about other potential impacts to the

21  environment attributable to commercial shellfish aquaculture, such as the destruction of eelgrass

22  beds. This is directly contrary to 40 C.F.R. § 230.11(g). By failing to discuss the § 230.11(g)

23  cumulative impacts, the Corps has failed to provide evidence adequate to support the conclusion

24

25  _____

26  [24] The Corps also provides no description of guidelines for what would constitute more than minimal impact, or a
    methodology for a District Engineer to evaluate or analyze such an impact cumulatively with other known impacts,

27  from both an industry that is growing and will continue to grow and from the other acknowledged contributors to
    impacts.

28  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 25
    CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

that there would be minimal cumulative adverse effects on the environment.[25] *NLRB* 345, F.3d at 1054.

The Seattle District's Supplement makes an attempt (albeit inadequate) to fill the gaping holes in the national analysis. The Supplement acknowledges the potential for cumulative adverse effects to eelgrass, forage fish, and other species, and notes the high degree of co-location with commercial shellfish aquaculture project areas. Yet the Supplement then makes a completely unsupported general conclusory statement that these cumulative adverse effects will be minimal when projects are "properly sited and operated." COE 127588 (2017 Supp. Decision Doc).

First, that is a conclusion, not an analysis, which is what is missing from the national Decision. Moreover, it is a conclusion that does not follow logically from the facts already found. The District's own draft cumulative impact analysis shows that there **are** many significant ongoing and reasonably foreseeable cumulative (and incremental) impacts from NWP 48 in Puget Sound that are considerably more than "minimal."  That means that authorization by the Corps of the use of NWP 48 in Puget Sound is a violation of 33 U.S.C. § 1344(e)(1).

The Corps' conclusion that NWP 48 will have minimal cumulative adverse effects is based on its speculation that there will be "proper siting and operation" that will somehow negate the otherwise expected cumulative adverse effects to eelgrass and other species. The Corps does not explain what "proper siting and operation" means, nor does it articulate how it would magically minimize already significant impacts. These missing steps, and the disconnect between the actual facts, show that authorization of the use of NWP 48 was and is a violation of both the CWA and the APA.[26]

---

[25] As alleged in the Fourth Claim for Relief, ¶¶112-114.

[26] The Corps' authorization of NWS-2013-759, NWS-2014-65, NWS-2015-121, NWS-2015-147, NWS-2013-1288, and/or NWS-2017-203 illustrate this point: Each of these authorizations either individually or cumulatively, creates more than negligible impacts, and by authorizing these activities without assessing the cumulative impacts, the Corps has violated the CWA, NEPA, and APA, as alleged in the Fifth Claim for Relief, ¶116.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 26
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

1

2

**3.    Refusal to consider key impacts directly connected to shellfish aquaculture was contrary to the broad scope of NEPA cumulative impacts analysis**

3

4      In the 2017 National Decision Document, the Corps expressly states that its cumulative

5  impacts analysis is limited to "[r]easonably foreseeable actions **regulated by the Corps.**" NWP

6  003077 (2017 Decision Doc)(emphasis added). This is arbitrary and capricious and a violation of

7  NEPA and its implementing regulations. The Corps cannot ignore the impacts of the actions of

   other "agenc[ies] (Federal or non-Federal) or person[s]." *See,* 40 C.F.R. § 1508.7

8      The Corps specifically acknowledged **but refused to consider** the cumulative impacts

9  of: (1) the use of pesticides, (NWP 003042, NWP 003077 -2017 Decision Doc. acknowledging

10 that pesticides may be discharge during operation and maintenance of shellfish aquaculture); (2)

11 the use of plastics, including PVC tubes, poly lines, and synthetic canopy nets, (NWP 003042,

12 003052-053 -2017 Decision Doc.); *see also,* COE 127552 (2017 Supp. Decision Doc.

13 recognizing "serious impact on marine environment" by marine debris)); (3) the discharge of

14 trash, garbage, and plastic waste, (NWP 003052-053 -2017 Decision Doc.); and (4) the risk of

15 parasitism and disease (NWP 003042).

16     The Corps gives several reasons for refusing to consider these impacts. One is, that the

17 activities are not regulated by the Corps. *See, e.g.*, NWP 003042, 003052-053 (2017 Decision

18 Doc. stating pesticides are regulated by EPA and trash, garbage, and plastic waste not "fill

19 material"). Another is that (in the Corps' view) the concerns are better addressed by another

20 regulator. *See, e.g.*, NWP 003042 (2017 Decision Doc. asserting that the risk of

21 parasitism/disease are better addressed by state or local public health agencies).

