THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THE COALITION TO PROTECT PUGET SOUND HABITAT, | No.  2:16-cv-00950-RSL |
| Plaintiff, | INTERVENOR-DEFENDANT TAYLOR SHELLFISH COMPANY, INC'S CROSS-MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, *et al.*, | |
| Defendants, | |
| and | NOTE ON MOTION CALENDAR: December 7, 2018 |
| TAYLOR SHELLFISH COMPANY, INC., | |
| Intervenor – Defendant. | |
| CENTER FOR FOOD SAFETY, | No.  2:17-cv-01209-RSL |
| Plaintiff, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, *et al.,* | |
| Defendants, | |
| and | |
| PACIFIC COAST SHELLFISH GROWERS ASSOCIATION, | |
| Intervenor – Defendant. | |

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:      206-588-4255

1

**TABLE OF CONTENTS**

2 I.  INTRODUCTION ................................................................................ 1

3 II.  FACTUAL BACKGROUND ................................................................ 3

4    A. Nationwide Permit 48 ............................................................... 3
    B. Nationwide Permit Verifications in Puget Sound ..................... 5

5

6 III. LEGAL FRAMEWORK ..................................................................... 6
    A. The Clean Water Act ................................................................. 6

7    B. The National Environmental Policy Act .................................. 8

8 IV. STANDARD OF REVIEW AND BURDEN OF PROOF ................... 9

9 V.  ARGUMENT ...................................................................................... 9
    A. CPPSH's Reliance on the 2012 NWP 48 is Misplaced. ......... 9

10     1. Any Challenge to the 2012 NWP 48 is Moot. ............... 10
     2. CPPSH's Challenges to the 2012 NWP 48 are Factually

11       Inaccurate. ...................................................................... 10

12    B. The Army Corps' 2017 Analysis Complies with NEPA and the
     CWA. ......................................................................................... 12

13     1. The Decision Document Complies With NEPA. ................. 12
     2. The 2017 Cumulative Effects Analysis Complies with the

14       CWA. ............................................................................... 14

15      a. CPPSH's Reliance on a Flawed, Draft Document Is
        Misplaced. ............................................................... 14

16      b. The Army Corps Analysis Is Conservative Under the
        CWA Because It Covers Activities that Do Not Require

17        Section 404 Permits. ............................................... 15

18    C. The Army Corps Adequately Analyzed Past, Present, and
     Reasonably Foreseeable Actions Under NEPA. ......................... 16

19
    D. The Army Corps Adequately Analyzed Impacts Under the CWA,

20     Including Shellfish Farming Interactions with Eelgrass and Forage
     Fish .......................................................................................... 20

21
    E. The Scope of the Army Corps' Cumulative Impact Analysis in the

22     Decision Document Complies With NEPA. .............................. 24

23    F. The Army Corps Appropriately Discussed District Engineer
     Discretion to Review Individual Projects and Impose Additional

24     Conditions. ............................................................................... 27

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - i
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone: 206-588-4188
Fax:  206-588-4255

G.   The Definition of "New" Operation in 2017 NWP 48 Is Supported and Does Not Authorize Unfettered Expansion as Alleged by CPPSH. ..........................................................................................29

H.   Should the Court Grant Summary Judgment in CPPSH's Favor, Remand Without Vacatur Is the Appropriate Remedy. ...................................32

VI.   CONCLUSION ......................................................................................................33

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - ii
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:       206-588-4255

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*

4

462 U.S. 87 (1983)............................................................................... 8, 13

5

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*

833 F.3d 1274 (11th Cir. 2016)............................................................. 27

6

7

*Decker v. Nw. Envtl. Def. Ctr.*

568 U.S. 597 (2013)............................................................................... 10

8

9

*Envtl. Def. Ctr., Inc. v. EPA*

344 F.3d 832 (9th Cir. 2003)................................................................. 27

10

*Friends of the Wild Swan v. Weber*

11

767 F.3d 936 (9th Cir. 2014)................................................................. 25

12

*Indep. Acceptance Co. v. California*

204 F.3d 1247 (9th Cir. 2000)........................................................... 20, 30

13

14

*Kentucky Riverkeeper, Inc. v. Rowlette*

714 F.3d 402 (6th Cir. 2013)............................................................ 10, 28

15

16

*Marsh v. Or. Nat. Res. Council*

490 U.S. 360 (1989)................................................................................ 8

17

*Nw. Res. Info. Ctr., Inc. v. NMFS*

18

56 F.3d 1060 (9th Cir. 1995)................................................................. 10

19

*Ohio Valley Envtl. Coal. v. Bulen*

429 F.3d 493 (4th Cir. 2005).................................................. 17, 23, 27, 28

20

21

*Preserve Our Island v. U.S. Army Corps of Eng'rs*

No. C08-1353 RSM, 2009 WL 2511953 (W.D. Wash. Aug. 13, 2009) ...................... 19, 20

22

*Rapanos v. United States*

23

547 U.S. 715 (2006)................................................................................ 7

24

*Robertson v. Methow Valley Citizens Council*

490 U.S. 332 (1989)................................................................................ 8

25

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:      206-588-4255

*Sierra Club v. Bostick,*
787 F.3d 1043 (10th Cir. 2015) .................................................................. 17, 23, 27, 28

*Sierra Club v. U.S. Army Corps of Eng'rs*
990 F.Supp.2d 9 (D.D.C. 2013) ............................................................................... 8

*Sierra Club v. Van Antwerp*
526 F.3d 1353 (11th Cir. 2008)............................................................................... 27

*Vanderslice v. Berryhill*
No. 16-5293-JCC, 2017 WL 2889371, at *3 (W.D. Wash. July 6, 2017) ............................ 24

*Wyo. Outdoor Council, Powder River Basin Res. Council v. U.S. Army Corps of
Eng'rs,* 351 F. Supp. 2d 1232 (D. Wyo. 2005) ............................................................. 26, 27


**Statutes**

33 U.S.C. § 404 ......................................................................................................... 22

33 U.S.C. § 1344 ......................................................................................................... 6

33 U.S.C. § 1344(e)(1) .................................................................................................. 7

42 U.S.C. § 4332 ......................................................................................................... 8


**Other Authorities**

Reissuance of Nationwide Permits
72 Fed. Reg. 11092 (March 12, 2007)................................................................................ 2, 3

H.R. Rep. No. 95-830, 38, 98, 100 (1977)......................................................................... 7

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - iv
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:      206-588-4255

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Regulations**

40 C.F.R. § 1501.4 ............................................................................................................... 8

40 C.F.R. § 1508.9 ............................................................................................................... 8

33 C.F.R. § 330.1 .................................................................................................... 7, 17, 28

33 C.F.R. §330.4 ..................................................................................................... 7, 17, 28

33 C.F.R. § 330.5 .......................................................................................................... passim

33 C.F.R. § 330.6 .............................................................................................................. 10

40 C.F.R. § 230.7 ......................................................................................................... 11, 22

40 C.F.R. § 230.11 ....................................................................................................... 21, 22

40 C.F.R. § 230.43 ............................................................................................................. 32

40 C.F.R. § 1501.4 ............................................................................................................... 8

40 C.F.R. § 1508.7 ................................................................................................ 8, 18, 25, 28

40 C.F.R. § 1508.9 ............................................................................................................... 8

40 C.F.R. § 1508.27 ............................................................................................................. 8

**Rules**

Local Rules W.D. Wash. LCR 7(f)(4). ................................................................................ 1

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - v
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:      206-588-4255

**MOTION**

Intervenor-Defendant Taylor Shellfish Company, Inc. ("Taylor Shellfish") cross moves for summary judgment and opposes Plaintiff Coalition to Protect Puget Sound Habitat's ("CPPSH's") motion for summary judgment ("CPPSH Mot."), ECF No. 36.[1] For the reasons set forth below, the Court should grant Defendants' and Intervenor-Defendant's cross motions for summary judgment, deny Plaintiff's motion for summary judgment, and enter judgment in favor of Defendants upholding the U.S. Army Corps of Engineers' ("Army Corps'") actions with regard to Nationwide Permit ("NWP") 48 in Puget Sound.

**MEMORANDUM IN SUPPORT OF CROSS-MOTION AND OPPOSITION**

**I.      INTRODUCTION**

Shellfish farming has been a widespread and economically significant activity in rural areas of Washington State for well over a century. COE 071708; COE 127582-83.[2] For additional history and overview of shellfish farming in Washington, *see* Pacific Coast Shellfish Growers Association ("PCSGA") Cross Motion for Summary Judgment ("Mot."), No. 2:17-cv-1209-RSL at Section II.A, filed concurrently and incorporated herein by reference.[3] Taylor Shellfish is a fifth-generation, family owned company with thousands of acres of tidelands and hundreds of employees throughout Washington State. COE 071924. Taylor Shellfish is headquartered in Puget Sound, the region that is the subject of this lawsuit. *Id.*; CPPSH Mot. 1.

---

[1] The Court granted Plaintiff CPPSH leave to file an over-length motion; Taylor Shellfish's brief in opposition is automatically allowed an equal number of additional pages. Local Rules W.D. Wash. LCR 7(f)(4).

[2] Taylor Shellfish cites to the pages of the Army Corps' administrative record for the Nationwide Permits by their Bates numbers (NWPxxxxxx and COE xxxxxx).