22     None of those reasons pass muster. Each of these limitations are contrary to the broad

23 scope of cumulative impacts analysis required by NEPA and the CWA. The plain language of 40

24 C.F.R. § 1508.7 requires the Corps' cumulative impacts analysis to consider "past, present, and

25 reasonably foreseeable future actions," ***regardless of what agency or other actor undertakes***

26 ***those actions***. In short, the Corps refusal to consider activities that it does not regulate was

27 clearly unlawful.

28  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 27
    CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

NEPA does not require that a cumulative impact analysis be ***absolutely*** thorough—it requires only that the discussion be "***reasonably*** thorough" and that it include the "significant aspects of the probable environmental consequences." *Trout Unlimited*, 509 F.2d at 1283. Here, refusing to do any analysis of a host of key known impacts, does not constitute a "reasonably thorough" look.  NEPA and its implementing regulations do not allow an agency to refuse to consider a particular impact on the theory that (in the agency's mind) it is better addressed by other agencies. Other federal courts have previously held that the regulations mean what they say and the Corps cannot refuse to consider particular impacts simply by claiming a lack of jurisdiction. *See, e.g.*, *Stewart v. Potts*, 996 F. Supp. 668, 683 (S.D. Tex. 1998) (holding that "even if the Corps does not have jurisdiction over the forested upland, it must nevertheless consider all of the cumulative impacts which result from the project, which clearly include the effects on the fragmentation of the forest"). *See also, Fritofson v. Alexander*, 772 F.2d 1225, 1243 (5th Cir. 1985)(noting that Part 1508.7 mandates consideration of impacts from actions "that are not themselves subject to the requirements of NEPA").

The Corps has no authority to refuse to consider the use of pesticides, the use of plastics, the discharge of trash, or the risk of parasitism and disease. The plain text of 40 C.F.R. § 1508.7 requires the Corps to consider those impacts. Those impacts will clearly combine with the other impacts of NWP 48, as well as with the impacts of other past, present, and reasonably foreseeable future actions.  As such, they need to be part of a cumulative impacts analysis.

### 4. The Corps' refusal to consider cumulative impacts render its Finding Of No Significant Impact arbitrary and capricious.

The Corps' refusal to consider these impacts completely hamstrung its ability to determine whether the cumulative impacts from NWP 48 would be significant, and warrant an EIS. Its refusal to follow NEPA regulations is itself arbitrary and capricious, and constitutes a violation of APA. 40 C.F.R. 1502.2(g). The Corps' cumulative impacts analysis repeatedly relies heavily on District and Division Engineers to exercise discretion necessary to ensure that the cumulative impacts are not significant under NEPA and not more than minimal under the CWA.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 28
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

*See e.g.*, NWP 003044, 003102 (2017 Decision Doc. relying on imposition of Regional Conditions to prevent significant cumulative effects to eelgrass or other species and on exercise of Engineers' discretion to ensure that cumulative effects of NWP 48 are minimal); COE 127552 (2017 Supp. Decision Doc. relying on Engineer to ensure that plastic gear will have minimal cumulative impact to the environment); COE 127588 (2017 Supp. Decision Doc. relying on Engineer to ensure minimal cumulative impact to eelgrass and forage fish). However,  such reliance is contrary to what NEPA and the CWA require.

NEPA required that the Corps assess the cumulative impacts of NWP 48 *before* it reauthorized the Permit. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1380 (Forest Service was obligated to assess cumulative impact of proposed timber sales on availability of old growth habitat for the pileated woodpecker). As the Sixth Circuit has noted, this requirement applies in the context of CWA Nationwide Permits, and does not allow the Corps to defer to or rely on the discretion of its District or Division engineers. *Ky. Riverkeeper*, 714 F.3d at 409.

In *Kentucky Riverkeeper*, the Corps defended similar general conclusory statements in a Nationwide Permit cumulative impacts analysis, arguing that the national review was "only the preliminary stage," and that "Divisions and Districts will add Regional Conditions that enhance environmental protections and address local concerns." *Id.* The Sixth Circuit rejected that argument, and held that such post-issuance assessments unlawfully presume that the Corps nationwide assessment satisfied NEPA requirements, when it did not. *Id* at 413.

The same pre-issuance legal requirements apply under the CWA. The regulations require the Corps to consider the potential impacts *before* it issues a Nationwide Permit, not defer them to later being addressed by lower level employees. *See* 40 C.F.R. § 230.7(b)(1) (requiring documented support for factual determinations before a general permit issues). In *Kentucky Riverkeeper* the court spoke to this point as well, holding that the Corps failed to meet its CWA obligations when the substance of its minimal cumulative impacts finding consisted of (1) an estimate of the use and acreage impact of nationwide permit 21, and (2) a conclusory statement that compensatory mitigation would attenuate the cumulative impacts such that they would be

minimal. 714 F.3d at 412. Such post-issuance mechanisms "do not explain how the Corps arrived at its *preissuance* minimal cumulative-impact findings." *Id.* (emphasis original).