[3] As encouraged in the Court's Scheduling Order, Intervenor Taylor Shellfish, Intervenor PCSGA in Case No. 2:17-cv-1209-RSL and Defendants in both proceedings have coordinated on briefing to improve efficiency and avoid redundancy.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 1
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:     206-588-4255

1    Since 2007, shellfish farmers in Puget Sound have received verifications for their

2    farms from the Army Corps under a general permit, NWP 48. The vast majority of these

3    verifications—over 86 percent of the total acreage—have authorized existing shellfish farms

4    that have been in place for over a decade, and in many instances for multiple decades.[4] In

5    issuing NWP 48, the Army Corps has repeatedly found that commercial shellfish aquaculture

6    activities can provide environmental benefits while resulting in minimal individual or

7    cumulative adverse environmental effects. *See* Reissuance of Nationwide Permits, 72 Fed.

8    Reg. 11092, 11144 (Mar. 12, 2007); COE 074468-69; NWP000065.

9    Contrary to CPPSH's assertions, the record demonstrates that the Army Corps, in

10   issuing NWP 48, appropriately considered cumulative effects including in Puget Sound,

11   under the National Environmental Policy Act ("NEPA"), Clean Water Act ("CWA"), and

12   Administrative Procedure Act ("APA"). CPPSH's arguments rely heavily on (i) a

13   misperception that there has been a "dramatic and unprecedented" expansion of shellfish

14   aquaculture operations in Puget Sound, (ii) a draft, unfinished document prepared by a

15   Seattle District Army Corps employee that has fundamental shortcomings and was

16   disavowed by its own author as "nonsense," and (iii) a mischaracterization of the Army

17   Corps' general permit program's multi-layer approach to ensuring no more than minimal

18   adverse cumulative effects will occur. The Army Corps' evaluation of cumulative effects

19   under NEPA appropriately considered impacts of shellfish farming in the context of other

20   past, present, and reasonably foreseeable future actions, and focused on appropriate

21   categories of resources and stressors. Further, the Army Corps considered cumulative

22   effects using reasonable usage estimates, and NWP 48 has appropriate conditions and

23   _____

24   [4] *Compare* COE 127591-92 (9,414 acres of shellfish farms in Puget Sound through March 2017) *with* COE
     134185 (8,169 acres of existing farms in Puget Sound over a decade ago). *See also* NWP003054 ("...the

25   vast majority of activities authorized by this NWP are on-going recurring activities in designated project
     areas. Many of these activities have been conducted in these project areas for decades.").

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 2
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:      206-588-4255

1  procedures to ensure that it will result in no more than minimal adverse cumulative effects

2  under the CWA. Defendants and Taylor Shellfish are entitled to summary judgment.

3                **II.     FACTUAL BACKGROUND**

4      **A.  Nationwide Permit 48**

5         The Army Corps first issued NWP 48 in 2007. 72 Fed. Reg. 11092, 11190-91. The

6  2007 version of NWP 48 authorized existing commercial shellfish activities, defined as an

7  activity that had been granted a permit, license, or lease from a state or local agency

8  authorizing commercial aquaculture activities, and that had undertaken activities prior to

9  March 12, 2007. *Id.* at 11144-45. Because of the extensive shellfish farming in Washington

10  State, the Army Corps Seattle District received many pre-construction notifications

11  ("PCNs") from farmers seeking verification for their existing farms under 2007 NWP 48.

12  The Army Corps worked with the National Marine Fisheries Service ("NMFS") and the U.S.

13  Fish and Wildlife Service ("USFWS") (collectively "the Services") to complete a

14  programmatic Endangered Species Act ("ESA") and Magnuson–Stevens Fishery

15  Conservation and Management Act essential fish habitat ("EFH") consultation for the

16  2007 NWP 48 in Washington State. COE 134144. That consultation, which was based on

17  detailed information shellfish farmers submitted to the Army Corps, covered 1,523

18  existing farm parcels totaling approximately 38,000 acres. *Id.*; COE 133072; COE

19  132838.

20         The Army Corps reissues its Nationwide Permit program on a five-year cycle.

21  NWP000002. Ongoing activities such as shellfish farming must be authorized under the

22  current version of the permit and comply with its terms and conditions. Thus, a farm

23  established prior to 2007 and in effect today likely pursued authorization in 2007, then 2012,

24  and then 2017, and will need to do so again under the 2022 version of NWP 48.

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 3
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

1      The 2012 version of NWP 48 authorized existing commercial shellfish farms as well

2 as new farms that do not directly affect more than ½-acre of submerged aquatic vegetation

3 beds. COE 074420, 074517-18. In explaining its decision to include new farms in 2012,

4 the Army Corps recognized commercial shellfish beds support the objectives of the CWA

5 because they improve water quality and provide habitat functions for the aquatic

6 environment. COE 074465-66.

7      After issuance of 2012 NWP 48, the Seattle District initiated a programmatic

8 ESA/EFH consultation covering shellfish activities in Washington State. COE 134134,

9 134143.[5] The Seattle District's programmatic biological assessment ("PBA"), which

10 formally commenced that consultation, evaluates both continuing and new shellfish

11 activities. COE 134148. "Continuing" in the PBA has a different, more restrictive, meaning

12 than "existing" in NWP 48. *Id*. Continuing activities are limited to a strictly defined subset of

13 farms that were in existence prior to March 18, 2007, and that "have been identified and

14 recorded in a database that is maintained by the Corps." *Id*. The Army Corps' database

15 identified 8,169 acres of continuing farms (i.e. in existence prior to March 18, 2007) in Puget

16 Sound.[6] COE 134185 (identifying 1,351 continuing acres in Hood Canal, 3,131 in South

17 Puget Sound, and 3,687 in North Puget Sound, for 8,169 total Puget Sound continuing acres).

18      The Army Corps reissued the NWPs, including NWP 48, on January 6, 2017, with

19 32 general conditions applicable to all NWPs. NWP000001, 000140-46. As was the case in

20 2012, the 2017 NWP 48 covered both existing farms and new shellfish farms that do not

21 directly affect more than ½-acre of submerged aquatic vegetation beds. NWP000137-38. The

22

23 [5] The programmatic consultation covers certain shellfish activities in Washington State inland marine waters; it is not tied to any specific permit and does not have a specific expiration date. COE 134145-46. The consultation excludes various activities and structures. COE 134180-81. For further discussion of the

24 programmatic consultation and its relationship to NWP 48, *see* PCSGA Mot. Section IV.C.2.

[6] The Puget Sound region is extensive and includes three of the five sub-regions identified in the PBA: Hood

25 Canal, South Puget Sound, and North Puget Sound. COE 134152, 134185.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 4
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:   206-588-4255

1   2017 NWP 48 clarified that a "new" shellfish aquaculture operation is one where activities

2   have not taken place in the last 100 years. NWP000137. The Army Corps stated the 100-year

3   definition "recognize[s] that many of these activities have taken place over long periods of

4   time, even though some sections of project areas may have been fallow for a number of

5   years." NWP003043-44. The Army Corps further stated that commercial shellfish

6   aquaculture activities do not cause losses of intertidal and subtidal habitats, that components

7   of those ecosystems are resilient to the impacts of shellfish activities, that such impacts are

8   comparable to impacts from natural disturbances, and in general recovery time is relatively

9   short. *Id.* The final Decision Document supporting the issuance of 2017 NWP 48 estimates

10  NWP 48 will be used nationwide to authorize a total of 1,165 activities, or a total of 56,250

11  acres, over the five-year term of the permit. NWP003098.

12      The Army Corps Northwestern Division Engineer subsequently considered the need

13  for regional conditions for NWP 48, which included the preparation of a supplemental

14  decision document ("Regional Supplement"), COE 127485-611, and placed an additional

15  twelve (eleven general and one NWP-specific) regional conditions on the use of NWP 48,

16  including in Puget Sound. COE 127594-98.

17      **B.  Nationwide Permit Verifications in Puget Sound**

18      Central to CPPSH's challenge is its claim that the Army Corps failed to adequately

19  evaluate an alleged "dramatic and unprecedented" increase in shellfish farms that has

20  occurred in Puget Sound as a result of NWP 48. CPPSH Mot. 1, 15.[7] However, the record

21  does not reflect any such dramatic increase.

22

23  [7] CPPSH uses a tortured interpretation of verification numbers to support its claim of a "dramatic and unprecedented increase" of shellfish farms. The Regional Supplement states the Seattle District issued about 1,720 verifications state-wide under the 2012 NWP 48. COE 127590. CPPSH interprets this as comprising

24  "at least 1,020 of those being new projects, and the other 700 reverifications of prior projects." CPPSH Mot. 17. However, the Regional Supplement states that about 700 projects "received two verifications within the

25  2012 NWP time period." COE 127590. Subtracting out the double verifications, this means approximately

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 5
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:  206-588-4188
Fax:     206-588-4255

1     Puget Sound is a vast area—125,736 marine tideland acres, as well as extensive

2  subtidal areas. COE 134219, 134232. There were 8,169 acres of existing farms in Puget

3  Sound a decade ago, and the Seattle District verified 9,414 acres of shellfish farms in Puget

4  Sound through March 2017. *Compare* COE 127591-92 (8,169 acres) *with* COE 134185

5  (9,414 acres). This represents a 15 percent increase over a ten-year period, and an average

6  annual increase of roughly 125 acres. It also bears noting that shellfish farms in Puget Sound,

7  the only region challenged by CPPSH, represent less than 19 percent of the overall acreage

8  verified in Washington State; the remaining 81 percent of farm acreage is located in other

9  (far smaller) sub-regions of Washington (Willapa Bay and Grays Harbor).[8] COE 127592;

10  COE 134152.

11                  **III.    LEGAL FRAMEWORK**

12     While CPPSH intermingles CWA and NEPA arguments in its motion, those statutes

13  impose different standards, including with regard to consideration of cumulative impacts.