The situation at hand is not meaningfully distinguishably from that in *Kentucky Riverkeeper*. The Corps' reliance on its District and Division engineers to conduct cumulative impact analyses to keep impacts minimal is a purely post-issuance mechanism. It cannot legally substitute for the Corps' required pre-issuance analysis and conclusions under either NEPA or the CWA. Simply put, the Corps' pre-issuance cumulative impact analysis is supposed to stand on its own. It cannot rely on the exercise of "downstream" discretion to meet the dictates of NEPA, the CWA, and the APA.

### 5. The 100-year "look back" has significant potential cumulative impacts, that have not been addressed by the Corps.

Another issue with 2017 NWP 48 is the changed definition for "new" commercial shellfish aquaculture operations. Under the 2017 definition, a "new" operation is "an operation in a project area where commercial shellfish aquaculture activities have **not been conducted during the past 100 years**." NWP 003034 (2017 Decision Doc.)(emphasis added). The effect of this change is to authorize operations in project areas so long as the project area was used for commercial shellfish aquaculture at **any** time, and in **any** manner, during the past 100 years. NWP 003035, 003046.

This is a massive expansion of the scope of authorized activities from the 2012 NWP 48, which had no similar lookback exception. COE 076090 (2012 Decision Doc.). This also starkly contrasts with the 2007 NWP 48 which did not authorize **any** new operations or expansions of project areas. COE 070099 (Corps Memo noting intent to "modify [2012] NWP 48 to authorize new shellfish aquaculture activities."). Essentially under 2017 NWP 48, if Great Grandma or Grandpa farmed and sold a few oysters then the Corps will now allow an industrial scale plastic tube and netting operation on the same parcel.[27]

---

[27] The Corps declined to distinguish between intensity levels of prior commercial activities, opening the door to dramatically increased activity. NWP 003048.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 30
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

Neither the national Document, nor the Seattle District Supplement expressly address the potential cumulative impacts of this massively expanded definition of "existing" in 2017 NWP 48. The Corps merely tries to rationalize the change, by saying in a response to a comment that the intent is "to recognize that many of these activities have taken place over long periods of time, even though some sections of project areas have been fallow for a number of years." NWP 003044-045 (2017 Decision Doc.). In reality, once an area has been fallow for a number of years, there will be significant changes in the aquatic environment that will be created by turning it into an industrial scale farm. And for areas that only had minimal historical use, the change in the scope and intensity creates the potential for a **huge** impact, both incrementally and cumulatively.

Yet as to those impacts, the Corps merely makes conclusory statements that: (1) "[NWP 48] activities do not cause losses of intertidal and subtidal habitats"; (2) "components of those ecosystems . . . are resilient to the impacts of these activities"; (3) "organisms recover in a relatively short time after disturbances caused by planting"; and (4) "[NWP 48] activities and submerged aquatic vegetation have been shown to co-exist with each other." NWP 003045. None of those are born out by the facts. The District Supplemental Decision directly contravenes the 2017 NWP 48 national conclusions. The Supplemental Decision concedes that when an NWP 48 project is permitted "the frequency of disturbance and relatively long recovery times result in a local habitat condition where eelgrass more often than not is either not present or present at a much reduced functional state." COE 127587-588 (2017 Supp. Decision Doc.). And : "This effect would persist as long as aquaculture is occurring at the site." COE 127588.[28]

Since the Corps' has not explained its basis for choosing to not consider the potential cumulative impacts of the 100-year lookback, the Corps has failed to provide a rational connection between the facts and its conclusions. That is a violation of NEPA, the CWA, and the APA. *See State Farm*, 463 U.S. at 43; *see also* COE 127550 (2017 Supp. Decision Doc.

_____
[28] Moreover, as we now know, the District's draft cumulative impact analysis **also** proves the national claims about minimal impacts are not true. *But see*, COE 127550 (2017 Supp. Decision Doc. responding to comments about the 100-year lookback and referring commenters back to the national Decision Document).

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 31
CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209

responding to comments about the 100-year lookback and referring commenters to the national Document).

The Corps has long been on notice of the importance of a complete and thorough cumulative impact analysis under NEPA and the CWA in Puget Sound.  This issue is particularly important when looking at impacts on resident Orcas, forage fish, and anadromous fish. As far back as 2009 this Court addressed that very issue in *Preserve Our Island, supra*. In that case the Corps had approved a dredge and fill permit for demolition and reconstruction of a dock on Maury Island in Puget Sound. *Id* at 5. This Court found that the Corps' failure to analyze noise impacts, impacts to eelgrass, and nearshore habitat impacts were fatal to the permit approval. *Id* at 59. This Court held that "there was no meaningful cumulative impact analysis of 'reasonably foreseeable future actions'… in complete disregard for the broader picture involving incremental factors which could affect the marine environment. *Id* at 56. This court characterized the impacts of constructing this individual dock "highly uncertain" and ordered the Corps to prepare a full EIS. *Id* at 57.