14  **A. The Clean Water Act**

15     The Army Corps reissued NWP 48 under Section 404 of the CWA and Section 10 of

16  the Rivers and Harbors Act. NWP000002, 000137-38.[9] CWA Section 404 permits are

17  required for activities that involve the discharge of dredged or fill material into navigable

18  waters. 33 U.S.C. § 1344.

19     NWP 48 is a type of general Section 404 permit. Congress amended the CWA in

20  1977 to authorize issuance of general CWA permits after concluding that requiring

21  individual permits for routine activities imposes unnecessary delay and administrative

22  1,020 total projects (new plus existing) received verifications under the 2012 NWP 48. *Id.* For comparison,
in February 2012 the Seattle District had over 1,000 applications for existing farms that it expected to

23  process under the 2012 NWP 48. COE 071994. These numbers do not support CPPSH's claim.
[8] CPPSH erroneously states, without citation, that over 90% of the usage of the 2012 NWP 48 was in Puget

24  Sound. CPPSH Mot. 22. Although over 90% of the usage of the 2012 NWP 48 was located in Washington
State, only 9,414 of 49,575 acres verified in Washington were located in Puget Sound. COE 127592.

25  [9] CPPSH does not challenge NWP 48 under Section 10 of the Rivers and Harbors Act.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 6
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:      206-588-4255

1   burdens on the public and the Army Corps. *See* H.R. Rep. No. 95-830, 38, 98, 100 (1977)

2   (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 4424. General permits are appropriate for

3   categories of activities that will have only minimal cumulative adverse effect on the

4   environment. 33 U.S.C. § 1344(e)(1). The nationwide permit program has succeeded in

5   reducing costs and delays: "The average applicant for an individual permit spends 788 days

6   and $271,596 in completing the process, and the average applicant for a nationwide permit

7   spends 313 days and $28,915—not counting costs of mitigation or design changes."

8   *Rapanos v. United States*, 547 U.S. 715, 721 (2006) (plurality opinion).

9        The NWP program is administered at three levels. At the first level, the issuance of

10  NWPs is performed by the Chief of Engineers. 33 C.F.R. § 330.5(b). The Chief of Engineers

11  conducts the NEPA analysis and documentation and, where an NWP covers regulated

12  discharges under CWA Section 404, the CWA Section 404(b)(1) compliance analysis. *Id.* At

13  the second level, Division Engineers conduct an additional analysis to ensure that no more

14  than minimal adverse effects will occur and may exercise limited discretionary authority to

15  modify, suspend or revoke NWP authorizations within the division where they have concerns

16  under the Clean Water Act section 404(b)(1) Guidelines or for any factor of the public

17  interest. 33 C.F.R. §§ 330.1(d), 330.4(e), 330.5(c). At the third level, District Engineers

18  evaluate activities on an individual basis when individual review is required[10] and also have

19  discretionary authority to impose activity-specific conditions to ensure they comply with the

20  terms and conditions of the NWP and result in no more than minimal adverse impacts. 33

21  C.F.R. §§ 330.1(d), 330.4(e), 330.5(d).

22

23

24

---

[10] Individual review is required for every activity in Washington State seeking coverage under NWP 48.
25  COE 127569, 127592.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 7
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:    206-588-4188
Fax:       206-588-4255

1    **B.  The National Environmental Policy Act**

2            Congress passed NEPA to focus governmental and public attention on the potential

3    environmental effects of any proposed "major Federal action." 42 U.S.C. § 4332(2)(C);

4    *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). NEPA does not mandate

5    substantive results but instead establishes a process to ensure federal decision-makers

6    consider environmental consequences of major federal actions. *Robertson v. Methow Valley*

7    *Citizens Council*, 490 U.S. 332, 350 (1989); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*

8    *Inc.*, 462 U.S. 87, 97–98 (1983).

9            NEPA requires the preparation of an Environmental Impact Statement ("EIS") for

10   any major federal action "significantly affecting the quality of the human environment[.]" 42

11   U.S.C. § 4332(2)(C). NEPA regulations define "significant" as requiring consideration of an

12   action's "context" and "intensity." 40 C.F.R. § 1508.27. The latter refers to the severity of

13   any impact when considering several factors. *Id.* § 1508.27(b). If the significance of an

14   action's effects are not evident on their face, an agency may prepare an Environmental

15   Assessment ("EA") to determine if its effects would be significant. *Id.* § 1501.4(b)-(d). An

16   EA briefly describes the proposal, examines alternatives, and considers environmental

17   impacts. *Id.* § 1508.9. No EIS is required where an EA leads to a finding of no significant

18   impact, or "FONSI." *Id.* § 1501.4(e).

19           NEPA compliance for the NWP program is accomplished at the national level. 33

20   C.F.R. § 330.5(b)(3); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F.Supp.2d 9, 20

21   (D.D.C. 2013). NEPA regulations define a "cumulative impact" as "the impact on the

22   environment which results from the incremental impact of the action when added to other

23   past, present, and reasonably foreseeable future actions regardless of what agency (Federal

24   or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Pursuant to

25   Council on Environmental Quality ("CEQ") NEPA guidance, cumulative effects analyses

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 8
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

1   should focus on specific categories of resources of concern, and disturbances and stressors

2   that degrade those resources. NWP003074-75.

### IV.   STANDARD OF REVIEW AND BURDEN OF PROOF

4          For a discussion of Standard of Review and Burden of Proof, *see* PCSGA Mot.

5   Section III, filed concurrently and incorporated herein by reference.

### V.   ARGUMENT

7          CPPSH argues that the Army Corps improperly issued NWP 48 for use in Puget

8   Sound because it results in more than minimal cumulative impacts in violation of the CWA

9   and NEPA. CPPSH alleges deficiencies with both the 2012 and 2017 versions of NWP 48,

10  referencing both the Decision Document and Regional Supplement associated with each. For

11  the reasons discussed below, CPPSH's arguments should be rejected.

12  **A. CPPSH's Reliance on the 2012 NWP 48 is Misplaced.**

13         CPPSH dedicates much of its motion to a discussion of alleged deficiencies with the

14  2012 NWP 48. *See,* CPPSH Mot. 1-3, 6-13, 15-23, 25, 30, 32. CPPSH argues the 2012

15  Decision Document and Regional Supplement's projections of the number of NWP 48

16  verifications are "gross underestimates" that do not reflect the "dramatic and unprecedented

17  increase in the number of commercial shellfish aquaculture operations in the waters of Puget

18  Sound." CPPSH Mot. 1-2, 17-21. To the extent CPPSH raises these issues as part of a direct

19  challenge to the 2012 NWP 48, such a challenge is moot. To the extent CPPSH raises these

20  issues as part of its challenge to the 2017 NWP 48, CPPSH's arguments are factually

21  inaccurate. The 2017 Decision Document reasonably predicted the number of verifications

22  that would be issued, and the record demonstrates that the "dramatic and unprecedented"

23  growth in shellfish farms in Puget Sound under NWP 48 has not occurred.

24

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 9
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:     206-588-4255

1        **1.      Any Challenge to the 2012 NWP 48 is Moot.**

2        The 2012 NWPs, including NWP 48, expired on March 18, 2017. COE 074421.

3    Activities authorized under the 2012 version of NWP 48 were eligible for a one-year

4    extension, which has also lapsed. *Id.*; 33 C.F.R. § 330.6(b). "It is a basic principle of Article

5    III that a justiciable case or controversy must remain extant at all stages of review, not

6    merely at the time the complaint is filed." *Decker v. Nw. Envtl. Def. Ctr.,* 568 U.S. 597, 609

7    (2013). Accordingly, the Ninth Circuit has held that challenges to a five-year permit are

8    moot when the permit expires. *Nw. Res. Info. Ctr., Inc. v. NMFS,* 56 F.3d 1060, 1069-

9    1070 (9th Cir. 1995). Specific to an NWP, the Sixth Circuit has held challenges to an

10    expired NWP become moot absent a grandfathering provision allowing authorized projects

11    to continue. *Kentucky Riverkeeper, Inc. v. Rowlette,* 714 F.3d 402, 406-407 (6th Cir. 2013).

12        Here, the 2012 version of NWP 48 expired on March 18, 2017, and the one-year

13    extension period expired in March 2018. COE 074421; 33 C.F.R. § 330.6(b). Commercial

14    shellfish aquaculture activities must seek verification under the 2017 version of the permit

15    and comply with its terms and conditions. COE 127590 ("All current verified operations

16    under the NWP 48 2012 will need to receive verification under the NWP 48 2017" or

17    pursue other means of coverage, such as an individual Army Corps permit.). Thus, only

18    the 2017 NWP 48 is now relevant, and any challenge to the 2012 NWP 48 is moot.

19        **2.      CPPSH's Challenges to the 2012 NWP 48 are Factually Inaccurate.**

20        To the extent CPPSH's claims regarding a "gross underestimate" in the 2012 NWP

21    48 are relevant to the 2017 NWP 48, those claims should be rejected because they are

22    factually inaccurate. First and foremost, as set forth in Section II.B above, there has simply

23    been no dramatic expansion of farms in Puget Sound under NWP 48.