That is precisely what should happen in the case at hand. Here, by approving NWP 48 for use in Puget Sound the Corps has rubber-stamped disruption of thousands of acres of eelgrass, forage fish habitat, and nearshore habitat. Instead of doing a proper cumulative impact analysis, the Corps Decision Documents just claim that is a lack of available data. NWP 003087 (2017 Decision Doc.) But the truth is, if construction of one dock on one island required more from the Corps in *Protect Our Island,* then the Corps can't seriously contend that it has taken the requisite "hard look" at impacts in this circumstance, where over a 1,000 facilities will be constructed throughout Puget Sound and they will likely result in permanent disruption of tens of thousands of acres of shoreline in the state, and yet the Corps merely did an EA.

## CONCLUSION

The Corps is still trying to sell the same defective cumulative impacts analysis from 2012, with a few cosmetic adornments in an attempt to pass it off as an updated product. The Corps' implementation of the 2017 NWP 48 evinces its willingness to continue selling the

LAW OFFICE OF KARL G. ANUTA, P.C.
TRIAL ATTORNEY
735 S.W. First Avenue
Portland, OR 97204
Phone: 503.827.0320 – Fax 503.228.6551

1   defective product even if dangerous conditions or risks surface.

2         Plaintiffs brought this case because the Corps has repeatedly refused (despite many

3   entreaties) to include a cumulative impact analysis in its Decisions, or to suspend issuance of

4   permits in Puget Sound until the impacts can be properly analyzed in an EIS.  The Corps has also

5   not articulated rational connections between the facts and its conclusions about  alleged

6   compliance with the legal obligations created by the CWA and/or NEPA. As a result,  it is

7   necessary to have this court direct the Corps take the actions necessary to address the defects and

8   to fulfill the agency obligations under NEPA and the CWA. Since, as outlined, the conduct of the

9   Corps was arbitrary and capricious and not in accordance with law, plaintiff respectfully asks

10  this court to vacate and set aside the Corps' issuance of the 2017 NWP 48 for use in Puget

11  Sound, and to remand the matter to the Corps with directions to address the deficiencies in the

12  analysis and to explain in an EIS the inconsistencies and incongruities between the facts and the

13  Corps decision both expand the scope of and also to continue to use NWP 48 in Puget Sound.

14

15         DATED this 30th day of April 2018.

16

17                              Respectfully submitted,
18                              /s/ Karl G. Anuta
                                Karl G. Anuta, WSBA # 21346
19                              Law Office of Karl G. Anuta, P.C.
                                735 S.W. 1st Ave., 2nd Floor
20                              Portland, Oregon 97204
                                T: (503 827-0320 / F: (503) 288-6551
21
22                              kga@integra.net
23
24
25
26
27
28  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 33          LAW OFFICE OF KARL G. ANUTA, P.C.
    CASE NOS. 2:16-CV-00950 AND 2:17-CV-01209                                TRIAL ATTORNEY
                                                                            735 S.W. First Avenue
                                                                             Portland, OR 97204
                                                                      Phone: 503.827.0320 – Fax 503.228.6551

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2018 I electronically filed this MOTION FOR

SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF THE MOTION with the

Clerk of the Court using the CM/ECF system which will send notification of such filing on the

following:

| | |
|---|---|
| Kent E. Hanson | Samuel W. Plauche' |
| Attorney for Defendants | Attorney for Defendant Intervenor |
| kent.hanson@usdoj.gov | billy@plauchecarr.com |
| | |
| Peter Kryn Dykema | Jesse G. Denike |
| Attorney for Defendants | Attorney for Defendant Intervenor |
| Peter.dykema@usdoj.gov | Jesse@plauchecarr.com |
| | |
| Dedra S. Curteman | Amanda M. Carr |
| Attorney for Defendants | Attorney for Defendant Intervenor |
| dedra.curteman@usdoj.gov | amanda@plauchecarr.com |
| | |
| Mark Brown | |
| Attorney for Defendants | |
| mark.brown@usdoj.gov | |

Dated this 30th day of April 2018

LAW OFFICE OF KARL G. ANUTA, P.C.

*/s/ Karl G. Anuta*_____
KARL G. ANUTA (WSBA #21346)
kga@integra.net

LANDYE BENNETT BLUMSTEIN
Thane Tienson (WSBA #13310)
Ttienson@lbblawyers