24        The Army Corps appropriately predicted the number of individual discharge

25    activities likely to be authorized under NPW 48 in both 2012 and 2017, in accordance with

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 10
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:      206-588-4255

1    Army Corps regulations. 40 C.F.R. § 230.7(b)(3) ("…the evaluation shall include the number

2    of individual discharge activities likely to be regulated…"); COE 076127. The Army Corps

3    predicted in the 2012 Decision Document that NWP 48 would be used to authorize

4    commercial shellfish farming approximately 3,200 times nationally. *Id.* This number actually

5    appears to have been an overestimate rather than an underestimate, since the Army Corps

6    then predicted in 2017 that approximately 1,625 activities would be authorized over the five-

7    year term of 2017 NWP 48. NWP003098.

8        CPPSH overlooks this predicted number of individual discharge activities entirely,

9    instead focusing solely on a discussion in the Decision Document of temporary impacts that

10   includes a figure of 3,320 acres. CPPSH Mot. 8. Given that the 2012 version of NWP 48

11   expanded the scope of general permit coverage to include some new farms, it is reasonable to

12   interpret this 3,320-acre figure as an estimate of additional temporary impacts associated

13   with that change. That is particularly true considering the Seattle District of the Army Corps

14   reported there were over 38,000 acres of existing shellfish farms in Washington State alone

15   prior to 2012. COE 133072. Regardless, the 2012 permit has expired, and the Army Corps'

16   analysis in 2017 includes updated estimates, which CPPSH does not challenge.

17       CPPSH also challenges the Seattle District's 2012 estimate that NWP 48 would be

18   used 50 times per year, claiming the actual usage of the 2012 permit was far greater. CPPSH

19   Mot. 17. However, read in context, the 2012 projection of 50 times per year is also an

20   estimate of new farms that could be authorized under the 2012 version, which, unlike the

21   2007 version of NWP 48, covered existing and new farms. COE 073091. This is confirmed

22   by the fact that the Army Corps knew when it issued 2012 NWP 48 that it had well over

23   1,000 applications for existing farm verifications pending. COE 071994.

24

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 11
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:     206-588-4255

1      **B. The Army Corps' 2017 Analysis Complies with NEPA and the CWA.**

2           Contrary to CPPSH's claims, the Army Corps' approach to evaluating cumulative

3      impacts under both NEPA and the CWA was proper. The 2017 NWP 48 Decision Document

4      estimates NWP 48 will be used approximately 325 times per year on a national basis (1,625

5      times total), resulting in impacts to approximately 11,250 acres per year (56,250 acres total).

6      NWP003098. These estimates are based on the reported use of NWP 48 during the 2012

7      permit cycle, including PCNs submitted to Corps district engineers and voluntary

8      notifications by permittees. *Id*. CPPSH does not challenge these 2017 estimates, instead

9      constructing several straw man arguments that ignore the Army Corps' actual analysis.[11]

10          **1.      The Decision Document Complies With NEPA.**

11          CPPSH contends the 2017 NWP 48 Decision Document's consideration of

12     cumulative effects is flawed because it "essentially just substituted a few numbers and

13     repeated the same analysis and findings" from 2012, while simultaneously failing to address

14     the 2012 "gross underestimate." CPPSH Mot. 19.[12] First, this argument relies more on

15     hyperbole than fact, as CPPSH concedes the 2012 and 2017 NWP 48 analyses are far from

16     identical, CPPSH Mot. 18 n.18, and, as described above, there was no "gross underestimate"

17     in 2012 to rectify in 2017.

18          Second, far from violating NEPA, the Army Corps' documentation of its analysis in

19     2017 complies with the direction provided in its regulations. Because both the 2012 and 2017

20     versions of NWP 48 authorize existing farms as well as new farms that do not directly affect

---

[11] CPPSH does note that the estimates in the 2017 NWP 48 Decision Document are lower than estimates in the 2017 Regional Supplement. *See* CPPSH Mot. 10. However, the acreage estimates in the 2017 Regional Supplement reflect the total acreage that could potentially be authorized, not what the Corps expects will be authorized, and the Regional Supplement is clear that the "vast majority" of commercial aquaculture acreage that the Army Corps expects to verify in Washington State under the 2017 NWP 48 is acreage that was authorized under the 2012 NWP 48. COE 127590-91.

[12] CPPSH's NEPA argument also references and relies upon an unfinished "draft analysis." CPPSH Mot. 18. As discussed *infra* at Section V.B.2.a, CPSSH's reliance on this "draft analysis" is misplaced.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 12
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:     206-588-4255

1    more than ½-acre of submerged aquatic vegetation, it is unsurprising that the analyses in the

2    two Decision Documents are similar. When the Chief of Engineers prepares NEPA

3    documents and section 404(b)(1) Guidelines compliance analyses for the reissuance of

4    existing NWPs, Army Corps regulations contemplate using existing documentation,

5    modified to reflect the use of the permit since its last issuance as well as any changes in the

6    scope of the permits. 33 C.F.R. § 330.5(b)(3) ("Documentation for existing NWPs will be

7    modified to reflect any changes in these permits and to reflect the Chief of Engineers'

8    evaluation of the use of the permit since the last issuance."). Consistent with this regulation,

9    in 2017 the Army Corps, after conducting its analysis, modified existing documentation,

10   focusing on changes to the permit.

11          The record demonstrates that the Army Corps conducted a new analysis in 2017; it

12   did not merely provide generalized conclusory statements or "copy and paste" its 2012

13   analysis. As discussed in Sections V.C and V.D below, the cumulative impacts analysis in

14   the 2017 Decision Document includes a 12-page cumulative effects analysis (compared to

15   about four pages in 2012) that is fully informed, well considered, and provides quantified

16   and detailed information. The analysis includes a new, detailed discussion of impacts to

17   threatened and endangered species and climate change, and it separately addresses

18   commenters' concerns about potential environmental impacts, including cumulative

19   effects. NWP003038-55 (Section 1.4, Public Comment and Response); NWP003073-85

20   (Section 4.3 Cumulative Effects). While some of the language of the 2012 analysis is

21   repeated in 2017, it was proper for the Army Corps to update its prior documentation. *See* 33

22   C.F.R. § 330.5(b)(3). The Army Corps complied with the regulations governing

23   documentation for NWPs, considered all relevant factors, and articulated a rational

24   connection between the facts found and the choices made, thus satisfying the requirement to

25   take a hard look at NWP 48 under NEPA. *Balt. Gas & Elec. Co.*, 462 U.S. at 100-101.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 13
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:      206-588-4255

1       **2.**     **The 2017 Cumulative Effects Analysis Complies with the CWA.**

2       CPPSH offers a similar argument with respect to the adequacy of the Army Corps'

3 cumulative impact analysis under the CWA. CPPSH Mot. 20-21. CPPSH argues the Army

4 Corps failed to articulate a "crucial rational connection" for its conclusions regarding

5 cumulative impacts because (i) the administrative record lacks information "to explain how

6 the 2017 NWP 48 addresses the significant oversight [gross underestimate] of the 2012 NWP

7 48," and (ii) the administrative record contains a contradictory "draft analysis" CPPSH Mot.

8 20-21. As explained above, there was no "gross underestimate" that needed to be addressed.

9 In addition, as explained below, CPPSH's reliance on the "draft analysis" is misplaced, and

10 the Army Corps' cumulative impacts analysis under the CWA is conservative because it

11 covers shellfish cultivation activities that do not require Section 404 permits.

12       **a.**  **CPPSH's Reliance on a Flawed, Draft Document Is Misplaced.**

13       CPPSH argues an unfinished and unpublished draft cumulative impact analysis

14 ("CIA Draft") undermines the 2017 Decision Document and Regional Supplement.

15 CPPSH Mot.18-21; COE 125583-700. CPPSH relies heavily on the CIA Draft, both here

16 and in subsequent sections, contending that (i) it concludes there would be significant

17 impacts from commercial shellfish aquaculture activities in Washington State, (ii) it

18 proves the conclusions in the 2017 Decision Document and Regional Supplement are

19 wrong, and (iii) the Chief of Engineers and Division Engineer erred by not including the

20 text of the CIA Draft in their respective decisions. *See* CPPSH Mot. 10-11, 15 n.11, 18-22,

21 26, 31. CPPSH's reliance is misplaced.

22       First, because it was merely an "initial draft" that was "never finished," the CIA

23 Draft does not purport to represent an agency position. COE 125862. In fact, the CIA

24 Draft was in such a poor state that its author completely disavowed it as "nonsense in its

25 current version," not even worth sharing with other Seattle District employees. *Id.* Second,

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 14
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:     206-588-4255

1  the record reveals that the CIA Draft "was beyond the scope of the NWPs." COE 125856.

2  And crucially, the CIA Draft failed to consider the NWP general conditions and regional

3  conditions; in contrast, the Division Engineer recognized the Regional Supplement would

4  "need to overlay all the NWP conditions to understand cumulative effects from NWP 48."

5  *Id*. Given the CIA Draft was never finished, beyond the scope of NWP 48, and failed to

6  consider the conditions that apply to authorized activities under the permit, it is no wonder

7  the author deemed it "nonsense." COE 125862.

8       It is worth noting that, despite the shortcomings regarding its analysis and pre-

9  decisional conclusions, the Army Corps considered some of the information in the CIA Draft

10  "to inform the NWP 48 cumulative effects analysis." COE 125856. The Army Corps'

11  decision to not adopt the CIA Draft's premature and out-of-scope conclusions does not serve

12  as evidence that it acted in an arbitrary and capricious manner. Rather, the Draft CIA's

13  inclusion in the record, along with the Army Corps' explanation for only using the

14  information in the document in a limited fashion, are evidence of a robust agency

15  decisionmaking process.

16             **b.  The Army Corps Analysis Is Conservative Under the CWA**
                 **Because It Covers Activities that Do Not Require Section 404**

17                  **Permits.**

18       If anything, the Army Corps' usage estimates and cumulative impact analysis in

19  the Decision Document is highly conservative under the CWA because it covers all

20  activities that are expected to receive authorization under NWP 48, not simply those that

21  require authorization under CWA Section 404. While the Army Corps reissued NWP 48

22  under both Section 10 of the Rivers and Harbors Act and Section 404 of the CWA,

23  NWP000137-38, many activities authorized under NWP 48 do not require a CWA Section

24  404 permit because they do not involve the discharge of dredged or fill material from a

25  point source. NWP000065; NWP003039; NWP018378. The Chief of Engineers made this

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 15
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:      206-588-4255

clear in the 2017 NWP 48 reissuance decision, stating that activities such as "the culture of oysters in bags suspended on long-lines, where there is no discharge of shell or gravel for bed preparation . . ." do not require authorization under the CWA. NWP00065; *see also* NWP003039. The Army Corps' CWA cumulative effects analysis does not attempt to parse out only those activities that require Section 404 approval and instead conservatively addresses all activities that might seek authorization under NWP 48.

### C.   The Army Corps Adequately Analyzed Past, Present, and Reasonably Foreseeable Actions Under NEPA.

CPPSH argues the Army Corps failed to consider the collective effect of NWP 48 verifications when added to past, present, and reasonably foreseeable actions under NEPA. CPPSH Mot. 21-24. CPPSH's argument is largely a repeat of its prior contentions that the Decision Document is undermined by the CIA Draft. *Id.* As discussed above, this argument lacks merit because the CIA Draft was never finalized, was beyond the scope of the NWPs, and failed to account for the numerous conditions imposed on NWP 48. *Supra* Section V.B.2.a.

CPPSH additionally restates its argument that the 2017 Decision Document is inadequate because it contains the same language as the 2012 Decision Document and improperly relies heavily on Division and District engineers to "ensure" cumulative impacts will not be significant. CPPSH Mot. 22. As discussed above, the 2017 Decision Document does not contain "the same language" as the 2012 analysis; consistent with the Army Corps regulations, the Chief of Engineers conducted a new analysis that considered activities under the permit during the prior cycle, considered changes made to the permit, considered public comments received, and updated the required documentation accordingly. *Supra* Section V.B.1.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 16
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:       206-588-4255

1    CPPSH's claim that the Army Corps relies "heavily" on Division and District

2  engineers imposing conditions to prevent significant impacts is a mischaracterization of the

3  Decision Document. Consistent with Army Corps regulations, the Decision Document states

4  that additional conditions may be imposed where there are specific concerns about impacts to

5  submerged aquatic vegetation. NWP003044; 33 C.F.R. §§ 330.1(d), 330.4(e), 330.5(c)(d).

6  *See also Sierra Club v. Bostick*, 787 F.3d 1043, 1056 (10th Cir. 2015) (the Army Corps

7  permissibly interpreted 33 U.S.C. § 404(e) to allow establishment of additional safeguards

8  involving the use of project-level personnel, requiring them to ensure particular activities

9  would not have more than minimal impacts); *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d

10  493, 501 (4th Cir. 2005) (the Army Corps may rely on the availability of post-issuance

11  procedures, such as individualized review and authorization, when it makes its minimal-

12  impact determination in issuing an NWP).

13    CPPSH also criticizes the Army Corps' finding that it is not practicable or feasible to

14  collect necessary information to assess past, present, and reasonably foreseeable future

15  actions. CPPSH Mot. 21, 23. However, the only information that the Army Corps concludes

16  it cannot practically or feasibly provide is quantitative data on the multitude of other

17  activities, outside of NWP 48, that contribute to cumulative effects to aquatic resources.

18  NWP003081. That conclusion is factually accurate and consistent with the Army Corps'

19  analytical approach, as instructed by CEQ NEPA guidance, which focuses the cumulative

20  effects analysis on specific categories of resources that have the potential for significant

21  impact concerns and stressors that degrade those resources. NWP003074-85 (citing CEQ

22  1997 (Considering cumulative effects under the National Environmental Policy Act), and

23  analyzing major stressors to wetlands, streams, and aquatic resources, including changes in

24  land use; draining wetlands; changes in water movement and volume; resource extraction;

25  and climate change).

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 17
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:     206-588-4255

1    CPPSH also argues the Army Corps misinterpreted 40 C.F.R. § 1508.7 in stating a

2  cumulative impact analysis examines the incremental impact of a proposed action. CPPSH

3  Mot. 23. But the regulation defines "cumulative impacts" as "the impact on the

4  environment which results from the incremental impact of the action," and the Decision

5  Document correctly states this standard. *E.g.*, NWP003040, 003074, 003080.

6    Substantively, the Army Corps' analysis, consistent with 40 C.F.R. § 1508.7,

7  evaluates the incremental impact of authorized activities when added to other past,

8  present, and reasonably foreseeable future actions. The Decision Document recognizes

9  commercial shellfish aquaculture activities may have some adverse effects, but it also

10  recognizes they provide ecosystem services such as water filtration, secondary production

11  that results in food, and habitat for other organisms. NWP003040. The Decision

12  Document further finds that shellfish farming has local and temporary effects that do not

13  cause losses of intertidal and subtidal areas or degrade water quality, and that these

14  activities are similar in scope and intensity to natural disturbances such as storms and

15  other ecosystem engineers. NWP004041.

16    The Army Corps' analysis also refutes CPPSH's working assumption that the

17  cumulative impacts of many aquaculture activities, even if individually minor, must be

18  significant. *E.g.*, CPPSH Mot. 23, 32. For example, summarizing a landscape-scale,

19  cumulative analysis, the Decision Document states:

20      The scale at which impacts are evaluated is an important factor in
       determining whether impacts are positive or negative (Dumbauld and
21      McCoy 2015). For example, at a small spatial scale (e.g., the site directly
       impacted by a specific aquaculture activity) there will be an adverse effect,
22      but at a landscape scale the adverse effects may be minor or there may be
       beneficial effects because of management approaches and ecosystem
23      resilience (Dumbauld and McCoy 2015).

24  NWP003040. The Army Corps' impact analysis of shellfish farming is supported by

25  referenced scientific literature and documents in the record evidencing this activity has

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 18
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

1   minimal and insignificant impacts. *E.g.,* NWP043323-50 (technical memorandum

2   reviewing relevant scientific literature and finding shellfish aquaculture has numerous

3   potential positive impacts and minimal individual and cumulative adverse impacts,

4   including with respect to eelgrass).

5          Finally, the Decision Document evaluates the relative and cumulative impact of

6   commercial shellfish farming in the context of other activities. The NEPA cumulative

7   effects analysis specifically references Section 3.0 (Affected Environment), which

8   discusses the present effects of past federal, non-federal, and private actions on wetlands,

9   streams, and aquatic resources. NWP003075. As discussed in the Decision Document,

10  numerous other human activities, including coastal development, land use changes,

11  stormwater runoff, pollution, hydrology changes, deforestation, wetland drainage, and

12  climate change are the main drivers impacting the aquatic environment. *E.g.,*

13  NWP003040-46, 003074-85. Commercial shellfish farming is a minor subset of activities

14  that contribute to cumulative effects, NWP003041, and "[c]ompared to the disturbances

15  and degradation caused by coastal development, pollution, and other human activities in

16  coastal areas, commercial shellfish aquaculture activities present relatively mild

17  disturbances to estuarine and marine ecosystems." NWP003044; *see also* NWP003046

18  (shellfish farming activities "will cause little change to the environmental baseline" and

19  "far less change" than other human activities).

20         The Army Corps' cumulative impact analysis here stands in stark contrast to the

21  Army Corps' analysis in *Preserve Our Island v. U.S. Army Corps of Eng'rs*, No. C08-1353

22  RSM, 2009 WL 2511953 (W.D. Wash. Aug. 13, 2009), relied upon by CPPSH. CPPSH

23  Mot. 32. In *Preserve Our Island*, the court held the Army Corps conducted "no meaningful

24  cumulative impact analysis of 'reasonably foreseeable future actions'" and disregarded the

25  broader picture of impacts to the marine environment associated with a gravel mining

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 19
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

1   operation. 2009 WL 2511953 at *19. Here, as stated above, the Army Corps properly

2   estimated and analyzed the environmental impacts of NWP 48 authorization and included

3   extensive discussion of other activities that impact the marine environment.

4        CPPSH may discount and disagree with the Army Corps' analysis supporting the

5   FONSI, but the APA requires that CPPSH do more than simply disagree, or point to

6   conflicting evidence, to show the Army Corps action is arbitrary and capricious. Rather, to

7   meet its burden CPPSH must show that the record does not reflect "a reasonable basis" for

8   the Army Corps' decision. *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th

9   Cir. 2000). The administrative record supports the Army Corps' actions with regard to the

10  use of NWP 48 in Puget Sound, as well as the rest of the nation.

### D. The Army Corps Adequately Analyzed Impacts Under the CWA, Including Shellfish Farming Interactions with Eelgrass and Forage Fish.

12       CPPSH next challenges the Army Corps' analysis of impacts to eelgrass and forage

13  fish, complaining the Army Corps' finding that effects of activities authorized by NWP 48

14  will be minimal when farms are properly sited and operated is merely a conclusion, not an

15  analysis. CPPSH Mot. 24-26.[13] CPPSH's arguments are unsupported by the record.

16       CPPSH first argues that the Army Corps' analysis and conclusions are undermined

17  by the CIA Draft. As discussed above, CPPSH's reliance on the CIA Draft is misplaced.

18  *Supra* Section V.B.2.a.

19       CPPSH next alleges failings with both the 2017 NWP Decision Document and

20  Regional Supplement. CPPSH acknowledges the Decision Document estimates use and

21  acreage impacts but contends "[i]t is silent about other potential impacts to the environment

22  attributable to commercial shellfish aquaculture, such as the destruction of eelgrass beds."

---

[13] CPPSH's single reference to NEPA in this section of its brief appears to be a typographical error, as its argument discusses only the CWA, and CPPSH does not identify any specific provision of NEPA in this section that is allegedly violated. CPPSH's specific NEPA arguments are addressed elsewhere in this brief.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 20
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:    206-588-4188
Fax:      206-588-4255

1    CPPSH Mot. 25. CPPSH also claims the Decision Document "fail[s] to discuss the §

2    230.11(g) cumulative impacts." CPPSH Mot. 25. Neither of these contentions are true.

3         Contrary to CPPSH's assertions, the Army Corps appropriately considered

4    potential impacts of the 2017 NWP 48 on eelgrass beds, focusing particular attention on

5    shellfish-eelgrass interactions at the landscape (i.e. cumulative) scale, including in its

6    analysis a study that examined these interactions in Willapa Bay, Washington, which

7    contains over 80 percent, COE 127590, of the state's authorized shellfish acreage:

> [C]ommercial shellfish aquaculture activities and submerged aquatic
> vegetation have been shown to co-exist with each other. The combination of
> shellfish and submerged aquatic vegetation provides a number of ecosystem
> functions and services (Dumbauld and McCoy 2015). Submerged aquatic
> vegetation is resilient to disturbances caused by oyster aquaculture activities,
> and the disturbances caused by oyster aquaculture activities are comparable
> to natural disturbances caused by winter storms (Dumbauld and McCoy
> 2015).… Because of the demonstrated co-existence of shellfish aquacultre
> and submerged aquatic vegetation and their resilience to withstand
> disturbances, we do not believe it is necessary to impose buffers around
> submerged aquatic vegetation beds.
> ….
> Dumbauld and McCoy (2015) recommend examining the effects of oyster
> aquaculture activities on eelgrass at the scale of estuarine ecosystems
> because such a perspective indicated that those aquaculture activities have
> relatively small impacts on seagrasses and that seagrasses recover quickly
> after disturbance.

17   NWP003044, 003086.

18        Section 7.2.3 of the Decision Document analyzes potential impacts to specific aquatic

19   environmental components under 40 C.F. R. § 230.11, including but not limited to vegetated

20   shallows such as eelgrass. NWP003097, 003102-06. The Decision Document determines

21   authorized activities "will have no more than minimal adverse effects on vegetated

22   shallows," identifies numerous bases for this determination, and supports it with references

23   to scientific literature. NWP003105. Potential impacts to other environmental components

24   are also addressed, along with minimization measures. *See, e.g.,* NWP003104 (determining

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 21
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:    206-588-4188
Fax:       206-588-4255

1   impacts to fish and other aquatic organisms in the food web will be minimal and identifying

2   specific General Conditions that protect fish spawning areas).

3          In addition, section 7.2.2 of the Decision Document includes a determination that

4   authorized activities will result in no more than minimal individual and cumulative impacts

5   given the scope and numerous limits of NWP 48. NWP003102. This determination is based

6   on the definition of cumulative effects at 40 C.F.R. § 230.11(g)[14] and a projection of

7   authorized discharges consistent with 40 C.F.R. § 230.7(b)(3). NWP003097-102.

8          With regard to the Regional Supplement, CPPSH argues the document fails "to fill

9   the gaping holes in the national analysis" because it makes a statement that cumulative

10   effects will be minimal when projects are properly sited and operated. CPPSH Mot. 26

11   (citing COE 127588); *see also* CPPSH Mot. at 24. The Decision Document does not contain

12   gaping holes, and the Regional Supplement more than satisfies the analytical and

13   documentation requirements for Division Engineer decisions. 33 C.F.R. § 330.5(c). The

14   Regional Supplement does not, as CPPSH suggests, simply consist of general conclusions

15   that impacts will be minimal when projects are properly sited and operated. The Regional

16   Supplement relies upon the Decision Document's discussion of environmental impacts,

17   which is itself informed by impact analyses conducted in Washington State (*see, e.g.,*

18   NWP003040-46, discussing Ruesink et al. 2006, Dumbauld et al. 2009, Dumbauld and

19   McCoy 2015), and it provides additional analysis based on environmental factors to support

20   the regional conditions imposed by the Division Engineer. *See, e.g.*, COE 127566-68 (public

21   interest review factors); COE 127569-70 (Section 404(b)(1) Guidelines impact analysis);

22   COE 127582-93 (cumulative effects analysis for NWP 48).[15]

23

24   [14] The Decision Document contains a typographical error indicating the cumulative effects definition is at 40
     C.F.R. § 230.11(a) rather than (g). NWP003097.

25   [15] Both here and elsewhere, CPPSH mischaracterizes the Decision Document and Regional Supplement, stating
     the Army Corps "admits that the long recovery time of eelgrass as compared to harvesting cycles results in an

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 22
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:      206-588-4255

1    CPPSH next argues the Regional Supplement's discussion of project-level review to

2    ensure impacts will be minimal is misplaced and claims the Army Corps' authorization of six

3    specific projects identified in its complaint illustrate this point. CPPSH Mot. 24-26. This

4    argument is legally and factually untenable.[16]

5    Legally, the Army Corps' reliance on the availability of post-issuance procedures

6    such as individual project review is permissible and reasonable. *Bulen*, 429 F.3d at 501;

7    *Bostick*, 787 F.3d at 1056-60. As the court held in *Bulen*:

8        [N]othing in the statute specifies how the Corps must make the minimal-
         impact determinations. And, given the inevitable *ex ante* uncertainty the
9        Corps confronts when issuing a nationwide permit, its reliance on post-
         issuance procedures is a reasonable, if not the only possible, way for it to
10       cement its determination that the projects it has authorized will have only
         minimal environmental impacts.
11
12   429 F.3d at 501. *Bulen* recognizes limits to this reliance, stating "[w]e would have

13   substantial doubts about the Corps' ability to issue a nationwide permit that relied solely

     on post-issuance, case-by-case determinations of minimal impact, with no general pre-
14
15   issuance determinations." *Id.* at 502. But when the Corps makes a minimal-impact

16   determination in advance of permit issuance, as required by the statute, after undertaking a

17   good faith, comprehensive review, "its partial reliance on post-issuance procedures to

     ensure minimal impacts did not make those determinations any less valid." *Id.*
18
19   Factually, all projects that seek NWP 48 authorization in Washington State must

20   submit PCNs and are hence subject to project-level review, and the Regional Supplement

21   essentially permanent displacement of eelgrass for the duration of shellfish aquaculture activities." CPPSH Mot.
22   24, citing COE 127588. CPPSH fails to acknowledge that the referenced discussion is limited to areas that
     contain nets and equipment that result in shading, not all farming operations. COE 127588. *See also* CPPSH
23   Mot. 11 (characterizing the Regional Supplement as acknowledging "a serious impact on the marine
     environment" from the use of PVC tubes in shellfish farming when it is discussing marine debris generally, *see*
     COE 127552); CPPSH Mot. 11 (claiming "[t]he Corps also acknowledged" various impacts, when in fact the
24   Army Corps simply summarized public comments, *see* NWP003042).
     [16] CPPSH's argument that the Army Corps' reliance on subsequent project level review violates NEPA is
25   addressed in Section V.F, below.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 23
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:    206-588-4188
Fax:      206-588-4255

1    clearly articulates that this review will occur and what its scope will be. COE 127569,

2    127592. The six specific project verifications noted by CPPSH demonstrate the District

3    Engineer carefully evaluates each project and imposes appropriate conditions as needed.

4    CPPSH Mot. 26 n.26. The files for each project in the administrative record are voluminous,

5    ranging from 80 to 322 pages; proponents must submit extensive information to the Army

6    Corps to support their verification requests. The verification letters include numerous

7    conditions to address a variety of potential impacts to ESA-listed species and critical habitat

8    (for example, conditions limiting interactions with eelgrass and forage fish, and the use of

9    plastic to prevent marine debris and entanglement). COE 126143-387 (NWS-2013-1288);

10   COE 126388-709 (NWS-2013-759); COE 126710-939 (NWS-2014-65); COE 126940-

11   127127 (NWS-2015-121); COE 127128-323 (NWS-2015-147); COE 127324-403 (NWS-

12   2017-203). The verification files for these projects demonstrate that farms authorized by the

13   Seattle District are "properly sited and operated" to ensure minimal impacts. CPPSH fails to

14   identify any impact from these farms that is more than minimal given the conditions of

15   approval, and it has presented no meaningful argument that these farm verifications violate

16   the CWA or NEPA, thereby waiving any challenge to them. *Vanderslice v. Berryhill*, No. 16-

17   5293-JCC, 2017 WL 2889371, at *3 (W.D. Wash. July 6, 2017) ("Claims that are

18   unsupported by explanation or authority may be deemed waived.").

19   **E.  The Scope of the Army Corps' Cumulative Impact Analysis in the
          Decision Document Complies With NEPA.**

20

21       CPPSH next argues the Army Corps' cumulative impact analysis fails to consider

21   four "key" impacts directly connected to shellfish aquaculture under NEPA, including (1) the

22   use of pesticides, (2) the use of plastics, (3) discharge of trash, garbage, and plastic waste,

23

24

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 24
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

1  and (4) the risk of parasitism and disease. CPPSH Motion at 27-28.[17] The characterization of

2  these topics as "key" is CPPSH's, and not the Army Corps'. Although it may not have

3  reached the conclusions CPPSH would have liked, the Army Corps appropriately considered

4  cumulative impacts under NEPA.

5       The Decision Document does not, as CPPSH contends, limit the scope of its NEPA

6  analysis to actions regulated by the Corps. CPPSH Mot. 27. Instead, it quotes 40 C.F.R. §

7  1508.7 and states "the NEPA cumulative effects analysis for an NWP is not limited to

8  activities authorized by the NWP, other NWPs, or other [Army Corps] permits," and

9  includes other federal and non-federal activities that affect impacted resources. NWP003074.

10 However, as CPPSH itself admits, a NEPA analysis need only be reasonably, not absolutely,

11 thorough. CPPSH Mot. 28. An "EA is not an exhaustive examination of every possible

12 environmental event, but must provide sufficient evidence and analysis to determine the

13 reasonableness of the decision not to prepare an EIS." *Friends of the Wild Swan v. Weber*,

14 767 F.3d 936, 942 (9th Cir. 2014). Consistent with this limitation, the Decision Document

15 states that, according to CEQ NEPA guidance, a NEPA cumulative effects analysis should

16 focus on specific categories of resources identified during the review process as having

17 significant cumulative effects concerns, along with the disturbances that degrade those

18 resources. NWP003074-75. The Decision Document analyzes impacts consistent with this

19 guidance. *See* NWP003074-85.

20      CPPSH has failed to demonstrate the Decision Document's discussion of its four

21 self-identified "key" issues is arbitrary and capricious. CPPSH's claim with respect to

22 pesticides is particularly striking. CPPSH's action is an as-applied challenge to the limited

23

24 [17] CPPSH references both the Decision Document and the Regional Supplement in arguing the NEPA analysis was inadequate. But NEPA compliance is performed exclusively at the national level for the NWP program, and the Regional Supplement does not purport to undertake NEPA compliance. 33 C.F.R. §

25 330.5(b)(3); NWP003034. Hence, only the Decision Document need be addressed for NEPA compliance.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 25
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:     206-588-4255

1   authorization of shellfish aquaculture operations "on the shores of the Puget Sound under

2   [NWP] 48," and no pesticides are permitted or even proposed for use in shellfish operations

3   in Puget Sound. CPPSH Suppl. Compl. ¶ 1. The only permitted pesticide related to shellfish

4   farming in Washington is to control a noxious, invasive weed on clam beds (not geoduck or

5   oyster farms) in Willapa Bay, located outside of Puget Sound. COE 134841. The NPDES

6   permit for this pesticide includes numerous limitations and is supported by a risk assessment

7   and EIS demonstrating it does not significantly impact non-target species. COE 134841-43,

8   134861-62, 134871, 134880.

9          Moreover, the Decision Document does discuss pesticide use: it acknowledges

10   pesticides may be used, correctly states the Army Corps does not have the authority to

11   regulate pesticide use and makes clear pesticide use "would likely require National Pollutant

12   Discharge Elimination System Permits under Section 402 of the Clean Water Act, which is

13   administered by U.S. EPA or by states with approved programs." NWP003077. As the court

14   held in *Wyo. Outdoor Council, Powder River Basin Res. Council v. U.S. Army Corps of

15   Eng'rs*, 351 F. Supp. 2d 1232, 1244 (D. Wyo. 2005), the Army Corps' discussion of

16   potential impacts from activities governed by Section 402 of the CWA, coupled with

17   acknowledgement that other agencies strictly regulate Section 402 discharges, is not arbitrary

18   or capricious. NWP 48 is issued at a national level, and given that impacts from pesticides

19   depend on numerous use-specific considerations, it would have been inappropriate for the

20   Army Corps to speculatively analyze national pesticide use in the Decision Document.

21          Neither did the Army Corps refuse to consider CPPSH's other "key impacts." The

22   Decision Document acknowledges commenters raised concerns with respect to plastics;

23   trash, garbage, and waste; and parasites and disease, and it responds to these comments in a

24   reasonable manner. *See* NWP004042-43, 003052-53. It states that commenters requested

25   compensatory mitigation to address alleged impacts from shellfish farming and responds that

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 26
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

1   mitigation would normally not be required, primarily because the activities "are unlikely to

2   cause resource losses that would result in more than minimal adverse environmental effects."

3   NWP003052. Additionally, the Decision Document states alleged impacts are minimized

4   through NWP 48 conditions (e.g. General Conditions 1 and 19), appropriately addressed by

5   agencies with expertise and authority, and may be further conditioned when appropriate on a

6   project-specific basis by District Engineers. NWP004042-43, 003052-53. The Army Corps'

7   consideration of NWP permit conditions, other regulatory programs, and District Engineer

8   review authority to address these concerns is reasonable and appropriate. *See Bostick*, 787

9   F.3d at 1056; *Bulen*, 429 F.3d at 501; *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1244.

10          CPPSH argues the Army Corps should have analyzed these issues at greater

11   length, but again the Army Corps' analysis at the national reissuance stage is necessarily

12   broad and must focus on resources of concern and stressors that degrade those resources.

13   *Bulen*, 429 F.3d at 501; NWP003074-75. The Army Corps is granted deference in

14   evaluating and resolving such technical issues. *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832,

15   869 (9th Cir. 2003). Further, as explained by the Eleventh Circuit in another case

16   challenging the Army Corps' NEPA analysis for an NWP, "[o]ur deference extends both

17   to an agency's ultimate findings as well as 'drafting decisions like how much discussion to

18   include on each topic, and how much data is necessary to fully address each issue.'" *Black*

19   *Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir.

20   2016) (quoting *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008)).

21          **F.  The Army Corps Appropriately Discussed District Engineer Discretion to**
            **Review Individual Projects and Impose Additional Conditions.**

22          CPPSH argues the Decision Document relies heavily on District and Division

23   Engineers to exercise discretion necessary to ensure that cumulative impacts are not

24

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 27
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:      206-588-4255

1   significant, citing NWP003044 and NWP003102,[18] and this constitutes a failure to assess

2   impacts under NEPA as occurred in *Kentucky Riverkeeper*, 714 F.3d 402. CPPSH Mot. 28-

3   30. *Kentucky Riverkeeper* is inapposite. There, the court held the Army Corps failed to

4   adequately address cumulative impacts under NEPA prior to reissuing NWP 21 when it

5   "expressly disclaim[ed] consideration of past impacts" in its Decision Document. 714 F.3d at

6   408. The court further held the Army Corps' post-issuance review processes at the Division

7   and District levels could not excuse the failure to consider past impacts prior to permit

8   issuance. *Id.* at 409. Here, in contrast, as described in Section III.C, above, the Decision

9   Document includes consideration of past actions, consistent with 40 C.F.R. § 1508.7, and it

10  does not attempt to excuse a pre-issuance failure to consider impacts through post-issuance

11  reviews. Rather, both pages of the Decision Document cited by CPPSH properly

12  acknowledge that, consistent with the Army Corps' NWP regulations and established case

13  law, Division and/or District Engineers have discretionary authority to review the use of

14  NWP 48 in the region and ensure that specific projects will result in no more than minimal

15  impacts. CPPSH Mot. 28-29; NWP003044, 003102; 33 C.F.R. §§ 330.1(d), 330.4(e),

16  330.5(c), (d); *Bulen*, 429 F.3d at 500-01; *Bostick*, 787 F.3d at 1056-59.

17      CPPSH again relies on *Kentucky Riverkeeper* to argue the Army Corps violated the

18  CWA by improperly relying on District and Division Engineers to ensure that cumulative

19  impacts will be no more than minimal. CPPSH Mot. 28-30. In *Kentucky Riverkeeper*, the

20  Corps determined that specific, compensatory mitigation was necessary to reduce impacts

21  below the CWA's minimal impact threshold. The court faulted the Corps when it failed to

22  provide "any . . . factual underpinnings" for its determination that approximately 540 acres of

23  compensatory mitigation would be adequate. 714 F.3d at 412. Here, by contrast, the Army

24  Corps determined that no compensatory mitigation would likely be required under the CWA.

25  _____

[18] CPPSH also cites to the Regional Supplement, but this is not a NEPA document.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 28
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:      206-588-4255

1   NWP003098. While the Army Corps noted that Division and District Engineers retain

2   discretionary authority to impose additional conditions to ensure specific authorized activities

3   result in no more than minimal impacts, the Army Corps' reference to post-issuance

4   procedures such as individual project review and authorization when making its minimal

5   impact determination is permissible and reasonable. *Supra* at Section V.D. CPPSH's

6   complaint about discretionary review falls particularly flat in Washington State, where all

7   NWP 48 authorizations require PCN submittal and review, and the specific projects

8   highlighted by CPPSH confirm this review is thorough, resulting in the imposition of

9   numerous additional conditions. *Supra* Section V.D.

10       **G. The Definition of "New" Operation in 2017 NWP 48 Is Supported and**
        **Does Not Authorize Unfettered Expansion as Alleged by CPPSH.**

11

12         Finally, CPPSH argues 2017 NWP 48 authorizes a massive expansion of commercial

shellfish activities because it includes as a "new" operation one that has not been farmed

13   within the last 100 years. CPPSH Mot. 30-32. This is not the case. As discussed above, both

14   the 2012 and 2017 versions of NWP 48 cover existing and new activities. The 2012 version

15   did not define how long a farm could be out of active production before it is considered new.

16   The 2017 version clarified this issue by stating a new operation is one in which commercial

17   shellfish activities have not been conducted during the past 100 years, NWP000137, and it

18   provided a rationale for this definition:

19

20         Our intent with the definition of "new commercial shellfish aquaculture
      operation" and the 100-year period is to recognize that many of these

20         activities have taken place over long periods of time, even though some
      sections of project areas may have been fallow for a number of years. The

21         long time frame provided by the 100-year period is also in recognition that
      commercial shellfish aquaculture activities do not cause losses of intertidal

22         and subtidal habitats and that components of those intertidal and subtidal
      ecosystems (e.g., submerged aquatic vegetation, benthic organisms, and

23         nekton that utilize those habitats) are resilient to the impacts of these
      activities and other disturbances.

24

25   NWP003043-44.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 29
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:   206-588-4188
Fax:      206-588-4255

1      While CPPSH claims that the Army Corps' conclusions regarding the minimally

2  adverse and beneficial impacts of shellfish farming are not borne out by the facts, the Federal

3  Register publication and Decision Document cite numerous specific studies in support of

4  these conclusions. *E.g.*, NWP000065-67 (citing, among others, Ruesink et al. 2005, Ruesink

5  et al. 2006, Dumbauld et al. 2009, Dumbauld and McCoy 2015); NWP003040-46. CPPSH

6  cannot solely rely on conflicting evidence in the record to meet its burden under the APA.

7  Under the arbitrary and capricious standard, CPPSH must demonstrate that the record does

8  not contain a reasonable basis for the Army Corps' conclusion. *Indep. Acceptance Co.*, 204

9  F.3d at 1251. Given the clear record support for the Army Corps' conclusion, CPPSH has

10  fallen far short of meeting its burden.

11      CPPSH also incorrectly claims the Regional Supplement directly contradicts the

12  Army Corps' conclusions regarding impacts to eelgrass and the clarified definition of a

13  "new" shellfish farming operation, citing COE 127587-88. CPPSH Mot. 31. The Regional

14  Supplement states impacts to eelgrass "can be temporary, depending on the activity, because

15  the habitat conditions themselves (elevation, water quality, etc.) are not permanently altered,

16  which allows eelgrass to eventually recover given sufficient time." COE 127587.  This is

17  consistent with the Decision Document. NWP003105 (stating the effects of aquaculture on

18  seagrasses vary depending on the type of cultivation techniques). The passages quoted by

19  CPPSH regarding impacts to eelgrass are limited to operations that involve placing nets and

20  other similar equipment; the Regional Supplement refers readers to the Decision Document

21  for a discussion of other impacts. COE 127587-88. Even in the limited context of nets and

22  similar equipment, the Regional Supplement does not state impacts are more than minimal,

23  and it notes all operations will be reviewed by the District Engineer who may exercise

24  discretionary authority to ensure impacts remain minimal. *Id.*

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 30
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA 98104
Phone:    206-588-4188
Fax:      206-588-4255

1    CPPSH claims that the clarified definition of a "new" operation has "rubber-stamped

2    disruption of thousands of acres of eelgrass, forage fish habitat, and nearshore habitat" in any

3    area that "Great Grandma or Grandpa farmed" in Puget Sound. CPPSH Mot. 30, 32. This

4    claim is demonstrably false; NWP 48 does not "rubber stamp" any shellfish farm, regardless

5    of whether it is existing or new. Beyond the limits in the text of NWP 48 itself, the permit is

6    subject to 32 general national conditions, 11 regional general conditions, and one additional

7    specific regional condition. NWP000140-46; COE 127594-98. Further, all farms seeking

8    NWP 48 authorization in Washington State must submit a PCN to the District Engineer

9    pursuant to NWP general condition 18, Endangered Species, triggering Army Corps review

10   of the project application for ESA compliance. COE 127592.

11   With regard to that ESA compliance, as discussed above, the Army Corps and

12   Services recently completed a programmatic ESA consultation for shellfish aquaculture

13   operations in Washington State. COE 134134-937. While the 2016 Programmatic

14   Consultation is not directly tied to NWP 48, all project proponents seeking authorization

15   under NWP 48 must obtain ESA coverage, and the 2016 Programmatic Consultation is a

16   potential mechanism for obtaining that coverage, as are individual ESA consultations. The

17   Programmatic Consultation is also a reflection of the Services' overall perspective on how

18   the ESA applies to shellfish farming, regardless of the ESA consultation vehicle.

19   The 2016 Programmatic Consultation contains some different standards for

20   continuing compared to new activities, and it defines a "new" aquaculture activity different

21   from NWP 48: an activity is considered "new" unless (1) it was existing in 2007; and (2)

22   previously disclosed to the Army Corps and reviewed by the Army Corps and Services.

23   COE 134148. If a farm is not already included in the Army Corps' database that was

24   compiled prior to the development of the PBA, then it is considered new and must comply

25   with the conditions for new farms, including a 16-foot eelgrass buffer, to obtain coverage

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 31
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

PLAUCHÉ & CARR LLP
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:    206-588-4188
Fax:       206-588-4255

1  under the 2016 Programmatic Consultation.[19] *Id*.; COE 134772. The definition of "new"

2  farm in the 2017 NWP 48 in no way modifies the definition of "new" farm in the

3  programmatic consultation. Farms seeking verification under NWP 48 can alternatively

4  choose to undergo individual ESA consultations rather than proceed under the 2016

5  Programmatic Consultation, but they still must address impacts to ESA-listed species and

6  critical habitat. COE 127550.

7         Again, the specific verifications that CPPSH identifies in its brief undermine its

8  argument. CPPSH Mot. 26 n.26. The PCNs for five of these farms were submitted prior to

9  completion of the 2016 Programmatic Consultation, underwent individual ESA consultation,

10  and include numerous project-specific conditions, including a 16-foot eelgrass buffer;

11  physical separation from forage fish spawning areas; and forage fish spawn survey

12  requirements. COE 126388-91; COE 126183-87; COE 126731-34; COE 126940-44; COE

13  127129-34. The sixth farm proceeded under the 2016 Programmatic Consultation and was

14  conditioned to require compliance with its provisions, including the conservation measures

15  and terms and conditions (which include a 16-foot eelgrass buffer). COE 127325-40.

16  Tellingly, given the numerous conditions on these farms, CPPSH fails to identify any alleged

17  impact resulting from these verifications that exceeds the minimal impact threshold.

18     **H. Should the Court Grant Summary Judgment in CPPSH's Favor, Remand Without Vacatur Is the Appropriate Remedy.**

19
         Taylor Shellfish incorporates by reference PCSGA's arguments in its cross-motion

20  regarding remedy. *See* PCSGA Mot. Section IV.D.

21

22

23

24  _____

[19] Protections for eelgrass under the ESA are more extensive than under the CWA; among other things, a vegetated shallow under the CWA regulations is limited to permanently inundated (i.e. subtidal) areas, whereas

25  both intertidal and subtidal eelgrass are reviewed under the ESA. 40 C.F.R. § 230.43(a); COE 127584.

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 32
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:     206-588-4255

1

### VI.    CONCLUSION

2    The Army Corps, both at the National and Division Engineer levels, carefully

3 evaluated the potential for cumulative impacts of the 2017 NWP 48 under the CWA and

4 NEPA. The scope of the Army Corps' analyses was proper, and its findings and

5 determinations are supported by concrete evidence in the record. CPPSH has failed to

6 demonstrate the Army Corps' analysis was arbitrary and capricious. Instead, its arguments

7 rely on, among other things, inaccurate claims of dramatic expansion of shellfish

8 cultivation in Puget Sound, a CIA Draft that was deemed nonsense by its own author, and

9 speculative concerns about pesticide applications that are nonexistent. Defendants and

10 Taylor Shellfish are entitled to summary judgment.

11    DATED this 6th day of August, 2018.

12

PLAUCHÉ & CARR LLP

13

14

By:  *s/Samuel W. Plauché*
15      Samuel W. Plauché, WSBA #25476
      Amanda M. Carr, WSBA #38025
16      Jesse DeNike, WSBA #39526
      Plauché & Carr LLP
17      811 First Avenue, Suite 630
      Seattle, WA 98104
18      Telephone: (206) 588-4188
      Fax: (206) 588-4255
19      Email:  billy@plauchecarr.com
20         amanda@plauchecarr.com
         jesse@plauchecarr.com
21      *Attorneys for Intervenor-Defendant Taylor*
      *Shellfish Company, Inc.*
22

23

24

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 33
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

1

2

### CERTIFICATE OF SERVICE

3

I hereby certify that on August 6, 2018, I electronically filed the foregoing

4

document with the Clerk of the Court using the CM/ECF system, which will send notice

5

of filing to all parties registered in the CM/ECF system for this matter.

6

DATED:  August 6, 2018.

7

8

*s/ Sarah Fauntleroy*
Sarah Fauntleroy, Legal Assistant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TAYLOR SHELLFISH'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION - 34
CASE NOS. 2:16-cv-00950 and 2:17-cv-01209

**PLAUCHÉ & CARR LLP**
811 First Avenue, Suite 630
Seattle, WA  98104
Phone:   206-588-4188
Fax:       206-588-4255